UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.:   1:18-cv-04901

ALLIANCE BASEBALL BBA, LLC,

　　　Plaintiff,

vs

TEN: THE ENTHUSIAST NETWORK, LLC,
TEN: THE ENTHUSIAST NETWORK
MAGAZINES, LLC, and GRIND MEDIA,
LLC,

　　　Defendants.

_____/

## **COMPLAINT**

The Plaintiff, Alliance Baseball BBA, LLC, sues Ten: The Enthusiast Network, LLC, Ten:

The Enthusiast Network Magazines, LLC, and Grind Media, LLC, and states:

## **JURISDICTION, VENUE, AND THE PARTIES**

1.　　　This is an action for damages in excess of $75,000 by Alliance Baseball BBA, LLC,

for breach of express representations and warranties, fraud in the inducement, negligent

misrepresentation, unjust enrichment, constructive trust, and accounting.

2.　　　This Court has jurisdiction pursuant to pursuant to 28 U.S.C. § 1332.

3.　　　Venue is proper in this District because the acts complained of here occurred in

substantial part in this District and because Plaintiff maintains its principal place of business in

this District.

4.　　　Plaintiff, Alliance Baseball BBA, LLC, is a Delaware Limited Liability Company

located in New York City, New York, and comprised of members including Alliance Baseball,

LLC, an owner of affiliated Minor League Baseball teams and 3 Step Sports, LLC, a digital

publisher of high school sports information and the owner and operator of baseball and other sports camps.

5.     Defendant, The Enthusiast Network, LLC, is a Delaware Limited Liability Company, located in El Segundo, California, that operates a network of publications, websites, events, branded products, an automotive VOD channel, and an action/outdoor sports media platform.

6.     Defendant, The Enthusiast Network Magazines, LLC, is a Delaware Limited Liability Company, located in El Segundo, California, that operates a catalog of magazines available for subscription.

7.     Defendant, Grind Media, LLC, is a Delaware Limited Liability Company, located in El Segundo, California, that publishes action sports magazines, web and television content.

8.     All conditions precedent to the filing of this action have occurred, have been fulfilled, waived, excused, or otherwise satisfied.

9.     The Plaintiffs have engaged Rimon, P.C. to represent them in the prosecution of this lawsuit, pursuant to the terms and conditions of a signed engagement letter, whose confidentiality under the attorney-client privilege and work-product doctrine is reserved unless expressly waived.

## **GENERAL ALLEGATIONS**

10.     Baseball America is one of the nation's oldest leading baseball publications, providing coverage of every level of the game, from the majors to high school (the "Publication"), and currently operated by Baseball America Enterprises, LLC ("BAE"), a wholly owned subsidiary of Alliance Baseball BBA, LLC ("Alliance Baseball").

2

11.     The Defendants owned and operated the Publication. In 2016, the owners of Alliance Baseball, here the Plaintiff, began discussions with Defendants for the purchase of the Publication.

12.     On February 13, 2017, the Parties executed an Asset Purchase Agreement (the "Agreement") for the purchase of the Publication and certain other related assets, attached as *Exhibit "A"*.

13.     In connection with the execution of the Agreement, the Parties included a disclosure statement as a Schedule to the Agreement ("Disclosure Schedule"), attached as *Exhibit "B"*.

14.     Pursuant to Section 2.01 of the Agreement, Alliance Baseball purchased from Defendants:

(a) all accounts receivable with respect to the Publication as set forth in Section 2.01(a) of the Disclosure Schedules ("Accounts Receivable");

(b) all inventory, work in progress, packaging and other inventories relating exclusively to the Publication ("Inventory");

(c) all Contracts set forth in Section 2.01(c) of the Disclosure Schedules and the Intellectual Property Agreements set forth in Section 4.08(a) of the Disclosure Schedules (collectively, the "Assigned Contracts");

(d) all Intellectual Property Assets;

(e) all furniture, fixtures, equipment, supplies and other tangible personal property related exclusively to the Publication listed in Section 2.01(e) of the Disclosure Schedules (the "Tangible Personal Property");

(f) all prepaid expenses, credits, advance payments, security, deposits, charges, sums and fees (including, without limitation, any prepaid revenue from advertising in connection with the Publication) set forth in Section 2.01(f) of the Disclosure Schedules;

(g) all causes of action, judgments, claims, including insurance claims, demands, and other rights of every kind or nature of Defendants' under warranties, indemnities, and all similar rights against third parties to the extent related to the Publication or any Purchased Assets;

(h) copies of (or copies of the applicable portions of) all books and records, including books of account, ledgers and general, financial and accounting records, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that exclusively relate to the Publication or the Purchased Assets, other than books and records set forth in Section 2.02(h) ("Books and Records"); and

(i) all goodwill associated with the Publication and any of the Purchased Assets described in the foregoing clauses.

15.    Exhibit "A" to the Agreement consists of an Escrow Agreement under which Alliance Baseball agreed to deposit a portion of the agreed to purchase price with the Escrow Agent, totaling sixty-seven thousand five hundred dollars ($67,500), in accordance with Sections

2.1 (b)(i) and 2.06 (a) of the Agreement. The terms were for the period of one year, unless a dispute arose, and Alliance Baseball delivered written notice of this dispute to the Defendants asking for indemnification pursuant to section 7.05 of the Agreement.

16.    Exhibit "C" to the Agreement consists of the Assignment and Assumption and Bill of Sale. Under Section 2 of this exhibit, the Parties agreed to transfer the Purchased Assets, and under Section 4 of this exhibit, Alliance Baseball assumed the obligations of the contracts of the Publication.

17.    Under Section 5.08 of the Agreement, Alliance Baseball acknowledged and agreed that: "(a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, [Alliance Baseball] has relied solely upon its own investigation and the express representations and warranties of [Defendants] set forth in Article IV of this Agreement (including related portions of the Disclosure Schedules); and (b) neither [Defendants] nor any other Person has made any representation or warranty as to [Defendants], the Publication, the Purchased Assets or this Agreement, except as expressly set forth in Article IV of this Agreement (including the related portions of the Disclosure Schedules)."

18.    Alliance Baseball signed the Agreement in express reliance on several affirmative misrepresentations and fraudulent omissions of Defendants through their principals, officers/managers and employees.

19.    As set forth in detail below, Defendants (a) violated express representations and warranties contained within the Agreement; and/or (b) communicated affirmative misrepresentations of fact to Alliance Baseball through knowingly false and misleading written and oral statements; and (c) engaged in a calculated effort to conceal known facts by providing materially false, misleading, and incomplete information to Alliance Baseball.

20.     As alleged further below, these wrongful written and oral misrepresentations and omissions of material fact by Defendants led to the misrepresentation of the financial condition of the Publication and the failure to disclose material contracts to Alliance Baseball. These misrepresentations include:

(a) It is Plaintiff information and belief that Defendants misrepresented total paid subscribers and subscription and newsstand revenue by approximately $489,700;

(b) It is Plaintiff information and belief that Defendants misrepresented the total costs of goods printed. Although BAE printed less books and about the same number of magazines as Defendants for the same period, total cost of print goods sold reported by Defendants was $719,000 and cost of print goods sold by BAE for the same period was $1,091,300, resulting in an understatement by Defendants of cost of print goods sold of $372,300.

21.     As a result of the overstatement of revenue by Defendants of $489,700 and an understatement of costs of print goods sold by Defendants equal to $372,300, Defendants misrepresented the financial performance of the Publication and damaged Alliance Baseball in the amount of $862,000.

22.     In addition, as required under Section 4.06 of the Agreement, it is plaintiff's information and belief that Defendants failed to disclose the existence of several material contracts that obligate Alliance Baseball and BAE (the "Material Contracts"). These Material Contracts include contracts with Palm Coast Data ($36,000 per year), Wolfe ISP ($48,000 per year), Major League Baseball Winter Meetings sponsorship agreement ($30,000 plus activation costs), Allen Simpson book contract and various digital platform

contracts with Barnes and Noble, Magster, and Google. The failure to disclose these Material Contracts obligated Alliance Baseball and BAE to additional costs well in excess of $100,000, that it had not anticipated and budgeted for, in purchasing the Publication and related assets from Defendants.

23. In addition to, and as wrongful acts of Defendants, independent of the fraud alleged in this Complaint, Defendants have breached contractual covenants under the Agreement, as set forth below:

Section 4.06 Material Contracts.

(a)     Section 4.06(a) of the Disclosure Schedules lists each of the following Contracts by which the Publication or any of the Purchased Assets are bound or affected (together with all Intellectual Property Agreements listed in Section 4.08(a) of the Disclosure Schedules, collectively, the "Material Contracts"):

(i)     all Contracts involving aggregate consideration in excess of $100,000 or requiring performance by any party more than one year from the date hereof, which, in each case, cannot be cancelled without penalty or without more than 180 days' notice;

(ii)     all Contracts that relate to the sale of any of the Purchased Assets, other than in the ordinary course of business, for consideration in excess of $100,000;

(iii)    except for agreements relating to trade receivables, all Contracts relating to indebtedness (including, without limitation, guarantees), in each case having an outstanding principal amount in excess of $100,000; and

(iv)    all Contracts between or among the [Defendants] on the one hand and any Affiliate of [Defendants] on the other hand.

(b)    Except as set forth on Section 4.06(b) of the Disclosure Schedules, [Defendants] (i) is not in breach of, or default under any Material Contract and (ii) has not received any notice or other communication (whether written or oral) or claim of any breach or default from the counterparty to any Material Contract.  Each Material Contract is in full force and effect and is valid, binding and enforceable against [Defendants] and, to the [Defendants'] knowledge, the counterparty to such Material Contract, in accordance with its terms.

Section 4.17 Financial Statements.

[Defendants] has made available to [Alliance Baseball] a true and complete copies of the financial statements set forth on Section 4.17 of the Disclosure Schedules (collectively, the "Financial Statements").  Except as set forth in Section

4.17 to the Disclosure Statements or as disclosed in the Financial Statements, the Financial Statements have been prepared based on the books and records of the Publication in accordance with GAAP and present fairly, in all material respects, the financial condition and results of operations of the Publication as of the dates or periods indicated.  The books of account and related records of [Defendants] with respect to the Publication are true, correct and complete in all material respects.  In the past three years, [Defendants] has not changed its accounting policies including its practices in connection with the treatment of revenue recognition, capitalization policies, reserves and expenses except as required under applicable law or in accordance with GAAP.

24.     Pursuant to Section 7.02, Indemnification by [Defendants], "the [Defendants] agreed to indemnify [Alliance Baseball] against, and shall hold [Alliance Baseball] harmless from and against, any and all losses incurred or sustained by, or imposed upon, [Alliance Baseball] based upon, arising out of, with respect to or by reason of:

> (a)  fraud in connection with any representation, warranty or covenant contained in this Agreement or (ii) any inaccuracy in or breach of any of the representations or warranties of [Defendants] contained in Section 4.01 (Organization and Qualification of [Defendants]), Section 4.02 (Authority of

[Defendants]), Section 4.04 (Title to Purchased Assets), Section 4.13 (Taxes) and Section 4.15 (Brokers);

(b)   any inaccuracy in or breach of any of the other representations or warranties of [Defendants] contained in this Agreement;

(c)   any breach or non-fulfillment of any covenant, agreement or obligation to be performed by [Defendants] pursuant to this Agreement."

25.     On February 5, 2018 and then again on March 8, 2018, pursuant to Section 7.05(c) of the Agreement, Alliance Baseball notified Defendants of a Direct Claim for misrepresentations by Defendants (the "Indemnification Claims") contained in Section 4.06 and Section 4.17 of the Agreement, asking for indemnification pursuant to section 7.05 of the Agreement (the "Indemnification Notice"). March 8, 2018 letter is attached as *Exhibit C*.

26.     On April 4, 2018, Defendants responded to the Indemnification Notice objecting to all of the Indemnification Claims made by Alliance Baseball in the prior notifications, attached as *Exhibit D*. The Defendants also requested for the escrow amount to be frozen until all disputes have been resolved.

**COUNT I – BREACHES OF EXPRESS REPRESENTATIONS AND WARRANTIES WITHIN ASSET PURCHASE AGREEMENT**
**(By Defendants Against Alliance Baseball)**

27.     Alliance Baseball BBA, LLC, re-alleges the allegations contained in paragraphs 1 through 26 of this Complaint.

28.     On February 17, 2017, the Parties signed the Agreement whereby the Alliance Baseball agreed to buy the Publication and certain other assets related to the Publication.

29.     As part of the due diligence for this purchase, it is Plaintiff's information and belief that Defendants provided Alliance Baseball with certain documents that

misrepresented the financial condition of the Publication and failed to disclose material contracts.

30.    Defendants breached express representations and warranties within Article IV of the Agreement, including (a) Section 4.06 Material Contracts and (b) Section 4.17 Financial Statements.

31.    As a direct and proximate cause of Defendants' breaches of the express representations and warranties of the Agreement, Alliance Baseball has been damaged in excess of $987,000.

WHEREFORE, Plaintiff, Alliance Baseball BBA, LLC., demands judgment on this Count in their favor and against Defendants, Ten: The Enthusiast Network, LLC, Ten: The enthusiast Network Magazines, LLC, and Grind Media, LLC., for compensatory damages together with pre-judgment interest and post-judgment interest, punitive damages, costs including an award of attorneys' fees under Section 7.02 of the Asset Purchase Agreement, and such other relief deemed just and proper.

### COUNT II – INTENTIONAL FRAUD IN THE INDUCEMENT OF THE TRANSACTION
### (By Defendants against Alliance Baseball)

32.    Alliance Baseball BBA, LLC, re-alleges the allegations contained in paragraphs 1 through 26 of this Complaint.

33.    Prior to Closing, Defendants made intentional misrepresentations of then presently-known facts and concealed and/or intentionally omitted then presently-known facts when under a duty under law or equity to disclose, including but not limited to the following:

(a) It is Plaintiff's information and belief that prior to Closing, Defendants made materially false, misleading, and incomplete disclosures during the "due

diligence" process regarding the true number of paid subscribers and subscription and newsstand revenue by approximately $489,700;

(b) It is Plaintiff's information and belief that prior to Closing, Defendants made materially false, misleading, and incomplete disclosures during the "due diligence" process regarding the circulation, printing and other expenses. Although BAE printed less books and about the same number of magazines as Defendants for the same period, total cost of print goods sold reported by Defendants was $719,000 and cost of print goods sold by BAE for the same period was $1,091,300 resulting in an understatement by Defendants of cost of print goods sold of $372,300;

(c) It is the Plaintiff's information and belief that prior to Closing, Defendants made materially false, misleading, and incomplete disclosures during the "due diligence" process regarding Material Contracts held by TEN. Defendants failed to disclose the existence several Material Contracts that would obligate Alliance Baseball and BAE, as required under Section 4.06 of the Agreement. (the "Material Contracts").  These Material Contracts include contracts with Palm Coast Data ($36,000 per year), Wolfe ISP ($48,000 per year), Major League Baseball Winter Meetings sponsorship agreement ($30,000 plus activation costs), Allen Simpson book contract and various digital platform contracts with Barnes and Noble, Magster and Google. The failure to disclose these Material Contracts obligated Alliance Baseball and BAE to additional costs well in excess of $100,000 that it had

12

not anticipated and budgeted for in purchasing the Publication and related assets from Defendants.

34.     Defendants knew or should have known that their material misrepresentations and omissions to be false when made.

35.     Alliance Baseball reasonably relied upon Defendants' fraudulent material misrepresentations and omissions to their detriment.

36.     As a consequence of the foregoing, Alliance Baseball has suffered damages in terms of diminution in value of the Purchased Assets.  Additionally, Alliance Baseball has suffered damages in the form of actual costs, and opportunity costs/loss of use of assets.

37.     Alliance Baseball is entitled to entry of an Order reforming the Purchase Price under the Asset Purchase Agreement, including but not limited to reforming the Purchase Price to reduce the amount that was paid by Alliance Baseball for the Purchased Assets by an amount determined at trial to be the true value of the Purchased Assets

38. Alliance Baseball is entitled to an award of compensatory damages and punitive damages, which sums should be in the form of a cash award.

39. Pursuant to Section 7.02 ("Indemnification Obligations of Defendants"), Alliance Baseball is entitled to an award of reasonable attorneys' fees arising out of or relating to Defendants' intentional misrepresentations and breaches of representations and warranties.

WHEREFORE, Plaintiff, Alliance Baseball BBA, LLC., demands judgment on this Count in their favor and against Defendants, Ten: The Enthusiast Network, LLC, Ten: The enthusiast Network Magazines, LLC, and Grind Media, LLC., for compensatory damages together with pre-judgment interest and post-judgment interest, punitive damages, costs including an award of

attorneys' fees under Section 7.02 of the Asset Purchase Agreement, and such other relief deemed just and proper.

## COUNT III – NEGLIGENT MISREPRESENTATION
### (By Defendants Against Alliance Baseball)

40.  Alliance Baseball BBA, LLC, re-alleges the allegations contained in paragraphs 1 through 26 of this Complaint.

41.  Defendants owed a duty of care to Alliance Baseball to make truthful, accurate, and complete representations regarding the acquired assets and debts, liabilities, and risks related thereto.

42.  Defendants' false, inaccurate, and misleading statements and omissions of fact include, but are not limited to the following:

(a) It is Plaintiff's information and belief that prior to Closing, Defendants made materially false, misleading, and incomplete disclosures during the "due diligence" process regarding the numbers of total subscribers and subscription and newsstand revenue by approximately $489,700;

(b) It is Plaintiff's information and belief that prior to Closing, Defendants made materially false, misleading, and incomplete disclosures during the "due diligence" process regarding the circulation, printing and other expenses.  Although BAE printed less books and about the same number of magazines as Defendants for the same period, total cost of print goods sold reported by Defendants was $719,000 and cost of print goods sold by BAE for the same period was $1,091,300 resulting in an understatement by Defendants of cost of print goods sold of $372,300;

14

(c) It is Plaintiff's information and belief that prior to Closing, Defendants made materially false, misleading, and incomplete disclosures during the "due diligence" process regarding material contracts held by BAE. Defendants failed to disclose the existence several material contracts that would obligate Alliance Baseball and BAE, as required under Section 4.06 of the Agreement. (the "Material Contracts"). These Material Contracts include contracts with Palm Coast Data ($36,000 per year), Wolfe ISP ($48,000 per year), Major League Baseball Winter Meetings sponsorship agreement ($30,000 plus activation costs), Allen Simpson book contract and various digital platform contracts with Barnes and Noble, Magster and Google. The failure to disclose these Material Contracts obligated Alliance Baseball and BAE to additional costs well in excess of $100,000 that it had not anticipated and budgeted for in purchasing the Publication and related assets from Defendants.

43. Defendants' affirmative misrepresentations and omissions were unreasonable under the facts and circumstances and grossly negligent in that they fell below an applicable duty of care.

44. Defendants' representations were materially false, incomplete, and misleading, and made with intent or grossly negligent disregard as to whether they would induce reliance on the part of Plaintiffs.

45. Defendants reasonably should have known that its representations were materially false, misleading, and incomplete.

46. Alliance Baseball justifiably relied to their detriment upon Defendants' material misrepresentations and omissions.

47.   As a consequence of the foregoing, Alliance Baseball has suffered damages in terms of diminution in value of the Purchased Assets. Additionally, Alliance Baseball has suffered damages in the form of actual costs, and opportunity costs/loss of use of assets.

48.   Alliance Baseball is entitled to entry of an Order reforming the Purchase Price under the Asset Purchase Agreement, including but not limited to reforming the Purchase Price to reduce the amount that was paid by Alliance Baseball for the Purchased Assets by an amount determined at trial to be the true value of the Purchased Assets.

49.   Alliance Baseball is entitled to an award of compensatory damages and punitive damages, which sums should be in the form of a cash award.

WHEREFORE, Plaintiff, Alliance Baseball BBA, LLC., demands judgment on this Count in their favor and against Defendants Ten: The Enthusiast Network, LLC, Ten: The enthusiast Network Magazines, LLC, and Grind Media, LLC., for compensatory damages together with pre-judgment interest and post-judgment interest, punitive damages, costs including an award of attorneys' fees under Section 7.02 of the Asset Purchase Agreement, and such other relief deemed just and proper.

### COUNT IV – UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST; ACCOUNTING
### (By Defendants Against Alliance Baseball)

50.   Alliance Baseball BBA, LLC, re-alleges the allegations contained in paragraphs 1 through 26 of this Complaint.

51.   Defendants have been unjustly enriched as a result of Defendants' receipt of monies under the Asset Purchase Agreement which represent payment of sums in excess of the true value of the Purchased Assets.

52. Alliance Baseball is entitled to the imposition of a constructive trust with respect to all categories of unjust enrichment enjoyed by Defendants.

53. Alliance Baseball is entitled to an accounting by Defendants, or by a Court-appointed forensic/financial accountant engaged to provide an accounting as to Defendants' unjust enrichment, with all costs associated with such accounting borne by Defendants.

WHEREFORE, Plaintiff, Alliance Baseball BBA, LLC, demands judgment on this Count in their favor and against Defendants, Ten: the enthusiast Network, LLC, Ten: The enthusiast Network Magazines, LLC, and Grind Media, LLC., for compensatory damages in the form of a constructive trust, together with pre-judgment interest and post-judgment interest, costs including an award of attorneys' fees under Section 7.02 of the Asset Purchase Agreement, and such other relief deemed just and proper.

Dated: June 1, 2018                          Respectfully submitted,

                                             /s/ *Brian T. Hafter*
                                             Brain T. Hafter
                                             Email Address:  brian.hafter@rimonlaw.com
                                             **Rimon Law, P.C.**
                                             One Embarcadero Center, Suite 400
                                             San Francisco, CA 94111
                                             Telephone: (415) 683-4572
                                             **Admission *Pro Hac Vice* Pending

                                             -and-

                                             Carlos F. Gonzalez
                                             Email Address: carlos.gonzalez@rimonlaw.com
                                             Rimon, PC
                                             1 Alhambra Plaza
                                             Suite 1130
                                             Coral Gables, Florida 33132
                                             T/F: (786) 870-4307
                                             **Admission *Pro Hac Vice* Pending

                                             *Attorneys for Plaintiff, Alliance Baseball BBA, LLC*

# EXHIBIT A

**EXECUTION COPY**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**TEN: THE ENTHUSIAST NETWORK, LLC,**

**TEN: THE ENTHUSIAST NETWORK MAGAZINES, LLC,**

**and**

**GRIND MEDIA, LLC**

**collectively, as Seller,**

**AND**

**ALLIANCE BASEBALL BBA, LLC,**

**as Buyer,**

Dated as of February 13, 2017

## Table of Contents

Page

ARTICLE I DEFINITIONS ............................................................................... 1

ARTICLE II PURCHASE AND SALE ............................................................. 7

    Section 2.01    Purchase and Sale of Assets ................................................. 7

    Section 2.02    Excluded Assets ..................................................................... 8

    Section 2.03    Assumed Liabilities .............................................................. 9

    Section 2.04    Excluded Liabilities ............................................................ 10

    Section 2.05    Non-assignable Assets. ...................................................... 10

    Section 2.06    Purchase Price .................................................................... 11

    Section 2.07    Working Capital Adjustment. ............................................. 11

    Section 2.08    Allocation of Purchase Price .............................................. 13

ARTICLE III CLOSING ................................................................................. 13

    Section 3.01    Closing ................................................................................ 13

    Section 3.02    Closing Deliverables ........................................................... 14

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ............................... 14

    Section 4.01    Organization and Qualification of Seller ........................... 15

    Section 4.02    Authority of Seller ............................................................. 15

    Section 4.03    No Conflicts; Consents ....................................................... 15

    Section 4.04    Title to Purchased Assets ................................................... 16

    Section 4.05    Absence of Certain Changes, Events and Conditions .................. 16

    Section 4.06    Material Contracts. ............................................................. 17

    Section 4.07    Title to Tangible Personal Property .................................... 17

    Section 4.08    Intellectual Property. .......................................................... 17

    Section 4.09    Legal Proceedings; Governmental Orders. ........................ 18

    Section 4.10    Compliance With Laws; Permits. ....................................... 18

    Section 4.11    Employee Benefit Matters. ................................................. 19

    Section 4.12    Employment Matters. ......................................................... 20

    Section 4.13    Taxes ................................................................................... 21

    Section 4.14    Real Property. ..................................................................... 21

    Section 4.15    Brokers ............................................................................... 22

    Section 4.16    Interest in Publication ......................................................... 22

Section 4.17    Financial Statements ................................................................................ 22

Section 4.18    Solvency ................................................................................................... 22

Section 4.19    Insurance .................................................................................................. 22

Section 4.20    No Other Representations and Warranties .................................................. 23

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER .................................. 23

Section 5.01    Organization of Buyer ............................................................................... 23

Section 5.02    Authority of Buyer .................................................................................... 23

Section 5.03    No Conflicts; Consents .............................................................................. 23

Section 5.04    Brokers ..................................................................................................... 24

Section 5.05    Sufficiency of Funds ................................................................................. 24

Section 5.06    Solvency ................................................................................................... 24

Section 5.07    Legal Proceedings ..................................................................................... 24

Section 5.08    Independent Investigation .......................................................................... 24

ARTICLE VI COVENANTS ................................................................................................. 25

Section 6.01    Employees and Employee Benefits ............................................................. 25

Section 6.02    Confidentiality .......................................................................................... 25

Section 6.03    Consents .................................................................................................... 26

Section 6.04    Books and Records. ................................................................................... 26

Section 6.05    Public Announcements ............................................................................... 26

Section 6.06    Bulk Sales Laws ........................................................................................ 26

Section 6.07    Taxes ........................................................................................................ 27

Section 6.08    Accounts Receivable ................................................................................. 27

Section 6.09    Further Assurances .................................................................................... 27

ARTICLE VII INDEMNIFICATION ..................................................................................... 27

Section 7.01    Survival ..................................................................................................... 27

Section 7.02    Indemnification By Seller .......................................................................... 27

Section 7.03    Indemnification By Buyer .......................................................................... 28

Section 7.04    Certain Limitations .................................................................................... 28

Section 7.05    Indemnification Procedures. ...................................................................... 30

Section 7.06    Tax Treatment of Indemnification Payments ............................................... 31

Section 7.07    Exclusive Remedies ................................................................................... 31

ARTICLE VIII MISCELLANEOUS ...................................................................................... 32

Section 8.01   Expenses ................................................................................................................ 32

Section 8.02   Notices .................................................................................................................... 32

Section 8.03   Interpretation ......................................................................................................... 33

Section 8.04   Headings ................................................................................................................. 33

Section 8.05   Severability ............................................................................................................ 33

Section 8.06   Entire Agreement ................................................................................................... 33

Section 8.07   Successors and Assigns ......................................................................................... 34

Section 8.08   No Third Party Beneficiaries ................................................................................. 34

Section 8.09   Amendment and Modification; Waiver .................................................................. 34

Section 8.10   Governing Law; Submission to Exclusive Jurisdiction; Waiver of Jury Trial.34

Section 8.11   Specific Performance .............................................................................................. 35

Section 8.12   Counterparts ........................................................................................................... 35

Section 8.13   Non-recourse .......................................................................................................... 35

EXHIBITS

Exhibit A: Escrow Agreement

Exhibit B: Form of Preliminary Working Capital Report

Exhibit C: Assignment and Assumption and Bill of Sale Agreement

Exhibit D: Transition Services Agreement

SCHEDULES

Schedule I: Publication

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of February 13, 2017, is entered into by and among TEN: The Enthusiast Network, LLC, a Delaware limited liability company ("**TEN**"), TEN: The Enthusiast Network Magazines, LLC, a Delaware limited liability company ("**TEN Magazines**") and  Grind Media, LLC, a Delaware limited liability company ("**Grind**," and collectively with TEN and TEN Magazines, jointly and severally, ("**Seller**"), and Alliance Baseball BBA, LLC, a Delaware limited liability company ("**Buyer**").

## RECITALS

WHEREAS, Seller is engaged, among other things, in the business of creating and publishing branded, original print and online publications and other digital content, in the automotive, sports and entertainment fields;

WHEREAS, Seller is desirous of selling, and Buyer is willing to purchase, the branded publication(s) known as Baseball America, in all media, described in Schedule I annexed hereto (collectively, the "**Publication**"); and

WHEREAS, subject to the terms and conditions set forth in this Agreement, Seller wishes to sell, assign and transfer to Buyer, and Buyer wishes to purchase from Seller, the Publication and the Purchased Assets, and Buyer is willing to assume from Seller the Assumed Liabilities, all as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"**Accounts Receivable**" has the meaning set forth in Section 2.01(a).

"**Actual Working Capital**" has the meaning set forth in Section 2.07(c).

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation** Schedule" has the meaning set forth in Section 2.08.

1

"**Assigned Contracts**" has the meaning set forth in <u>Section 2.01(c)</u>.

"**Assignment and Assumption and Bill of Sale Agreement**" has the meaning set forth in <u>Section 3.02(a)(ii)</u>.

"**Assumed Liabilities**" has the meaning set forth in <u>Section 2.03</u>.

"**Base Purchase Price**" means $1,350,000.

"**Benefit Plan**" has the meaning set forth in <u>Section 4.12(a)</u>.

"**Books and Records**" has the meaning set forth in <u>Section 2.01(i)</u>.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Closing**" has the meaning set forth in <u>Section 3.01</u>.

"**Closing Date**" has the meaning set forth in <u>Section 3.01</u>.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" means the Confidentiality Agreement, dated as of May 31, 2016, by and between Buyer, or the applicable Affiliate thereof, and Seller.

"**Contracts**" means all legally binding written contracts, leases, mortgages, licenses, instruments, notes, commitments, undertakings, indentures and other agreements.

"**Data Room**" means the electronic documentation site established by SmartRoom on behalf of Seller containing the documents set forth in the index included in Section 1.01(a) of the Disclosure Schedules.

"**Direct Claim**" has the meaning set forth in <u>Section 7.05(c)</u>.

"**Direct Claim Notice**" has the meaning set forth in <u>Section 7.05(c)</u>.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"**Dispute Accounting Firm**" means RSM US, LLP or, if RSM US, LLP is unable to serve, another impartial nationally recognized firm of independent certified public accountants mutually appointed by Buyer and Seller.

"**Dollars or $**" means the lawful currency of the United States.

"**Employees**" has the meaning set forth in <u>Section 4.12(a)</u>.

4814-6433-2857.12

"**Encumbrance**" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**Estimated Working Capital**" has the meaning set forth in Section 2.07(a).

"**Escrow Agent**" has the meaning set forth in Section 2.06(a).

"**Escrow Agreement**" has the meaning set forth in Section 2.06(a).

"**Escrow Amount**" has the meaning set forth in Section 2.06(a).

"**Excluded Assets**" has the meaning set forth in Section 2.02.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04.

"**Final Purchase Price**" has the meaning set forth in Section 2.07(e).

"**Form of Preliminary Working Capital Report**" has the meaning set forth in Section 2.07(a).

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Global Settlement Offer**" has the meaning set forth in Section 7.05(b).

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Grind**" has the meaning set forth in the preamble.

"**Indemnified Party**" has the meaning set forth in Section 7.04.

"**Indemnifying Party**" has the meaning set forth in Section 7.04.

"**Intellectual Property**" means (a) worldwide trademarks, service marks, trade names, trade dress, designs, logos, slogans and general intangibles of like nature, together with all goodwill related to the foregoing (whether registered or not, but including any registrations and applications for any of the foregoing); (b) patents (including the ideas, inventions and discoveries described therein, any pending applications, any registrations, patents or patent applications based

4814-6433-2857.12

on applications that are continuations, continuations-in-part, divisional, reexamination, reissues, renewals of any of the foregoing and applications and patents granted on applications that claim the benefit of priority to any of the foregoing); (c) editorial materials, works of authorship or copyrights (including any registrations, applications and renewals for any of the foregoing) and other rights of authorship; (d) trade secrets and other confidential or proprietary information, know-how, confidential or proprietary technology, databases, processes, work flows, formulae, algorithms, models, user interfaces, customer, supplier, vendor, distributor and user lists, databases, pricing and marketing information, inventions, marketing materials, inventions and discoveries (whether patentable or not);  (e) computer programs and other software, macros, scripts, source code, object code, binary code, methodologies, processes, work flows, architecture, structure, display screens, layouts, development tools, instructions and templates; (f) published and unpublished works of authorship, including audiovisual works, databases and literary works; (g) rights in, or associated with a person's name, voice, signature, photograph or likeness, including rights of personality, privacy and publicity; (h) rights of attribution and integrity and other moral rights; (i) Uniform Resource Locators (URLs) and Internet domain names and applications therefor (and all interest therein), IP addresses, adwords, key word associations and related rights; and (j)(i) all other proprietary intellectual property and other rights relating to any or all of the foregoing, (ii) all copies and tangible embodiments of any or all of the foregoing (in whatever form or medium, including electronic media) and (iii) rights to sue for and any and all remedies for past, present and future infringements of any or all of the foregoing and rights of priority and protection of interests therein under the Laws of any jurisdiction.

"**Intellectual Property Agreements**" means all licenses, sublicenses and other agreements by or through which other Persons grant Seller or Seller grants any other Persons any exclusive or non-exclusive rights or interests in or to any Intellectual Property that is used exclusively in connection with the Publication.

"**Intellectual Property Assets**" means all Intellectual Property that is owned by Seller and used exclusively in connection with the Publication, including the Intellectual Property Registrations set forth on Section 4.08(a) of the Disclosure Schedules.

"**Intellectual Property Registrations**" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names, and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"**Inventory**" has the meaning set forth in Section 2.01(b).

"**Knowledge of Seller or Seller's Knowledge**" or any other similar knowledge qualification, means the actual knowledge of those persons listed on Section 1.01(b) of the Disclosure Schedules.

"**Law**" means any federal, state, foreign, local statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Leased Real Property**" has the meaning set forth in Section 4.14(b).

"**Leases**" has the meaning set forth in Section 4.14(b).

"**Losses**" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is materially adverse to (a) the business, results of operations, financial condition or assets of the Publication and the Purchased Assets, taken as a whole, or (b) the ability of Seller to consummate the transactions contemplated hereby; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Seller operates; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (vi) any matter of which Buyer is aware on the date hereof; (vii) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (viii) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with the Seller, provided that Seller shall have informed Buyer of any such losses or threatened losses of which it had actual knowledge; (ix) any natural or man-made disaster or acts of God; or (x) any failure by the Publication to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded).

"**Material Contracts**" has the meaning set forth in Section 4.06(a).

"**Objection Notice**" has the meaning set forth in Section 2.07(d).

"**Objection Period**" has the meaning set forth in Section 2.07(d).

"**Permits**" means all permits, licenses, franchises, approvals, authorizations and consents required to be obtained from Governmental Authorities.

"**Permitted Encumbrances**" means (a) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures; (b) mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business; (c) easements, rights of way, zoning ordinances and other similar encumbrances affecting real property; (d) liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business; and (e) other imperfections of title or Encumbrances, if any, that have not had, and would not have, a Material Adverse Effect.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Publication**" has the meaning set forth in the Recitals.

"**Purchased Assets**" has the meaning set forth in Section 2.01.

"**Qualified Benefit Plan**" has the meaning set forth in Section 4.12(b).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Seller**" has the meaning set forth in the preamble.

"**Settlement Notice**" has the meaning set forth in Section 7.05(b).

"**Subscriber Liabilities**" means any and all liabilities, of any nature whatsoever, that Seller (or any Affiliate of Seller) may have to any subscribers of the Publication in all medium and formats.

"**Tangible Personal Property**" has the meaning set forth in Section 2.01(e).

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**TEN**" has the meaning set forth in the preamble.

"**TEN Magazines**" has the meaning set forth in the preamble.

"**Third Party Claim**" has the meaning set forth in Section 7.05(a).

"**Third Party Claim Notice**" has the meaning set forth in Section 7.05(a).

"**Transaction Documents**" means this Agreement, the Confidentiality Agreement, the Escrow Agreement, the Form of Preliminary Working Capital Report, the Assignment and Assumption and Bill of Sale Agreement, the Transition Services Agreement and the other agreements, instruments and documents required to be delivered at the Closing.

"**Transferred Employee**" has the meaning set forth in Section 6.01(a).

"**Transition Services Agreement**" has the meaning set forth in Section 3.02(a)(iii).

"**Working Capital**" means the excess of those current assets pertaining to Publication in excess of those current assets of the Publication set forth on **Exhibit B** attached hereto.

"**Working Capital Cushion**" has the meaning set forth in <u>Section 2.07(b)</u>.

"**Working Capital Report**" has the meaning set forth in <u>Section 2.07(c)</u>.

"**Working Capital Shortfall**" has the meaning set forth in <u>Section 2.07(b)</u>.

"**Working Capital Surplus**" has the meaning set forth in <u>Section 2.07(b)</u>.

"**Working Capital Target**" means $0.

<h1 style="text-align:center">ARTICLE II<br>PURCHASE AND SALE</h1>

Section 2.01   **Purchase and Sale of Assets**. Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances other than Permitted Encumbrances, all of Seller's right, title and interest in and, to (i) the Publication, and (ii) the following assets, properties and rights of Seller (collectively, the "**Purchased Assets**"):

(a)   all accounts receivable with respect to the Publication as set forth on Section 2.01(a) of the Disclosure Schedules ("**Accounts Receivable**");

(b)   all inventory, work in progress, packaging and other inventories relating exclusively to the Publication ("**Inventory**");

(c)   all Contracts set forth on Section 2.01(c) of the Disclosure Schedules and the Intellectual Property Agreements set forth on Section 4.08(a) of the Disclosure Schedules (collectively, the "**Assigned Contracts**");

(d)   all Intellectual Property Assets;

(e)   all furniture, fixtures, equipment, supplies and other tangible personal property related exclusively to the Publication listed on Section 2.01(e) of the Disclosure Schedules (the "**Tangible Personal Property**");

(f)   all prepaid expenses, credits, advance payments, security, deposits, charges, sums and fees (including, without limitation, any prepaid revenue from advertising in connection with the Publication) set forth on Section 2.01(f) of the Disclosure Schedules;

(g)   all causes of action, judgments, claims, including insurance claims, demands and other rights of every kind or nature of Seller's under warranties, indemnities and all similar rights against third parties to the extent related to the Publication or any Purchased Assets;

(h)   copies of (or copies of the applicable portions of) all books and records, including books of account, ledgers and general, financial and accounting records, customer lists,

7

customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that exclusively relate to the Publication or the Purchased Assets, other than books and records set forth in <u>Section 2.02(h)</u> ("**Books and Records**"); and

(i)     all goodwill associated with the Publication and any of the Purchased Assets described in the foregoing clauses; and

Section 2.02   **Excluded Assets**. Other than the Publication and the Purchased Assets subject to <u>Section 2.01</u>, Buyer expressly understands and agrees that it is not purchasing or acquiring, and Seller is not selling, assigning, transferring or otherwise disposing of any right, title or interest in, to or under any other assets, properties, rights, interests and goodwill of any kind or nature whatsoever, whether tangible or intangible, wherever located, of Seller that do not constitute the Publication or are not included in the Purchased Assets (the "**Excluded Assets**"), including but not limited to the following:

(a)     other than the Leased Real Property, all real property, buildings, structures and improvements thereon used in connection with Seller's operation of the Publication or otherwise, whether owned or leased by Seller or any of its Affiliates, all fixtures and fittings attached thereto, but not including any of the Tangible Personal Property, and all security deposits with respect to any leased properties;

(b)     subject to <u>Section 6.08(a)</u> and <u>(b)</u>, all (i) cash and cash equivalents of Seller or its Affiliates, including checks, money orders, marketable securities and short-term instruments, (ii) funds in time and demand deposits or similar accounts and (iii) any evidence of indebtedness issued or guaranteed by any Governmental Authority;

(c)     all bank and brokerage accounts of Seller or its Affiliates;

(d)     all right, title and interest in, to and under all Contracts to which Seller or any of its Affiliates is a party or by which Seller, any of its Affiliates or any of their respective assets or properties is otherwise subject to or bound other than the Assigned Contracts;

(e)     all right, title and interest in and to all Intellectual Property of Seller other than the Intellectual Property Assets;

(f)     (i) the corporate seals, organizational documents, minute books, Tax Returns or other records having to do with the corporate organization of Seller or any of its Affiliates, all employee-related or employee benefit-related files or records of Seller or any of its Affiliates, other than personnel files of Transferred Employees, (ii) all books of account, ledgers and general, financial and accounting records,  customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that do not exclusively relate to the Publication or the Purchased Assets and, (iii) any other books and

records which Seller is prohibited from disclosing or transferring to Buyer under applicable Law or pursuant to any third party agreements or is required by applicable Law to retain;

(g)      all employee benefit plans of Seller and all assets relating thereto;

(h)      all Tax losses and Tax loss carry forwards and rights to receive refunds, credits and credit carry forwards with respect to any and all Taxes, to the extent attributable to a taxable period (or portion thereof) ending prior to the date hereof, including interest thereon, whether or not the foregoing is derived from the Publication or the Purchased Assets, and any deposit or similar advance payment or refund or credit with respect to Taxes;

(i)      all assets, properties and rights used by Seller and any of its Affiliates in any of their respective businesses other than those exclusively pertaining to the Publication or any Purchased Assets; and

(j)      the rights which accrue or will accrue to Seller under the Transaction Documents.

Section 2.03   **Assumed Liabilities**. Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge when due any and all liabilities and obligations of Seller arising out of or relating to the Publication or the Purchased Assets first arising on or after the Closing, other than the Excluded Liabilities (collectively, the "**Assumed Liabilities**"), including, without limitation, the following:

(i)      all Subscriber Liabilities as of the Closing Date as set forth on Section 2.03(i) of the Disclosure Schedules;

(ii)      all trade accounts payable of Seller to third parties in connection with the Publication related directly to services or products that are to be used by Buyer after the Closing;

(iii)      all liabilities and obligations arising under or relating to the Assigned Contracts that are to be performed after the Closing, including without limitation the Leases;

(iv)      all liabilities and obligations of Buyer or its Affiliates relating to employee benefits, compensation or other arrangements with respect to any Transferred Employee arising after the Closing;

(v)      all liabilities and obligations for (i) Taxes relating to the Publication, the Purchased Assets or the Assumed Liabilities for any taxable period commencing after the date hereof and (ii) Taxes for which Buyer is liable pursuant to Section 6.07;

(vi)      all other liabilities and obligations arising out of or relating to Buyer's ownership or operation of the Publication and the Purchased Assets after the Closing; and

(vii)      all liabilities and obligations of Seller set forth on Section 2.03(vii) of the Disclosure Schedules.

Section 2.04   **Excluded Liabilities**. Buyer shall not assume and shall not be responsible to pay, perform or discharge any of the following liabilities or obligations of Seller (collectively, the "**Excluded Liabilities**"):

(i)        Except for Subscriber Liabilities, any liabilities or obligations arising out of or relating to Seller's ownership or operation of the Publication or the Purchased Assets prior to the Closing;

(ii)       any liabilities or obligations relating to or arising out of the Excluded Assets;

(iii)      any liabilities or obligations for (i) Taxes relating to the Publication, the Purchased Assets or the Assumed Liabilities for any taxable period prior to the date hereof and (ii) any other Taxes of Seller or any equityholders or Affiliates of Seller (other than Taxes allocated to Buyer under Section 6.07) for any taxable period;

(iv)      any liabilities or obligations of Seller relating to or arising out of (i) salaries and commissions due and payable to employees which  relate to events occurring prior to the Closing, (ii) the employment, or termination of employment, of any employee on or prior to the Closing, or (iii) workers' compensation claims of any employee which relate to events occurring prior to the Closing;

(v)       any liabilities or obligations of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others; and

(vi)      any liabilities and obligations of Seller set forth on Section 2.04(vi) of the Disclosure Schedules.

Section 2.05   **Non-assignable Assets.**

(a)       Notwithstanding anything to the contrary in this Agreement, and subject to the provisions of this Section 2.05, to the extent that the sale, assignment, transfer, conveyance or delivery, or attempted sale, assignment, transfer, conveyance or delivery, to Buyer of any Purchased Asset would result in a violation of applicable Law, or would require the consent, authorization, approval or waiver of a Person who is not a party to this Agreement or an Affiliate of a party to this Agreement (including any Governmental Authority), and such consent, authorization, approval or waiver shall not have been obtained prior to the Closing, this Agreement shall not constitute a sale, assignment, transfer, conveyance or delivery, or an attempted sale, assignment, transfer, conveyance or delivery, thereof; *provided*, *however*, that the Closing shall occur notwithstanding the foregoing without any adjustment to the Final Purchase Price on account thereof. Following the Closing, Seller and Buyer shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent, authorization, approval or waiver, or any release, substitution or amendment, including but not limited to any consent set forth on Section 4.03 of the Disclosure Schedules, required hereunder to novate all liabilities and obligations under any and all Assigned Contracts or other liabilities that constitute Assumed

Liabilities or to obtain in writing the unconditional release of all parties to such arrangements, so that, in any case, Buyer shall be solely responsible for such liabilities and obligations from and after the date hereof; *provided*, *however*, that neither Seller nor Buyer shall be required to pay any consideration therefor. Once such consent, authorization, approval, waiver, release, substitution or amendment is obtained, Seller shall sell, assign, transfer, convey and deliver to Buyer the relevant Purchased Asset to which such consent, authorization, approval, waiver, release, substitution or amendment relates for no additional consideration. Applicable sales, transfer and other similar Taxes in connection with such sale, assignment, transfer, conveyance or license shall be paid by Buyer in accordance with Section 6.07.

(b)     To the extent that any Purchased Asset and/or Assumed Liability cannot be transferred to Buyer following the Closing pursuant to this Section 2.05, Buyer and Seller shall use commercially reasonable efforts to enter into such arrangements (such as subleasing, sublicensing or subcontracting) to provide to the parties the economic and, to the extent permitted under applicable Law, operational equivalent of the transfer of such Purchased Asset and/or Assumed Liability to Buyer as of the Closing and the performance by Buyer of its obligations with respect thereto. Buyer shall, as agent or subcontractor for Seller pay, perform and discharge fully the liabilities and obligations of Seller thereunder from and after the date hereof. To the extent permitted under applicable Law, Seller shall, at Buyer's expense, hold in trust for and pay to Buyer promptly upon receipt thereof, such Purchased Asset and all income, proceeds and other monies received by Seller to the extent related to such Purchased Asset in connection with the arrangements under this Section 2.05. Seller shall be permitted to set off against such amounts all direct costs associated with the retention and maintenance of such Purchased Assets.

Section 2.06   **Purchase Price**. The total purchase price payable by Buyer at Closing for the Publication and Purchased Assets shall be an amount equal to the Base Purchase Price. At the Closing, Buyer shall pay the Base Purchase Price as follows:

(a)     An amount equal to five percent (5%) of the Base Purchase Price (the "**Escrow Amount**") shall be deposited by Buyer into an escrow account with Zukerman Gore Brandeis & Crossman, LLP, as escrow agent (the "**Escrow Agent**"), to be held in accordance with the terms of the escrow agreement attached as **Exhibit A** hereto (the "**Escrow Agreement**") as security for Seller's obligations to satisfy indemnification claims, if any, made in accordance with **Article VII**.

(b)     An amount equal to the Base Purchase Price less the Escrow Amount shall be paid by Buyer to Seller in cash by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer.

Section 2.07   **Working Capital Adjustment.**

(a)     Prior to the Closing Date, Seller has prepared and delivered to Buyer a report (the "**Preliminary Working Capital Report**") showing Seller's reasonably detailed, good faith estimate of the Working Capital (the "**Estimated Working Capital**") which shall be comprised of those certain assets and liabilities pertaining to the Publication as set forth on the Preliminary Working Capital Report attached hereto as **Exhibit B**, which, for the avoidance of doubt, does not include Subscriber Liabilities.

(b)      The Base Purchase Price shall be subject to adjustment in accordance with the following sentence. In the event that the Estimated Working Capital (i) is less than the Working Capital Target (the "**Working Capital Shortfall**") by more than Fifty Thousand Dollars ($50,000) (the "**Working Capital Cushion**"), then the Base Purchase Price shall be decreased, dollar for dollar, by the amount by which the Working Capital Shortfall exceeds the Working Capital Cushion, or (ii) exceeds the Working Capital Target (the "**Working Capital Surplus**") by more than the Working Capital Cushion, then the Base Purchase Price shall be increased, dollar for dollar, by the amount by which the Working Capital Surplus exceeds the Working Capital Cushion.

(c)      Within one hundred twenty (120) calendar days following the Closing, Buyer shall prepare and deliver to Seller a report (the "**Working Capital Report**"), certified as to completeness and accuracy by Buyer, showing Buyer's reasonably detailed good faith calculation of the actual Working Capital (the "**Actual Working Capital**"), together with applicable documentation substantiating such calculation. The Working Capital Report shall be calculated in the same manner as Estimated Working Capital in accordance with **Exhibit B** hereto.  Each party hereto shall provide the other parties with reasonable access to all records which such party has in its possession and which are reasonably necessary for such other party to prepare or review the Working Capital Report.

(d)      Within thirty (30) days after receipt of the Working Capital Report (the "**Objection Period**"), Seller shall have the right to give Buyer written notice of any objections that Seller has regarding the Actual Working Capital set forth in the Working Capital Report, which written notice shall set forth, in reasonable detail, Seller's objections to the Actual Working Capital as set forth in the Working Capital Report (the "**Objection Notice**"). If Seller notifies Buyer of its acceptance of the Actual Working Capital as set forth in the Working Capital Report, or if Seller does not give Buyer the Objection Notice within the Objection Period, then the amount of the Actual Working Capital set forth in the Working Capital Report delivered by Buyer will be deemed final, conclusive and binding, in all respects, on Buyer and Seller and each of their respective Affiliates. In the event that Seller delivers the Objection Notice within the Objection Period, the parties shall endeavor in good faith to resolve the issues set forth in the Objection Notice within thirty (30) days after Buyer's receipt of the Objection Notice. If Buyer and Seller cannot so resolve all such issues, the parties agree to appoint the Dispute Accounting Firm to resolve the issues set forth in the Objection Notice. The Dispute Accounting Firm will report its determination in writing to Buyer and Seller within ninety (90) days following its engagement, and such determination will be conclusive and binding on Buyer, Seller and each of their respective Affiliates and will not be subject to further dispute or review.  The cost of retaining the Dispute Accounting Firm shall initially be borne one-half (½) by Seller and one-half (½) by Buyer; provided that Seller and Buyer shall eventually pay the fees and expenses of the Dispute Accounting Firm in proportion to the percentage of the disputed amount of the Actual Working Capital resolved in favor of Seller and Buyer, respectively. By way of example, assume that Buyer asserts that Actual Working Capital is $100,000 less than the Working Capital Cushion and Seller asserts that Actual Working Capital is $50,000 less than the Working Capital Cushion, thereby leaving $50,000 in dispute. Assume further that the Dispute Accounting Firm determines that the correct calculation of Actual Working Capital is $90,000 less than the Working Capital Cushion, thus resolving $40,000 of the $50,000 contested amount (i.e., 80%) in favor of Buyer. Accordingly, Seller would pay 80% of the fees and expenses of the Dispute Accounting Firm and Buyer would pay the remaining 20% of the fees

12

and expenses of the Dispute Accounting Firm.  Any resolution reached by Buyer and Seller pursuant to the Working Capital Report, or any determination made by the Dispute Accounting Firm, wherein Buyer is finally determined to owe any amount to Seller, or Seller is finally determined to owe any amount to Buyer, the obligor will pay such amount to the other party within five (5) Business Days of such resolution or determination to an account or accounts specified in writing by the oblige in accordance with Section 2.07(e) below.

(e)     Upon final determination of the Working Capital Report, the Base Purchase Price shall be adjusted, if necessary, to arrive at a final purchase price to be calculated based upon the Base Purchase Price (i) *minus* any sums paid to Buyer in accordance with the provisions of Section 2.7(d) above, if any, or *plus* any sums paid to Seller pursuant to the provisions of Section 2.7(d), and (ii) adjustments, if any, in respect of payments to the Dispute Accounting Firm (the Base Purchase Price, as same may or may not be adjusted as hereinabove provided, the "**Final Purchase Price**").

(f)     All payments under Section 2.7(e), if any, shall be made by certified or bank check or wire transfer of immediately available funds within five (5) Business Days upon final determination to an account specified in writing by the receiving party. To the extent any such payment is not made when due, such payment shall be made together with interest on such amount from the date such payment was due at an interest rate of 8% per annum.

Section 2.08   **Allocation of Purchase Price**. Within one hundred and fifty (150) days after the Closing Date, or the determination of the Final Purchase Price in accordance with the provisions of Section 2.07 above, whichever is later, Seller shall deliver to Buyer a schedule allocating the Final Purchase Price (including any Assumed Liabilities treated as consideration for the Purchased Assets for Tax purposes) (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Code. The Allocation Schedule shall be deemed final unless Buyer notifies Seller in writing that Buyer objects to one or more items reflected in the Allocation Schedule within thirty (30) days after delivery of the Allocation Schedule to Buyer. In the event of any such objection, Seller and Buyer shall negotiate in good faith to resolve such dispute; provided, however, that if Seller and Buyer are unable to resolve any dispute with respect to the Allocation Schedule within thirty (30) days after the delivery of the Allocation Schedule to Buyer, such dispute shall be resolved by the Dispute Accounting Firm. The fees and expenses of the Dispute Accounting Firm shall be borne equally by Seller, on the one hand, and Buyer, on the other hand. Buyer and Seller and their respective Affiliates shall file all Tax Returns (including IRS Form 8594) consistent with the final allocation of the Final Purchase Price determined hereunder (as reasonably adjusted to account for events occurring after the determination of the final allocation of the Final Purchase Price). None of Buyer, Seller or their respective Affiliates shall take any Tax position inconsistent with the final allocation of the Final Purchase Price determined hereunder unless required to do so by a change in applicable Laws.

**ARTICLE III**
**CLOSING**

Section 3.01   **Closing**. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at a time to be mutually agreed upon on the date hereof (the "**Closing Date**"). The Closing shall

be effected telephonically in coordination with the delivery of documents via e-mail, facsimile and/or overnight courier, or in such other manner as the parties may agree. The consummation of the transactions contemplated by this Agreement to occur at the Closing shall be deemed to occur at 12:01 a.m. (EST) on the Closing Date.

Section 3.02    **Closing Deliverables.**

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    the Escrow Agreement executed by Seller;

(ii)    an assignment and assumption and bill of sale agreement attached as **Exhibit C** hereto (the "**Assignment and Assumption and Bill of Sale Agreement**") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and Intellectual Property Assets, and the Assumed Liabilities and transferring the tangible personal property included in the Purchased Assets to Buyer;

(iii)    a Transition Services Agreement in the form of **Exhibit D** hereto (the "**Transition Services Agreement**") and duly executed by Seller;

(iv)    executed copies of the third-party consents and/or notices set forth under the heading "Pre-Closing Consents" in Section 4.03 of the Disclosure Schedules; and

(v)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be reasonably requested to effect to the transactions contemplated by this Agreement.

(b)    At the Closing, in addition to Buyer's obligations to deliver the Final Purchase Price and the Escrow Amount pursuant to Section 2.06, Buyer shall deliver to Seller the following:

(i)    the Escrow Agreement executed by Buyer;

(ii)    the Assignment and Assumption and Bill of Sale Agreement duly executed by Buyer and Baseball America Enterprises, LLC, a wholly-owned subsidiary of Buyer;

(iii)    the Transition Services Agreement duly executed by Buyer; and

(iv)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Seller, as may be reasonably requested to effect to the transactions contemplated by this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this **Article IV** are true and correct as of the Closing Date (or if

14

made as of a specified date, as of such date). For purposes of the representations and warranties of Seller contained herein, disclosure in any Disclosure Schedule of any facts or circumstances shall also be deemed to apply to each other representation and warranty in this **Article IV** to the extent it is reasonably apparent, upon reading such disclosure, without independent knowledge on the part of the reader regarding the matter disclosed, that such disclosure is responsive to such other representation and warranty in this **Article IV**.

Section 4.01   **Organization and Qualification of Seller**. Each of TEN, TEN Magazines and Grind is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware, each is treated as a partnership or disregarded entity for federal income tax purposes and has not made an election to be treated otherwise, and, collectively, have all necessary corporate power and authority to own and operate the Publication and the Purchased Assets and to carry on the business related to the Publication as currently conducted. Each of TEN, TEN Magazines and Grind is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Publication and Purchased Assets or the operation of the business as related to the Publication as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect.

Section 4.02   **Authority of Seller**. Each of TEN, TEN Magazines and Grind has all necessary corporate power and authority to enter into this Agreement and the other Transaction Documents to which they are a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by each of TEN, TEN Magazines and Grind of this Agreement and any other Transaction Document to which they are a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of each of TEN, TEN Magazines and Grind, as required. This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). When each other Transaction Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 4.03   **No Conflicts; Consents**. The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of the certificate of formation or other organizational documents of Seller; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller, the Publication or the Purchased Assets; (c) result in any

Encumbrance on the Publication or any of the Purchased Assets other than Permitted Encumbrances; or (d) except as set forth in Section 4.03 of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any Material Contract; except in the cases of clauses (b), (c) and (d), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a Material Adverse Effect. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated thereby and thereby, except for the "Pre-Closing Consents" set forth in Section 4.03 of the Disclosure Schedules and such consents, approvals, Governmental Orders, declarations, filings or notices which, in the aggregate, would not have a Material Adverse Effect.

Section 4.04   **Title to Purchased Assets**. Seller (i) is the sole and exclusive legal and equitable owner of all right, title and interest in, and has good, valid and marketable title to, or (ii) has a valid and enforceable leasehold interest or other right of use in (solely in respect of each Purchased Asset held under or subject to a Lease), all of the Purchased Assets, free and clear of all Encumbrances except for Permitted Encumbrances. Seller has the power and the right to sell, assign and transfer, and upon consummation of the transactions contemplated by this Agreement Buyer will acquire, good, valid, exclusive and marketable title to, or a valid leasehold interest or right of use in (solely in respect of each Purchased Assets held under or subject to a Lease), all of the Purchased Assets, free and clear of all Encumbrances except for Permitted Encumbrances.  The Purchased Assets constitute all of the assets which are reasonably necessary for the operation, conduct and maintenance of the Publication as conducted by Seller prior to the Closing.

Section 4.05   **Absence of Certain Changes, Events and Conditions.** Except as expressly contemplated by this Agreement, or as set forth on Section 4.05 of the Disclosure Schedules, from February 1, 2016 until the date of this Agreement, Seller has operated the Publication in the ordinary course of business in all material respects and there has not been, with respect to the Publication or any of the Purchased Assets, any:

(a)     event or condition of any kind or character that, individually or in the aggregate, is material to the Publication or the Purchased Assets;

(b)     sale, assignment, transfer, lease, license or other disposition, or agreement to sell, assign, transfer, lease, license or otherwise dispose of, any of the material assets of Seller related to the Publication or the Purchased Assets, except in the ordinary course of business consistent with past practice;

(c)     with respect to the Publication, acceleration of the delivery or sale of products or services, acceleration of the collection of accounts receivable, or discounts or price protection on the sale of products or services, except in the ordinary course of business consistent with past practice;

(d)     indebtedness or capital expenditures which would constitute an Assumed Liability;

(e)     imposition of any Encumbrance upon the Publication or any of the Purchased Assets, except for Permitted Encumbrances; or

(f)     any acquisition (by merger, consolidation or other combination, or acquisition of stock or assets or otherwise) by Seller related to the Publication or the Purchased Assets of any corporation, partnership or other business organization, or any division thereof; or

(g)     any agreement, other than this Agreement, to take any actions specified in this Section 4.05.

Section 4.06   **Material Contracts.**

(a)     Section 4.06(a) of the Disclosure Schedules lists each of the following Contracts by which the Publication or any of the Purchased Assets are bound or affected (together with all Intellectual Property Agreements listed in Section 4.08(a) of the Disclosure Schedules, collectively, the "**Material Contracts**"):

(i)     all Contracts involving aggregate consideration in excess of $100,000 or requiring performance by any party more than one year from the date hereof, which, in each case, cannot be cancelled without penalty or without more than 180 days' notice;

(ii)     all Contracts that relate to the sale of any of the Purchased Assets, other than in the ordinary course of business, for consideration in excess of $100,000;

(iii)     except for agreements relating to trade receivables, all Contracts relating to indebtedness (including, without limitation, guarantees), in each case having an outstanding principal amount in excess of $100,000; and

(iv)     all Contracts between or among the Seller on the one hand and any Affiliate of Seller on the other hand.

(b)     Except as set forth on Section 4.06(b) of the Disclosure Schedules, Seller (i) is not in breach of, or default under any Material Contract and (ii) has not received any notice or other communication (whether written or oral) or claim of any breach or default from the counterparty to any Material Contract.  Each Material Contract is in full force and effect and is valid, binding and enforceable against Seller and, to the Seller's knowledge, the counterparty to such Material Contract, in accordance with its terms.

Section 4.07   **Title to Tangible Personal Property**. Except as set forth in Section 4.07 of the Disclosure Schedules, Seller has good and valid title to, or a valid leasehold interest in, all Tangible Personal Property included in the Purchased Assets, free and clear of Encumbrances except for Permitted Encumbrances and all such Tangible Personal Property is, in all material respects, in good working order and condition, ordinary wear and tear excepted, and at the Closing shall be adequate for all uses for which the Tangible Personal Property was used prior to the Closing.

Section 4.08   **Intellectual Property.**

(a)       Section 4.08(a) of the Disclosure Schedules lists (i) all Intellectual Property Registrations and (ii) all Intellectual Property Agreements.

(b)       Except as set forth in Section 4.08(b) of the Disclosure Schedules, to the Seller's knowledge: (i) the conduct of the Publication as currently conducted does not infringe, misappropriate, dilute or otherwise violate the Intellectual Property of any Person; (ii) no Person is infringing, misappropriating or otherwise violating any Intellectual Property Assets; (iii) Seller owns or possesses adequate licenses or other valid rights to use (without the making of any payment to others or the obligation to grant rights to others in exchange), all the Intellectual Property Assets, free and clear of all Encumbrances other than Permitted Encumbrances; (iv) the Intellectual Property Assets included in the Purchased Assets constitute all such rights reasonably necessary for the operation, conduct and maintenance of the Publication as conducted by Seller prior to the Closing; (v) Seller is not a party to any administrative proceeding or litigation questioning the validity of any of the Intellectual Property Assets; and (vi) the conduct of the Publication does not conflict with, and has not conflicted with, the patent rights, licenses, trademark rights, trade name rights, copyrights or other intellectual property rights of others. Notwithstanding anything to the contrary in this Agreement, this Section 4.08(b) constitutes the sole representation and warranty of the Seller under this Agreement with respect to any actual or alleged infringement, misappropriation or other violation by Seller of any Intellectual Property of any other Person.

Section 4.09    **Legal Proceedings; Governmental Orders.**

(a)       Except as set forth in Section 4.09(a) of the Disclosure Schedules, there are no actions, suits, claims, investigations or other legal proceedings pending or, to Seller's Knowledge, threatened against or by Seller relating to or affecting the Publication, the Purchased Assets, the Assumed Liabilities or any of the Transaction Documents.

(b)       Except as set forth in Section 4.09(b) of the Disclosure Schedules, there are no outstanding Governmental Orders and no judgments or unsatisfied judgments, penalties or awards against or affecting the Publication or the Purchased Assets.

(c)       Section 4.09(c) of the Disclosure Schedules sets forth all litigations against the Seller related to the Publication or the Purchased Assets.

Section 4.10    **Compliance With Laws; Permits.**

(a)       Except as set forth in Section 4.10(a) of the Disclosure Schedules, Seller is in compliance with all Laws applicable to the conduct of the business of the Publication as currently conducted or the ownership and use of the Purchased Assets including, without limitation, Laws relating to privacy, data protection and collection and use of personal information gathered to be used by Seller, and any personal information to be transferred to Buyer hereunder has been obtained and maintained in accordance with their respective privacy policies and all applicable Laws and the transfer of such personal information to Buyer hereunder and Buyer's use thereof in accordance with Buyer's privacy policy is permitted by the terms of the privacy policy of Seller and is not contrary to any Law.  Seller has not received any notice or other communication (whether written or oral), not previously complied with, from any Governmental Authority or any

18

insurance or inspection body, that Seller or any of the properties, facilities, equipment or business procedures or practices of the Publication fails to comply with any applicable Law, ordinance, regulation, building or zoning law, or requirement of any Governmental Authority.

(b)     None of the representations and warranties in Section 4.10 shall be deemed to relate to employee benefits matters (which are governed by Section 4.11), employment matters (which are governed by Section 4.12) or tax matters (which are governed by Section 4.13).

Section 4.11     **Employee Benefit Matters.**

(a)     Section 4.11(a) of the Disclosure Schedules contains a list of each benefit, retirement, employment, consulting, compensation, incentive, bonus, stock option, restricted stock, stock appreciation right, phantom equity, change in control, severance, vacation, paid time off, welfare and fringe-benefit agreement, plan, policy and program in effect and covering Employees (as defined below) or former Employees which (i) is maintained, sponsored, contributed to, or required to be contributed to by Seller or its Affiliates, or (ii) under which Seller or its Affiliates has any liability for premiums or benefits (as listed on Section 4.11(a) of the Disclosure Schedules, each, a "**Benefit Plan**"), and a brief description of the primary terms of each material Benefit Plan.  Except as set forth in Section 4.11(a) of the Disclosure Schedule, No Benefit Plan is a deferred compensation arrangement subject to Code Section 409A.

(b)     Except as set forth in Section 4.11(b) of the Disclosure Schedules, or as would not have a Material Adverse Effect, each Benefit Plan and related trust complies with all applicable Laws (including ERISA and the Code and applicable local Laws). Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code (a "**Qualified Benefit Plan**") has received a favorable determination letter from the Internal Revenue Service, or with respect to a prototype or volume submitter plan, can rely on an opinion or advisory letter from the Internal Revenue Service to the prototype or volume submitter plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income Taxes under Sections 401(a) and 501(a), respectively, of the Code, and nothing has occurred that could reasonably be expected to cause the revocation of such determination letter from the Internal Revenue Service or, to Seller's Knowledge, the unavailability of reliance on such opinion or advisory letter from the Internal Revenue Service, as applicable. With respect to any Benefit Plan, no event has occurred or is reasonably expected to occur that has resulted in or would subject Seller to a Tax under Section 4971 of the Code or the Purchased Assets to a lien under Section 430(k) of the Code.

(c)     Except as set forth in Section 4.11(c) of the Disclosure Schedules, no Benefit Plan: (i) is subject to the minimum funding standards of Section 302 of ERISA or Section 412 of the Code; or (ii) is a "multi-employer plan" (as defined in Section 3(37) of ERISA). Except as would not have a Material Adverse Effect, Seller has not: (A) withdrawn from any pension plan under circumstances resulting (or expected to result) in liability; or (B) engaged in any transaction which would give rise to a liability under Section 4069 or Section 4212(c) of ERISA.

(d)     Except as set forth in Section 4.11(d) of the Disclosure Schedules and other than as required under Section 4980B of the Code or other applicable Law, no Benefit Plan provides benefits or coverage in the nature of health, life or disability insurance following

retirement or other termination of employment (other than death benefits when termination occurs upon death).

(e)     Except as set forth in Section 4.11(e) of the Disclosure Schedules, or as would not have a Material Adverse Effect, no Benefit Plan exists that could, solely as a result of the execution of this Agreement, result in the payment of, or accelerate the vesting of, any additional rights or benefits (including funding of compensation or benefits through a trust or otherwise) to any Employee. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will result in "excess parachute payments" within the meaning of Section 280G(b) of the Code being made to any Employee.

(f)     No Benefit Plan provides post-employment or post-termination life, death, health, medical, prescription drug, dental or other welfare benefits to any Employee, except for group health plan continuation coverage as required by Code Section 4980B, Part 6 of Title I of ERISA or comparable state Law ("COBRA").

(g)     The representations and warranties set forth in this Section 4.11 are the Seller's sole and exclusive representations and warranties regarding employee benefit matters.

Section 4.12   **Employment Matters.**

(a)     Section 4.12(a) of the Disclosure Schedules sets forth a correct and complete list of (1) all employees of the Seller who render services to Seller solely with respect to the Publication (the "**Employees**") and (2) all independent contractors of the Seller who render services to Seller solely with respect to the Publication ("**Independent Contractors**"). Correct and complete copies of all written individual employment, consulting and compensation (including salary, commission and bonus) arrangements applicable to all Employees, and all Independent Contractors have been made available to Buyer.  For each Employee listed on Section 4.12(a) of the Disclosure Schedules, such Section of the Disclosure Schedules also sets forth such Employee's current rate of compensation by Seller and date of hire by Seller.  All material obligations to current or former Employees and all Independent Contractors required to be satisfied with respect to services rendered to Seller prior to the Closing have been satisfied or accrued to the extent required under GAAP to be paid in the normal course, including without limitation any accrued salaries, commissions, wages, severance and accrued vacation pay.

(b)     Except as set forth in Section 4.12(b) of the Disclosure Schedules, Seller is not, and it has never been, a party to, bound by, any collective bargaining or other agreement with a labor organization representing any of the Employees and, to Seller's Knowledge, no Employees have engaged in any union organizing activities with respect to Seller.

(c)     Seller is in compliance in all material respects with all contractual obligations and applicable Laws pertaining to employment and employment practices and Contracts to the extent they relate to the Employees and Independent Contractors.  There are no complaints, charges or claims against Seller pending or, to the knowledge of Seller, threatened to

20

be brought or filed with any public or Governmental Authority, arbitrator or court based on, arising out of, in connection with, or otherwise relating to the employment of, or termination of employment by, Seller of any Employees or Independent Contractors.  Seller has complied in all material respects with all applicable foreign, federal, state and local laws and regulations regarding occupational safety and health standards with respect to the Employees and Independent Contractors.

(d)     All individuals who perform services for Seller with respect to the Publication and who have been classified as other than employees have been properly classified. All Employees are employed in the United States, and all of the terms and conditions of their employment are governed exclusively by United States law and not the law of any other jurisdiction.  No Employees are "leased employees" within the meaning of Code § 414(n).

(e)     Within the two (2) years immediately preceding the Closing Date, the Seller and its Affiliates have not implemented any plant closing or layoff affecting any Employees or former Employees that could reasonably be expected to result in a material liability to Seller under the Worker Adjustment and Retraining Notification Act.

(f)     The representations and warranties set forth in this Section 4.12 are the Seller's sole and exclusive representations and warranties regarding employment matters.

Section 4.13    **Taxes.**

(a)     Except as set forth in Section 4.13 of the Disclosure Schedules, Seller has timely, regularly and promptly filed (taking into account any valid extensions) all Tax Returns in connection with the Publication, except where the failure to do so would not constitute a Material Adverse Effect.  All Taxes accrued as of the Closing Date payable by Seller in connection with the Publication have been timely, regularly and promptly paid, or adequate escrows have been established, prior to the Closing Date, except where the failure to do so would not constitute a Material Adverse Effect.  Seller has not received any formal written notice of any deficiencies or disputes in connection with such Tax Returns or Taxes.  Seller has not entered into a joint venture with any other enterprise with respect to the Publication which resulted in any additional Tax to the Publication as a result thereof.

(b)     Except for certain representations related to Taxes in Section 4.11, the representations and warranties set forth in this Section 4.13 are Seller's sole and exclusive representations and warranties regarding Tax matters.

Section 4.14    **Real Property**.

(a)     Seller does not own any real property used in connection with the Publication.

(b)     Section 4.14(b) of the Disclosure Schedules sets forth all material real property leased or subleased by Seller exclusively used in connection with the Publication (collectively, the "**Leased Real Property**"), and a list, as of the date of this Agreement, of all leases for each Leased Real Property (collectively, the "**Leases**").

(c)     There exists no default or condition that, with the giving of notice or the passage of time or both, could become a default under any Lease. Seller has not received any written notice of existing, pending or threatened (i) condemnation proceedings affecting the Leased Real Property, or (ii) zoning, building code or other moratorium proceedings, or similar matters which would reasonably be expected to materially and adversely affect the ability to operate the Leased Real Property as currently operated. Neither the whole nor any material portion of any Leased Real Property has been damaged or destroyed by fire or other casualty.

Section 4.15    **Brokers**. Except as set forth in Section 4.15 of the Disclosure Schedules, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller. Seller shall be solely responsible and shall indemnify Buyer for the payment of any commission due any other broker claiming to have represented Seller should such a claim be made in connection with the transactions contemplated by this Agreement.

Section 4.16    **Interest in Publication**.  Except for this Agreement, Seller has not granted, and there is not outstanding, any option, right, agreement or other obligation pursuant to which any Person has or could claim a right to acquire in any way all or any part of, or any interest in, the Publication or any of the Purchased Assets.

Section 4.17    **Financial Statements**.  Seller has made available to Buyer a true and complete copies of the financial statements set forth on Section 4.17 of the Disclosure Schedules (collectively, the "**Financial Statements**").  Except as set forth on Section 4.17 to the Disclosure Statements or as disclosed in the Financial Statements, the Financial Statements have been prepared based on the books and records of the Publication in accordance with GAAP and present fairly, in all material respects, the financial condition and results of operations of the Publication as of the dates or periods indicated.  The books of account and related records of Seller with respect to the Publication are true, correct and complete in all material respects.  In the past three years, Seller has not changed its accounting policies including its practices in connection with the treatment of revenue recognition, capitalization policies, reserves and expenses except as required under applicable law or in accordance with GAAP.

Section 4.18    **Solvency**. Immediately after giving effect to the transactions contemplated hereby, Seller shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business.

Section 4.19    **Insurance**. Section 4.19 of the Disclosure Schedules sets forth a correct and complete list of all insurance policies of Seller that cover the Publication and the Purchased Assets. All of such insurance policies are in full force and effect, and Seller is not in material default with

22

respect to its obligations under any of such insurance policies. All premiums due and payable under such insurance policies have been paid on a timely basis. No written notice of cancellation, termination or non-renewal has been received by Seller with respect to any such insurance policy.

Section 4.20 **No Other Representations and Warranties**. Except for the representations and warranties contained in this **Article IV** (including the related portions of the Disclosure Schedules), neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Publication and the Purchased Assets furnished or made available to Buyer and its Representatives (including any Confidential Information Memorandum prepared by Moelis & Company and any information, documents or material delivered to Buyer and/or made available to Buyer in the Data Room, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Publication, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the Disclosure Schedules, Buyer represents and warrants to Seller that the statements contained in this **Article V** are true and correct as of the Closing Date.

Section 5.01 **Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware.

Section 5.02 **Authority of Buyer**. Buyer has all necessary corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 5.03 **No Conflicts; Consents**. The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the

consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of the organizational documents of Buyer; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) except as set forth in Section 5.03 of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any agreement to which Buyer is a party, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby and thereby.

Section 5.04   **Brokers**. Except as set forth in Section 5.04 of the Disclosure Schedules, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer. Buyer shall be solely responsible and shall indemnify Seller for the payment of any commission due any other broker claiming to have represented Buyer should such a claim be made in connection with the transactions contemplated by this Agreement.

Section 5.05   **Sufficiency of Funds**. Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Final Purchase Price and consummate the transactions contemplated by this Agreement.

Section 5.06   **Solvency**. Immediately after giving effect to the transactions contemplated hereby, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business.

Section 5.07   **Legal Proceedings**. Except as set forth in Section 5.07 of the Disclosure Schedules, there are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

Section 5.08   **Independent Investigation**.  Buyer has conducted its own independent investigation, review and analysis of the Publication and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in **Article IV** of this Agreement (including related portions of the Disclosure Schedules); and (b) neither Seller nor any other Person has made any

24

representation or warranty as to Seller, the Publication, the Purchased Assets or this Agreement, except as expressly set forth in **Article IV** of this Agreement (including the related portions of the Disclosure Schedules).

## ARTICLE VI
## COVENANTS

Section 6.01   **Employees and Employee Benefits**.

(a)     Prior to the Closing, Buyer shall, or shall cause an Affiliate of Buyer to, make offers of employment to each of the Employees listed on Section 6.01(a) to the Disclosure Schedules, effective as of and conditioned upon the Closing.  All Employees that accept such offer of employment or commence employment with Buyer following the Closing are hereinafter referred to as "**Transferred Employees.**"  The Benefit Plans shall remain liable, in accordance with their terms, for all eligible claims for benefits that are incurred by the Transferred Employees prior to the Closing. For purposes of this Agreement, the following claims shall be deemed to be incurred as follows: (i) life, accidental death and dismemberment, short-term disability, and workers' compensation insurance benefits, shall be incurred upon the event giving rise to such benefits; (ii) medical, vision, dental, and prescription drug benefits shall be incurred on the date the applicable services, materials or supplies giving rise to the claim were provided; and (iii) long-term disability benefits shall be incurred on the benefits eligibility date determined by the long-term disability insurance carrier for the plan in which the applicable Transferred Employee participates.

(b)     Buyer shall be liable and hold Seller harmless for (i) any statutory, common law, contractual or other severance with respect to any Transferred Employee; and (ii) any claims relating to the employment of any Transferred Employee arising in connection with or following the Closing.

(c)     This Section 6.01 shall be binding upon and inure solely to the benefit of each of the parties to this Agreement, and nothing in this Section 6.01, express or implied, shall confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Section 6.01. Nothing contained herein, expressed or implied, shall be construed to establish, amend or modify any benefit plan, program, agreement or arrangement. The parties hereto acknowledge and agree that the terms set forth in this Section 6.01 shall not create any right in any Transferred Employee or any other Person to any employment with Buyer or any of its Affiliates or compensation or benefits of any nature or kind whatsoever.

Section 6.02   **Confidentiality**. Each of Buyer and Seller acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, each covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to the other Party pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section 6.02 shall nonetheless continue in full force and effect.

Section 6.03   **Consents**.  Seller and Buyer shall use commercially reasonable efforts to carry out their respective obligations pursuant to Section 2.05, including obtain the consents set forth under the heading "Post-Closing Consents" in Section 4.03 of the Disclosure Schedules.

Section 6.04   **Books and Records.**

(a)   In order to facilitate the resolution of any claims made against or incurred by Seller prior to the Closing, or for any other reasonable purpose, for a period of six (6) years after the Closing, Buyer shall:

(i)   retain the Books and Records (including personnel files) relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of Seller; and

(ii)   upon reasonable notice, afford the Seller's Representatives reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such Books and Records.

(b)   In order to facilitate the resolution of any claims made by or against or incurred by Buyer after the Closing, or for any other reasonable purpose, for a period of six (6) years after the Closing, Seller shall:

(i)   retain the books and records (including personnel files) of Seller which relate to the Publication and its operations for periods prior to the Closing; and

(ii)   upon reasonable notice, afford the Buyer's Representatives reasonable access (including the right to make, at Buyer's expense, photocopies), during normal business hours, to such books and records.

(c)   Neither Buyer nor Seller shall be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this Section 6.04 where such access would violate any Law.

Section 6.05   **Public Announcements**. Buyer shall prepare and determine the timing of any press release or other announcement to the public concerning the execution of this Agreement and the transactions contemplated herein; provided that any such press release or announcement shall be made only with the prior written consent of Seller, not to be unreasonably withheld or delayed.  Except as provided for in the preceding sentence, no party hereto will issue any press release or make any other public announcement relating to the execution of this Agreement or the transactions contemplated herein, except that any party may make any disclosure required to be made by it under applicable Law if it determines in good faith that it is appropriate to do so and uses commercially reasonable efforts to give prior notice and a reasonable time to comment to the other party hereto.

Section 6.06   **Bulk Sales Laws**. The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

Section 6.07  **Taxes**.

(d)    The Seller and Buyer shall reasonably cooperate, and shall cause their respective Affiliates, officers, employees, agents, auditors and representatives reasonably to cooperate, in preparing and filing all Tax Returns (including amended Tax returns) relating to Taxes that pertain to the Publication, including maintaining and making available to each other all records necessary in connection with such Taxes and in resolving all disputes and audits with respect to all taxable periods relating to such Taxes.  After the Closing Date, the Seller shall timely prepare and file with the appropriate Taxing Authorities all Tax Returns for the Publication required to be filed after the Closing Date with respect to the period prior to the Closing Date and shall pay all Taxes due with respect to such Tax Returns.

(e)    All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Seller shall cooperate with respect thereto as necessary).

Section 6.08  **Accounts Receivable**. Following the Closing, all Accounts Receivable shall be the sole property of and be payable to Buyer, and Buyer shall use commercially reasonable efforts to collect payment on any Accounts Receivable.  In the event that Seller comes into possession of any Accounts Receivable subsequent to the Closing, such payment shall be deemed to be held in trust by Seller for the benefit of Buyer and shall be turned over to Buyer within twenty (20) Business Days after receipt thereof by Seller.

Section 6.09  **Further Assurances**. Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

## ARTICLE VII
## INDEMNIFICATION

Section 7.01  **Survival**. Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is twelve (12) months from the date hereof, except that the representations set forth in Section 4.13 (Taxes) shall survive the Closing until the date that is thirty (30) days following the expiration of the applicable statute of limitations. Unless otherwise expressly set forth in this Agreement, the covenants and agreements set forth in this Agreement shall survive the Closing and remain in effect until  performed or until the obligation to so perform shall have expired.

Section 7.02  **Indemnification By Seller**. Subject to the other terms and conditions of this **Article VII**, Seller shall indemnify Buyer against, and shall hold Buyer harmless from and

27

against, any and all Losses incurred or sustained by, or imposed upon, Buyer based upon, arising out of, with respect to or by reason of:

(a)  (i) fraud in connection with any representation, warranty or covenant contained in this Agreement or (ii) any inaccuracy in or breach of any of the representations or warranties of Seller contained in <u>Section 4.01</u> (Organization and Qualification of Seller), <u>Section 4.02</u> (Authority of Seller), <u>Section 4.04</u> (Title to Purchased Assets), <u>Section 4.13</u> (Taxes) and <u>Section 4.15</u> (Brokers).

(b)  any inaccuracy in or breach of any of the other representations or warranties of Seller contained in this Agreement;

(c)  any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement;

(d)  any Excluded Asset or any Excluded Liability;

(e)  the litigation set forth on Section 4.09(a) of the Disclosure Schedules; or

(f)  any Taxes which may become due as a result of the Parties agreeing to waive compliance with any bulk sales statutes which may be applicable to the transactions contemplated hereby.

Section 7.03  **Indemnification By Buyer**. Subject to the other terms and conditions of this **Article VII**, Buyer shall indemnify Seller against, and shall hold Seller harmless from and against, any and all Losses incurred or sustained by, or imposed upon, Seller based upon, arising out of, with respect to or by reason of:

(a)  (i) fraud in connection with any representation, warranty or covenant contained in this Agreement or (ii) any inaccuracy in or breach of any of the representations or warranties of Buyer contained in <u>Section 5.01</u> (Organization of Buyer), <u>Section 5.02</u> (Authority of Buyer) and <u>Section 5.04</u> (Brokers);

(b)  any inaccuracy in or breach of any of the other representations or warranties of Buyer contained in this Agreement;

(c)  any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement; or

(d)  any Assumed Liability.

Section 7.04  **Certain Limitations**. The party making a claim under this Article VII is referred to as the "Indemnified Party", and the party against whom such claims are asserted under this **Article VII** is referred to as the "Indemnifying Party". The indemnification provided for in <u>Section 7.02</u> and <u>Section 7.03</u> shall be subject to the following limitations:

(a)  The Indemnifying Party shall not be liable to the Indemnified Party for indemnification under <u>Section 7.02(b)</u> or <u>Section 7.03(b)</u>, as the case may be, until the aggregate

4814-6433-2857.12

amount of all Losses in respect of indemnification under Section 7.02(b) or Section 7.03(b) exceeds an amount equal to $20,000 (the "**Deductible**"), in which event the Indemnifying Party shall only be required to pay or be liable for Losses in excess of the Deductible. With respect to any claim as to which the Indemnified Party may be entitled to indemnification under Section 7.02(b) or Section 7.03(b), as the case may be, the Indemnifying Party shall not be liable for any individual or series of related Losses which do not exceed $5,000.00 (which Losses shall not be counted toward the Deductible).

(b)     The aggregate amount of all Losses for which an Indemnifying Party shall be liable pursuant to Sections 7.02(a) or (e) or Section 7.03(a), as the case may be, shall not exceed an amount equal to the Base Purchase Price.

(c)     The aggregate amount of all Losses for which an Indemnifying Party shall be liable pursuant to Section 7.02(b), (c) and (d) or Section 7.03(b), as the case may be, shall not exceed an amount equal to fifteen percent (15%) of the Base Purchase Price.

(d)     Notwithstanding the foregoing Section 7.04(c), the aggregate amount of all Losses for which Seller shall be liable for a breach by Seller of its obligations under the Transition Services Agreement shall not exceed an amount equal to twenty five percent (25%) of the Base Purchase Price, which amount, if any, shall be included in the calculation of the aggregate amount of any Losses pursuant to Section 7.04(c) hereof.

(e)     Payments by an Indemnifying Party pursuant to Section 7.02 or Section 7.03 in respect of any Loss shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Indemnified Party in respect of any such claim. The Indemnified Party shall use its commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements for any Losses prior to seeking indemnification under this Agreement.

(f)     Payments by an Indemnifying Party pursuant to Section 7.02 or Section 7.03 in respect of any Loss shall be reduced by an amount equal to any Tax benefit realized or reasonably expected to be realized as a result of such Loss by the Indemnified Party.

(g)     In no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple.

(h)     Each Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise thereto, including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

(i)     Each party hereto shall not be liable under this **Article VII** for any Losses based upon or arising out of any inaccuracy in or breach of any of the representations or warranties of such party contained in this Agreement if the other party had knowledge of such inaccuracy or breach prior to the Closing.

(j)      Nothing in this Section 7.04 shall limit any remedy any Indemnified Party may have against any Person for any Losses resulting from, arising out of or relating to fraud or intentional misconduct.

Section 7.05    **Indemnification Procedures.**

(a)      If any Indemnified Party receives notice of the assertion or commencement of any action, suit, claim or other legal proceeding made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "**Third Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party prompt written notice thereof (a "**Third Party Claim Notice**"); provided, however, that the failure to provide a Third Party Claim Notice or any defect in a Third Party Claim Notice will not affect the rights of the Indemnified Party to obtain indemnification hereunder, except to the extent such failure was negligent or intentional and materially prejudices the ability of the Indemnifying Party to defend such Third Party Claim. A Third Party Claim Notice shall describe the Third Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense. In the event that the Indemnifying Party assumes the defense of any Third Party Claim, subject to Section 7.05(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right, at its own cost and expense, to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. If the Indemnifying Party elects not to compromise or defend such Third Party Claim or fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, the Indemnified Party may, subject to Section 7.05(b), pay, compromise, defend such Third Party Claim, at the Indemnifying Party's cost and expense, and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim. Seller and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available (subject to the provisions of Section 6.04) records relating to such Third Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the proper and adequate defense of such Third Party Claim.

(b)      Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably conditioned, withheld or delayed), except as provided in this Section 7.05(b). If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third Party Claim

(the "**Global Settlement Offer**") and the Indemnifying Party desires to accept and agree to the Global Settlement Offer, the Indemnifying Party shall give written notice to that effect (the "**Settlement Notice**") to the Indemnified Party. In the event that within ten (10) days after the giving of the Settlement Notice, the Indemnifying Party does not receive written notice from the Indemnified Party of its objection to the Global Settlement Offer and the Indemnified Party's affirmative agreement to take over the entire defense of the Third Party Claim, then the Indemnified Party shall be deemed to have irrevocably consented to the Global Settlement Offer and the Indemnifying Party may proceed to settle the Third Party Claim in accordance with the Global Settlement Offer. If the Indemnified Party provides timely notification to the Indemnifying Party of its objection to the proposed Global Settlement Offer and that it shall assume the defense of the Third Party Claim, the Indemnified Party shall continue to contest or defend such Third Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim shall not exceed the amount set forth in the Global Settlement Offer that was rejected by the Indemnified Party. If the Indemnified Party has assumed the defense of a Third Party Claim pursuant to Section 7.05(a), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably conditioned, withheld or delayed).

(c)     Any claim by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party prompt written notice thereof (a "**Direct Claim Notice**"); provided, however, that the failure to provide a Direct Claim Notice or any defect in a Direct Claim Notice will not affect the rights of the Indemnified Party to obtain indemnification hereunder, except to the extent such failure was negligent or intentional and materially prejudices the ability of the Indemnifying Party to defend such Direct Claim. A Direct Claim Notice shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have thirty (30) days after its receipt of a Direct Claim Notice to respond in writing to such Direct Claim. During such thirty (30)-day period, the Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such thirty (30)-day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party upon the terms and subject to the provisions of this Agreement.

Section 7.06   **Tax Treatment of Indemnification Payments**. All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Final Purchase Price for Tax purposes, unless otherwise required by Law.

Section 7.07   **Exclusive Remedies**. Subject to Section 8.11, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set

forth in this **Article VII**. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this **Article VII**. Nothing in this Section 7.07 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to Section 8.11.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.01 **Expenses**. Except as otherwise expressly provided herein (including Section 6.07 hereof), all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

Section 8.02 **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.02):

|  |  |
|---|---|
| If to Seller: | 831 South Douglas Street<br>El Segundo, CA 90245<br>Facsimile: 310-531-5015<br>E-mail: bsutman@enthusiastnetwork.com<br>Attention: Bill Sutman, Chief Financial Officer |
| with a copy simultaneously by like means (but which shall not constitute notice hereunder) to: | Zukerman Gore Brandeis & Crossman, LLP<br>Eleven Times Square, Fifteenth Floor<br>New York, NY 10036<br>Facsimile: (212) 223-6433<br>E-mail: cbrandeis@zukermangore.com<br>Attention: Clifford A. Brandeis, Esq. |
| If to Buyer: | 318 West 39th Street<br>8th Floor |

32

New York, NY  10018
Facsimile: 646-484-4495
E-mail: ggreen@alliance.us
Attention: Gary Green

with a copy simultaneously
by like means (but which
shall not constitute notice
hereunder) to:

Rimon P.C.
245 Park Avenue
39th Floor
New York, NY  10168
E-mail: matthew.pace@rimonlaw.com
Attention: Matthew Pace

Section 8.03   **Interpretation**. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

Section 8.04   **Headings**. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 8.05   **Severability**. The invalidity or unenforceability   of any provision hereof shall in no way affect the validity or enforceability of any other provision.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

Section 8.06   **Entire Agreement**. This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

Section 8.07   **Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably conditioned, withheld or delayed; provided, that such prior written consent shall not be required in connection with the assignment of a party's rights or obligations hereunder to a purchaser of a majority of such party's issued and outstanding equity interests or business (whether directly or indirectly by merger, consolidation, reorganization, sale of all or substantially all assets, or otherwise) if such purchaser expressly agrees in writing to assume all of such selling party's obligations hereunder.

Section 8.08   **No Third Party Beneficiaries**. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 8.09   **Amendment and Modification; Waiver**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 8.10   **Governing Law; Submission to Exclusive Jurisdiction; Waiver of Jury Trial.**

(a)      This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction).

(b)      ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF NEW YORK IN EACH CASE LOCATED IN THE CITY OF NEW YORK AND COUNTY OF NEW YORK, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT,

ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.10(c).

Section 8.11  **Specific Performance**. The parties agree that irreparable damage could occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to seek specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 8.12  **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 8.13  **Non-recourse**. This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to such party. No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other Representative of any party hereto or of any Affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement or for any claim, action, suit or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

*[Rest of Page Intentionally Left Blank; Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

TEN: THE ENTHUSIAST NETWORK, LLC

By: _____
    Name:   William A. Sutman
    Title:

    EVP, CFO & Treasurer

TEN: THE ENTHUSIAST NETWORK MAGAZINES, LLC

By: _____
    Name:   William A. Sutman
    Title:

    EVP, CFO & Treasurer

GRIND MEDIA, LLC

By: _____
    Name:   William A. Sutman
    Title:

    EVP, CFO & Treasurer

**BUYER:**

ALLIANCE BASEBALL BBA, LLC

By: _____
    Name:
    Title:

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**Schedule I**
**Publication**

**Print:**
- The print magazine known as "Baseball America."

**Domains:**
- BASEBALLAMERICA.BIZ
- BASEBALLAMERICA.CO
- BASEBALLAMERICA.COM
- BASEBALLAMERICA.NET
- BASEBALLAMERICA.TV
- BASEBALLAMERICADIGITAL.COM
- BASEBALLAMERICADIGITAL.NET
- BBA.AM
- BBAMAG.COM
- BASEBALLAMERICAMAG.COM
- BASEBALLAMERICAONLINE.COM

**Main Social Handles:**
- twitter.com/BaseballAmerica
- facebook.com/BaseballAmericaMag/
- twitter.com/baseballamerica
- instagram.com/baseballamerica
- youtube.com/baseballamerica
- plus.google.com/+baseballamerica
- linkedin.com/company/baseball-america

**Digital Magazines:**
- itunes.apple.com/us/app/baseball-america-magazine/id526363971?ls=1&mt=8
- play.google.com/store/search?q=Baseball+America&c=magazines
- amazon.com/Baseball-America/dp/B0098NM170
- barnesandnoble.com/w/baseball-america-source-interlink-media/1112775823?ean=2940043961068
- zinio.com/magazine/Baseball%20America/pr-500663170/cat-cat1960163
- Magzter: https://www.magzter.com/US/TEN-:-The-Enthusiast-Network/Baseball_America/Men's_Interest
- Readly:  https://us.readly.com/products/magazine/us/baseball-america
- Ebsco flipster: https://flipster.ebsco.com/magazine/baseball-america

**Podcasts:**
- itunes.apple.com/us/podcast/baseball-america/id201539011?mt=2

**Additional Podcast URLs (Not sure if BA manages these or not)**
- audioboom.com/channel/baseball-america
- tunein.com/radio/Baseball-America-Podcast-p302360/

**E-Commerce**
- baseballamerica.myshopify.com

# EXHIBIT A

**EXECUTION VERSION**

## <u>ESCROW AGREEMENT</u>

This ESCROW AGREEMENT (this "<u>Agreement</u>") is made and entered into as of February 13, 2017, by and among (i) TEN: The Enthusiast Network, LLC, a Delaware limited liability company ("<u>TEN</u>"), TEN: The Enthusiast Network Magazines, LLC, a Delaware limited liability company ("<u>TEN Magazines</u>") and  Grind Media, LLC, a Delaware limited liability company ("<u>Grind</u>," and collectively with TEN and TEN Magazines, jointly and severally, ("<u>Seller</u>"), (ii) Alliance Baseball BBA, LLC, a Delaware limited liability company ("<u>Buyer</u>"), and (iii) Zukerman Gore Brandeis & Crossman, LLP, a New York limited liability partnership (in its capacity as escrow agent hereunder, "<u>Escrow Agent</u>").  Each of Buyer and Seller is referred to herein individually as a "<u>Party</u>," and collectively as the "<u>Parties</u>."  Except as expressly set forth herein to the contrary, capitalized terms used herein but not defined herein shall have the meanings set forth in the Asset Purchase Agreement (as defined below).

WHEREAS, simultaneously herewith, the Parties are entering into that certain Asset Purchase Agreement of even date hereof (as the same may be amended or modified from time to time in accordance with its terms, the "<u>Asset Purchase Agreement</u>"), providing for, among other things, the purchase by Buyer from Seller of certain assets and liabilities with respect to the Publication;

WHEREAS, pursuant to the terms of the Asset Purchase Agreement and as part of the transactions contemplated thereby, the Parties agreed to enter into this Agreement and deposit a portion of the purchase price with Escrow Agent for the purposes set forth herein; and

WHEREAS, the Parties hereto desire to more specifically set forth their rights and obligations with respect to the Escrow Fund (as defined below) and the distribution and release thereof.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.      <u>Escrow Deposit</u>.  Simultaneously with the execution of this Agreement, Buyer has caused to be deposited with Escrow Agent an aggregate of Sixty-Seven Thousand Five Hundred Dollars ($67,500) in immediately available funds in accordance with Section 2.1(b)(i) and Section 2.06(a) of the Asset Purchase Agreement (the "<u>Escrow Amount</u>").  Escrow Agent hereby acknowledges receipt of the Escrow Amount and agrees to hold the Escrow Amount, together with all products and proceeds thereof (including all interest, dividends, gains and other income earned with respect thereto) (collectively, the "<u>Escrow Funds</u>"), in a separate and distinct account (the "<u>Escrow Account</u>"), subject to the terms and conditions of this Agreement.  Escrow Agent shall not distribute or release the Escrow Funds except in accordance with the express terms and conditions of this Agreement.

2.      <u>Investment of Funds</u>.  The Escrow Amount shall be invested in an interest bearing account maintained by Escrow Agent at Signature Bank, a federally chartered bank that has offices in New York City.  Escrow Agent shall have no obligations to add to the Escrow Funds because of any diminution thereof as a result of losses realized on investments.  Escrow Agent

shall liquidate any investments in the Escrow Funds necessary to provide funds in order to make any payments required by this Agreement.  Escrow Agent shall not receive any fee for its services hereunder and shall not be responsible or liable for any loss suffered in connection with any investments of funds made by it in accordance with this Section.

3.     Release of Escrow Funds.  The Escrow Funds shall be subject to release for indemnification claims as provided in this Section 3.

(a)     Indemnification Claims.  If at any time and from time to time prior to the Distribution Date (as defined below), Buyer a makes a claim for indemnification pursuant to Section 7.02 of the Asset Purchase Agreement, Buyer shall deliver to Escrow Agent and Seller a written notice (an "Indemnification Notice"), setting forth the amount of such claim for indemnification (to the extent the amount of such claim is known and quantifiable as of such date) pursuant to Section 7.05 of the Asset Purchase Agreement and setting forth the nature and the basis for such claim (an "Indemnification Claim").  In the event Escrow Agent has not received a written objection to such Indemnification Claim from Seller within thirty (30) calendar days following delivery of the Indemnification Claim to Seller, then on the thirty-first (31st) day following such delivery, Escrow Agent shall release by wire transfer to an account or accounts designated in writing by Buyer an amount of Escrow Funds from the Escrow Account equal to the amount of such Indemnification Claim.

(b)     Disputes.  In the event Seller in good faith delivers to Escrow Agent and Buyer a written objection (a "Dispute Notice") to any Indemnification Claim (or portion thereof) within thirty (30) days following Escrow Agent's receipt of the applicable Indemnification Notice, except as otherwise provided in Section 3(d) below, Escrow Agent shall not distribute to Buyer any Escrow Funds that are the subject of the Dispute Notice until Escrow Agent receives either (i) written instructions signed by Buyer and Seller authorizing the release to Buyer of the Escrow Funds that are the subject of the Dispute Notice, or (ii) a final decision of a court of competent jurisdiction pursuant to the Asset Purchase Agreement directing the release to Buyer of the Escrow Funds that are the subject of the Dispute Notice.  Upon receipt of such written instructions or such final decision, as the case may be, Escrow Agent shall release to Buyer the Escrow Funds subject to dispute in accordance with such written instructions or final decision. In the event that Seller is the prevailing party in whole or in part in connection with any such dispute, the portion of the Escrow Funds that were the subject of such Dispute Notice and that are not released to Buyer as provided in the immediately preceding sentence shall remain in the Escrow Account and shall be available to satisfy subsequent Indemnification Claims until released as provided in Section 3(d) below.  Any Dispute Notice shall describe in reasonable detail the basis for any objection to the matters set forth in the Indemnification Notice and the portion of such Indemnification Claim (if less than all) which is the subject of such Dispute Notice.  Each of Buyer and Seller agree to negotiate in good faith to resolve as promptly as practicable any Indemnification Claim or portion thereof that is the subject of a Dispute Notice.

(c)     Partial Release.  If any Dispute Notice includes an objection to only a portion of an Indemnification Claim, Escrow Agent shall promptly release to Buyer an amount of Escrow Funds equal to the portion of the Indemnification Claim for which there is no objection; *provided* that no such partial release by Escrow Agent shall terminate or otherwise

prejudice either Seller or Buyer's rights with respect to amounts claimed in any Indemnification Notice which are in excess of the amounts so released.

(d)    Release of Earnings.  Notwithstanding anything to the contrary contained herein, that portion of the Escrow Funds that do not constitute the initial Escrow Amount shall be released in accordance with Section 11 or as otherwise provided herein.

(e)    Release of Remaining Escrow Funds.

(i)    On the date that is the first Business Day after the first (1st) anniversary of the Closing Date (the "Distribution Date"), Escrow Agent shall release by wire transfer to Seller's account designated in writing by Seller the remaining balance of the Escrow Funds in the Escrow Account as of the Distribution Date, less the amount of all Unresolved Claims.  For purposes of this Section 3(f)(i), the term "Unresolved Claims" shall mean, as of the Distribution Date, the aggregate amount of all Indemnification Claims that are the subject of a Dispute Notice or that are otherwise unresolved as of the Distribution Date, including any Indemnification Claims for which an Indemnification Notice has been delivered prior to the Distribution Date but for which the thirty (30)-day objection period has not expired as of the Distribution Date.

(ii)    Promptly upon Escrow Agent's receipt of the final determination of Buyer and Seller, or the final determination of a court of competent jurisdiction of any Unresolved Claims that are the subject of a Dispute Notice or upon the expiration of the thirty (30)-day objection period for any Unresolved Claims for which no Dispute Notice has been delivered, Escrow Agent shall release by wire transfer or otherwise distribute to an account or accounts designated in writing by Buyer or Seller, as the case may be, an amount of Escrow Funds equal to the amount of Escrow Funds to be released to Buyer or Seller pursuant to such final determination or the amount of such Unresolved Claim for which no Dispute Notice has been delivered, as the case may be.  After the resolution of all Unresolved Claims and subsequent to the Distribution Date, any remaining Escrow Funds not distributed to Buyer pursuant to the immediately preceding sentence shall be released promptly thereafter by Escrow Agent to Seller.

(f)    Optional Release by Buyer.  Notwithstanding anything set forth herein to the contrary, Buyer shall have the right at any time during the term hereof, upon written notice to Escrow Agent, to cause the Escrow Funds, including any Escrow Amount with respect to Unresolved Claims, to be released to Seller.

4.    Conditions to Escrow.  Escrow Agent agrees to hold the Escrow Funds and to perform its obligations in accordance with the terms and provisions of this Agreement.  The Parties agree that Escrow Agent shall not assume any responsibility for the failure of the Parties to perform in accordance with the Asset Purchase Agreement or this Agreement.  The acceptance by Escrow Agent of its responsibilities hereunder is subject to the following terms and conditions which the Parties hereto agree shall govern and control with respect to Escrow Agent's rights, duties and liabilities hereunder:

(a)     <u>Documents</u>.  Escrow Agent shall be protected in acting upon any written notice, request, waiver, consent, receipt or other paper or document or e-mail transmission furnished to it, not only as to its due execution and validity and the effectiveness of its provisions, but also as to the truth and accuracy of any information therein contained, which Escrow Agent in good faith believes to be genuine and what it purports to be.  Should it be necessary for Escrow Agent to act upon any instructions, directions, documents or instruments issued or signed by or on behalf of any corporation, partnership, fiduciary or individual acting on behalf of another party hereto, it shall not be necessary for Escrow Agent to inquire into such corporation's, partnership's, fiduciary's or individual's authority.  Escrow Agent is also relieved from the necessity of satisfying itself as to the authority of the persons executing this Agreement in a representative capacity on behalf of any of the Parties.

(b)     <u>Status of Escrow</u>.  Escrow Agent is acting under this Agreement as a stakeholder only and, subject to the last sentence of this <u>Section 4(b)</u>, shall be considered an independent contractor with respect to the Parties.  No term or provision of this Agreement is intended to create, nor shall any such term or provision be deemed to have created, any principal-agent, trust, joint venture, partnership, debtor-creditor or attorney-client relationship between or among Escrow Agent and any of the Parties.  To the extent any beneficiary under this Agreement, including but not limited to Buyer or any Affiliate of Buyer, is or has been represented by Escrow Agent, such beneficiary including Buyer or any Affiliate of Buyer hereby waives any conflict of interest and irrevocably authorizes and directs Escrow Agent to carry out the terms and provisions of this Agreement fairly as to all Parties, without regard to any such representation and irrespective of the impact upon any of the Parties or any of their respective Affiliates.  Escrow Agent's only duties are those expressly set forth in this Agreement, and each of the Parties hereby authorizes Escrow Agent to perform those duties in accordance with its usual practices in holding funds of its own or those with respect to other escrow agreements.  Escrow Agent may exercise or otherwise enforce any of its rights, powers, privileges, remedies and interests under this Agreement and applicable law, or perform any of its duties under this Agreement by or through its partners, employees, attorneys, agents or designees.  Notwithstanding the foregoing, Buyer expressly acknowledge that Escrow Agent has previously and is currently representing Seller and various Affiliates of Seller on certain matters, including but not limited to the transactions contemplated by the Asset Purchase Agreement, and nothing herein shall prevent or preclude Escrow Agent from continuing to represent Seller and various Affiliates of Seller in any fashion or with respect to any matter whatsoever, including but not limited to, any dispute relative to the Escrow Funds, the Asset Purchase Agreement, or in connection with any matter relative to Seller, or any of its Affiliates, or otherwise.

(c)     <u>Discharge of Escrow Agent</u>.  Upon delivery of all of the Escrow Funds pursuant to the terms of <u>Section 3</u> above and <u>Section 11</u> below, pursuant to a court of competent jurisdiction in accordance with <u>Section 4(d)</u> below, or pursuant to a successor escrow agent pursuant to <u>Section 6</u> below, Escrow Agent shall thereafter be discharged from any further obligations hereunder.  Escrow Agent is hereby authorized, in any and all events, to comply with and obey any and all final judgments, orders and decrees of any court of competent jurisdiction which may be filed, entered or issued, and all final arbitration awards and, if it shall so comply or obey, it shall not be liable to any other person by reason of such compliance or obedience.

(d)     Disputes; Interpleader.  In the event that any conflicting or adverse claims or demands are made or notices served upon Escrow Agent with respect to the escrow provided for herein, the Parties agree that Escrow Agent shall be entitled, but shall not be obligated, to refuse to comply with any such claim or demand and to withhold and stop all further performance of this escrow so long as such disagreement shall continue.  In so doing, Escrow Agent shall not be or become liable for damages, losses, expenses or interest to Buyer or Seller or any other person for its failure to comply with such conflicting or adverse demands.  Escrow Agent shall be entitled to continue to so refrain and refuse to so act until: (i) the rights of the adverse claimants have been finally adjudicated in a court assuming and having jurisdiction and venue over the parties and/or the documents, instruments or funds involved herein or affected hereby; and/or (ii) Escrow Agent shall have received an executed copy of a dispositive settlement agreement or other written agreement or instructions to which each of Buyer and Seller and all other adverse claimants, if any, are parties and signatories.  Escrow Agent also may elect to commence an interpleader or other action for declaratory judgment for the purpose of having the respective rights of the claimants adjudicated, and may deposit with a court all funds (*i.e.*, the Escrow Funds) held hereunder pursuant to this Agreement; and if it so commences such an action and deposits the Escrow Funds, Escrow Agent shall be relieved and discharged from any further duties and obligations under this Agreement and relieved from any and all liability or obligation with respect to such interpleaded assets.  Each of Seller and Buyer agrees to pay one-half (1/2) of all costs, expenses and attorneys' fees and expenses incurred by Escrow Agent in seeking any such judgment or taking any other action hereunder (including legal fees (at its normal and customary rates) of Zukerman Gore Brandeis & Crossman, LLP if Escrow Agent acts as its own legal counsel. All of the foregoing costs, expenses and attorneys' fees and expenses shall be deemed recoverable attorneys' fees. The Parties further agree to pursue any redress or recourse in connection with such a dispute, without making Escrow Agent a party to the same.

(e)     Limitations on Escrow Agent Duties.  Escrow Agent shall have only those duties as are specifically provided herein, which shall be deemed purely ministerial in nature, and shall under no circumstance be deemed a fiduciary for any of the Parties to this Agreement.  Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument or document between the Parties in connection herewith, including without limitation the Asset Purchase Agreement, or otherwise.  This Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of Escrow Agent shall be inferred from the terms of this Agreement or any other agreement

(f)     Court Orders.  In the event that any Escrow Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

5.      Exculpation and Indemnification.

(a)      Escrow Agent and its designees, and each of its and their respective partners, members, employees, attorneys and agents, shall not incur any liability whatsoever for the investment or disposition of the Escrow Funds or the taking of any other action or executing and delivering any documentation in accordance with the terms and provisions of this Agreement, for any mistake or error in judgment, for compliance with any applicable law or any attachment, order or other directive of any court or other authority (irrespective of any conflicting term or provision of this Agreement), or for any act or omission of any other person engaged by Escrow Agent in connection with this Agreement other than those attributable to the gross negligence or willful misconduct as finally determined pursuant to applicable law by a court or governmental authority having jurisdiction; and each of the Parties hereto irrevocably waives any and all claims and actions whatsoever against Escrow Agent and its designees, and each of their respective partners, members, employees, attorneys and agents, arising out of or related directly or indirectly to any and all of the foregoing acts, omissions and circumstances other than those of gross negligence or willful misconduct as finally determined pursuant to applicable law by a court or governmental authority having jurisdiction.  Furthermore, Escrow Agent and its designees, and each of their respective directors, officers, partners, employees, attorneys and agents, shall not incur any liability (other than for a person's own acts or omissions breaching a duty owed to the claimant and amounting to gross negligence or willful misconduct as finally determined pursuant to applicable law by a court or governmental authority having jurisdiction) for other acts and omissions arising out of or related directly or indirectly to this Agreement or the Escrow Funds; and each of the Parties, and each of their respective Affiliates, hereby expressly waives any and all claims and actions (other than those attributable to a person's own acts or omissions breaching a duty owed to the claimant and amounting to gross negligence or willful misconduct as finally determined pursuant to applicable law by a court or governmental authority having jurisdiction) against Escrow Agent and its designees, and each of their respective directors, officers, partners, employees, attorneys and agents, arising out of or related directly or indirectly to any and all of the foregoing acts, omissions and circumstances.

(b)      Escrow Agent and its designees, and each of their respective directors, officers, partners, employees, attorneys and agents, shall be indemnified, reimbursed and held harmless, jointly and severally, by the Parties, from and against any and all claims, liabilities, losses and expenses (including, without limitation, the disbursements, expenses and fees of their respective attorneys) that may be imposed upon, incurred by, or asserted against any of them, or any of their respective directors, officers, partners, employees, attorneys or agents, arising out of or based upon any act or omission by Escrow Agent, except such as are occasioned by the indemnified person's own acts and omissions breaching a duty owed to the claimant and amounting to gross negligence or willful misconduct as finally determined pursuant to applicable law by a court or governmental authority having jurisdiction.  The indemnification provisions of this Section 5 shall survive the termination of this Agreement.

6.      Resignation or Termination of Escrow Agent.  Escrow Agent shall have the right to resign at any time by giving written notice of such resignation to Buyer and Seller, and Buyer and Seller shall have the right to terminate the services of Escrow Agent hereunder at any time by giving a joint written notice of such termination to Escrow Agent, in each case specifying the effective date of such resignation or termination.  Within thirty (30) days after receiving or

delivering the aforesaid notice, as the case may be, Buyer and Seller agree to appoint a successor escrow agent to which Escrow Agent shall distribute the property then held hereunder.  If a successor escrow agent has not been appointed and has not accepted such appointment by the end of such thirty (30)-day period, Escrow Agent may apply to a court of competent jurisdiction for the appointment of a successor escrow agent, and one-half (1/2) of the costs, expenses and reasonable attorneys' fees which are incurred in connection with any such proceeding (collectively, "Appointment Costs") shall be paid by Buyer and one-half (1/2) of the Appointment Costs shall be paid by Seller.  Except as otherwise agreed to in writing by Buyer and Seller, no Escrow Funds shall be released from the Escrow Account unless and until a successor escrow agent has been appointed in accordance with this Section 6.

7.      Limitations on Rights to Escrow Funds.  Neither Buyer nor Seller shall have any right, title or interest in or to, or possession of, the Escrow Account and therefore shall not have the ability to pledge, convey, hypothecate or grant as security all or any portion of the Escrow Funds unless and until such Escrow Funds have been released pursuant to Section 3 above and Section 11 below.  Accordingly, Escrow Agent shall be in sole possession of the Escrow Funds and shall not act as custodian of Buyer or Seller under this Agreement for the purposes of perfecting a security interest therein, and no creditor of any of Buyer or Seller shall have any right to have or to hold or otherwise attach or seize all or any portion of the Escrow Funds as collateral for any obligation and shall not be able to obtain a security interest in any of the Escrow Funds unless and until such Escrow Funds have been released pursuant to Section 3 above and Section 11 below.

8.      Notices. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, sent by telecopy (with hard copy to follow) or sent by reputable overnight express courier (charges prepaid) or (b) three (3) days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid.  Such notices, demands and other communications shall be sent to Escrow Agent, Buyer and Seller at the addresses indicated below or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party:

If to Buyer:                            318 West 39th Street
                                        8th Floor
                                        New York, NY  10018
                                        Facsimile: 646-484-4495
                                        E-mail: ggreen@alliance.us
                                        Attention: Gary Green

with a copy simultaneously
by like means (but which
shall not constitute notice
hereunder) to:                          Rimon P.C.
                                        245 Park Avenue
                                        39th Floor
                                        New York, NY  10168

E-mail: matthew.pace@rimonlaw.com
Attention: Matthew Pace

|  |  |
|---|---|
| If to Seller: | 831 South Douglas Street<br>El Segundo, CA 90245<br>Facsimile: 310-531-5015<br>E-mail: bsutman@enthusiastnetwork.com<br>Attention: Bill Sutman, Chief Financial Officer |
| with a copy simultaneously by like means (but which shall not constitute notice hereunder) to: | Zukerman Gore Brandeis & Crossman, LLP<br>Eleven Times Square, Fifteenth Floor<br>New York, NY 10036<br>Facsimile: (212) 223-6433<br>E-mail: cbrandeis@zukermangore.com<br>Attention: Clifford A. Brandeis, Esq. |
| If to Escrow Agent: | Zukerman Gore Brandeis & Crossman, LLP<br>Eleven Times Square<br>New York, NY 10036<br>Attention: Clifford A. Brandeis, Esq.<br>Facsimile: (212) 223-6433 |

9.     Entire Agreement; Amendments.  This Agreement, together with the Asset Purchase Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter..  This Agreement may be amended, or any provision of this Agreement may be waived, so long as such amendment or waiver is set forth in a writing executed by each of the Parties; *provided* that if any such amendment or waiver would have the effect of modifying, supplementing, amending, reducing or expanding Escrow Agent's obligations or duties under this Agreement in any fashion whatsoever, the written consent of Escrow Agent shall be required in addition to the written consent of the Parties.  No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any party hereto under or by reason of this Agreement.

10.     Assigns and Assignment.  This Agreement and all actions taken hereunder shall inure to the benefit of and shall be binding upon all of the Parties hereto and upon all of their respective successors and assigns; *provided* that Escrow Agent shall not be permitted to assign its obligations hereunder except as provided in Section 4(d) and Section 6 above and except to any entity into which Escrow Agent may be merged or consolidated or to any entity to whom Escrow Agent may transfer all or substantially all of its escrow business as long as such entity

assumes all of the obligations of Escrow Agent hereunder.  The foregoing notwithstanding, no assignment of the interest of any of the parties hereto shall be binding upon Escrow Agent unless and until written evidence of such assignment shall be delivered to and acknowledged by Escrow Agent.

11.    Taxation of Interest Earned on Investment of Escrow Amount.  Each of the Parties hereby acknowledges that, for federal and state income tax purposes, the interest, gains and income earned on the investment of the Escrow Amount shall be income of Buyer.  Escrow Agent shall be responsible for reporting any interest, gains and income earned to the Internal Revenue Service; *provided* that the Parties acknowledge that payments of any interest, gains and income earned on the Escrow Funds will be subject to backup withholding penalties unless a properly completed Internal Revenue Service form W-8 or W-9 certification is submitted to Escrow Agent on behalf of Buyer.  To the extent not previously distributed to Buyer, Escrow Agent shall distribute to Buyer all of the interest, gains and income earned on the Escrow Amount on the Distribution Date; and with respect to Unresolved Claims, Escrow Agent will also distribute to Buyer any additional interest, gains and income, if any, earned on any portion of the Escrow Amount retained by Escrow Agent subsequent to the Distribution Date at such time(s) as the Escrow Amount with respect to any Unresolved Claim is thereafter distributed to Buyer or Seller as provided in Section 3(f)(ii) above.

12.    No Other Third Party Beneficiaries.  This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

13.    Interpretation.  The headings in this Agreement are inserted for convenience of reference only and shall not be a part of or control or affect the meaning hereof.

14.    No Waiver.  No failure or delay by any of the Parties hereto, or Escrow Agent, in exercising any right, power or privilege hereunder shall operate as a waiver thereof, and no single or partial exercise thereof shall preclude any right of further exercise or the exercise of any other right, power or privilege.  The right of Buyer and Seller to receive all or a portion of the Escrow Funds under the circumstances described in Section 3 and Section 11 above is in addition to, and not in lieu of, any other remedies that any such party may have against another party pursuant to the Asset Purchase Agreement.

15.    Severability.  The parties hereto agree that (a) the provisions of this Agreement shall be severable in the event that for any reason whatsoever the provisions hereof are invalid, void or otherwise unenforceable, (b) such invalid, void or otherwise unenforceable provisions shall be automatically replaced by other provisions which are as similar as possible in terms to such invalid, void or otherwise unenforceable provisions, but are valid and enforceable, and (c) the remaining provisions shall remain enforceable to the fullest extent permitted by law.

16.    No Strict Construction.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their collective mutual intent, and no rule of strict construction shall be applied against any person.  The term "including" as used herein shall be by way of example, and shall not be deemed to constitute a limitation of any term or

provision contained herein.  Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form.

17. <u>Releases on Non-business Days</u>.  In the event that a release of Escrow Funds hereunder is required to be made on a date that is not a Business Day, such release may be made on the next succeeding business day with the same force and effect as if made when required.  As used herein, the term "<u>Business Day</u>" shall mean any day other than Saturdays, Sundays or holidays, when federally chartered banks are open in the State of New York.

18. <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction).  All of the parties hereto irrevocably consent to the exclusive jurisdiction and venue of the federal and state courts located in the State of New York, County of New York, and waive the right to a jury trial.

19. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

20. <u>Termination</u>.  This Agreement shall terminate when all of the Escrow Funds in the Escrow Account have been released and distributed in accordance with <u>Section 3</u> and <u>Section 11</u>.  Upon such termination, this Agreement shall have no further force and effect, except that the provisions of <u>Sections 4</u>, <u>5</u> and <u>6</u> and <u>Sections 8</u> through <u>20</u> above shall survive such termination and the resignation or removal of Escrow Agent.

[*Rest of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the date first written above.

BUYER:

ALLIANCE BASEBALL BBA, LLC

By: _____

Name:  Gary Green

Title:
         Chairman & CEO

SELLER:

TEN: THE ENTHUSIAST NETWORK, LLC

By: _____

Name:  William A. Sutman

Title:
    EVP, CFO & Treasurer

TEN: THE ENTHUSIAST NETWORK MAGAZINES, LLC

By: _____

Name:  William A. Sutman

Title:
    EVP, CFO & Treasurer

GRIND MEDIA, LLC

By: _____

Name:  William A. Sutman

Title:
    EVP, CFO & Treasurer

[Signature Page to Escrow Agreement]

ESCROW AGENT:

**ZUKERMAN GORE BRANDEIS &
CROSSMAN, LLP**, as Escrow Agent

By: _____
    Name: Clifford A. Brandeis
    Title: Partner

[Signature Page to Escrow Agreement]

# EXHIBIT B

**Working capital calc. updated as of 2/10/2017**

| Row Labels | Sum of 1/31/2017 |
|---|---:|
| 12100 - Trade Receivables | 336,209 |
| 12600 - Reserve for Bad Debt | (79,528) |
| 12900 - Other Receivables | 3,309 |
| 14220 - Prepaid Consumer Marketing Expense | 14 |
| 14900 - Other Prepaid Expenses | 62,462 |
| 19110 - Deposits - Non-current | 5,045 |
| 21113 - Accounts Payable Non-Trade | (72,529) |
| 21120 - Accrued Accounts Payable | (56,879) |
| 21121 - Accrued Circulation Expense - Ful | (4,761) |
| 21124 - Accrued Circulation Expense - O | (269) |
| 21125 - Retail Display Allowance | (8,647) |
| 21127 - Accrued Inventory | (37,087) |
| 26400 - Miscellaneous Long Term Liab | (6,424) |
| **Grand Total** | **140,916** |

# EXHIBIT C

## ASSIGNMENT AND ASSUMPTION AND BILL OF SALE

This ASSIGNMENT AND ASSUMPTION AND BILL OF SALE, dated as of February 13, 2017 (this "Agreement"), is made, executed and delivered by and between TEN: The Enthusiast Network, LLC ("TEN"), TEN: The Enthusiast Network Magazines, LLC ("TEN Magazines"), Grind Media, LLC ("Grind Media" and, together with TEN and TEN Magazines, the "Assignors") and Alliance Baseball BBA, LLC ("Buyer") and its wholly-owned subsidiary Baseball America Enterprises, LLC ("Assignee").

R E C I T A L S:

A.    Assignors and Buyer are parties to that certain Asset Purchase Agreement dated as of the date hereof (the "Purchase Agreement"), which provides for the assignment by Seller to Buyer, and the assumption by Buyer from Seller, of certain rights and obligations in and to the Purchased Assets (as defined in the Purchase Agreement);

B.    Assignors and Buyer are conducting the Closing effective as of 12:01 A.M. New York City time on the date hereof.  Pursuant to the Purchase Agreement, Seller and Buyer desire to effect such assignment and assumption, effective as of as of 12:01 A.M. New York City time on the date hereof.

A G R E E M E N T S:

In consideration of the above premises and the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignors and Buyer hereby agree as follows:

1.    Purchase Agreement.  This Agreement is made pursuant to and in accordance with the Purchase Agreement.  Except where the context otherwise requires, any capitalized term used but not defined herein shall have the meaning given to such term in the Purchase Agreement.

2.    Assignment and Assumption.  Pursuant to the terms and subject to the conditions of the Purchase Agreement and effective as of the date hereof, (a) each Assignor hereby sells, assigns, transfers, conveys, grants and delivers to Assignee, its successors and assigns, all of the right, title and interest of such Assignor in, to and under the Purchased Assets (including, without limitation, all Intellectual Property Assets listed on Schedule I and all Tangible Personal Property listed on Schedule II ), in each case free and clear of any and all Encumbrances and (b) Assignee hereby purchases, acquires and accepts from each Assignor, all of such Assignor's right, title, and interest in, to and under the Purchased Assets (including, without limitation, all Intellectual Property Assets and all Tangible Personal Property) and assumes and agrees to pay and discharge when due the Assumed Liabilities.

3.    Assumption of Assumed Liabilities.  Each Assignor hereby assigns to Assignee the Assumed Liabilities and Assignee hereby unconditionally assumes and agrees to pay and discharge when due the Assumed Liabilities.

4.    <u>Assumption of Transferred Contracts</u>. In consideration of the Assignors' conveyance of any contract that is a Purchased Asset (each a "<u>Transferred Contract</u>") and other good and valuable consideration, Assignee, for the benefit of the Assignors, and their respective successors and assigns and the obligees thereunder, hereby expressly assumes and agrees to perform the obligations of each Assignor under and pursuant to the Transferred Contracts.

5.    <u>Further Assurances</u>.  Assignors, Buyer and Assignee shall each execute and deliver such other documents and take such other actions as the other party hereto may reasonably request to confirm the assignment executed hereby and to vest title in and to the Purchased Assets in Assignee.

6.    <u>Limitation on Assignment</u>.  Notwithstanding any of the provisions of the foregoing, this instrument shall not constitute an assignment to Assignee of any asset if an attempted assignment of the same without the consent of the other party thereto would constitute a breach thereof or in any way impair the rights of any Assignor thereunder, but only to the extent that such consent has not been obtained as of the date hereof, *provided, however*, that if any such consent is obtained after the date hereof with respect to any such contract, this instrument shall constitute an assignment of the same to Assignee as of the date of such consent, without any further action by Assignors or Buyer.

7.    <u>Binding Effect; Amendments</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  This Agreement cannot be amended, supplemented, or changed except by an agreement in writing that is signed by the parties hereto.

8.    <u>Purchase Agreement Controlling</u>.  Nothing contained herein shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including warranties, covenants, agreements, conditions, representations or, in general, any of the rights and remedies, and any of the obligations, of Assignors or Buyer set forth in the Purchase Agreement, including, without limitation, any limits on indemnification specified therein. Nothing contained herein is intended, as between the parties, to modify or supersede any of the provisions of the Purchase Agreement.

9.    <u>Choice of Law</u>.  This Agreement and all matters arising out of or relating to this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

10.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by facsimile or .pdf, each of which will be deemed an original, but all of which together will constitute one and the same instrument

*[Remainder of Page Left Intentionally Blank]*

2

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**ASSIGNORS**

**TEN:  THE ENTHUSIAST NETWORK, LLC**

By: _____
Name:
Title:
William A. Sutman

EVP, CFO & Treasurer

**TEN:  THE ENTHUSIAST NETWORK MAGAZINE, LLC**

By: _____
Name:
Title:
William A. Sutman

EVP, CFO & Treasurer

**GRIND MEDIA, LLC**

By: _____
Name:
Title:
William A. Sutman

EVP, CFO & Treasurer

**BUYER**

**ALLIANCE BASEBALL BBA, LLC**

By: _____

Name:   Gary Green

Title:   Chairman & CEO

**ASSIGNEE**

**BASEBALL AMERICA ENTERPRISES, LLC**

By: _____

Name:   DAVID GEASLEN

Title:   PRESIDENT

**SCHEDULE I**

**INTELLECTUAL PROPERTY ASSETS**

See Section 4.08 of the Disclosure Schedules.

**SCHEDULE II**

**TANGIBLE PERSONAL PROPERTY**

See Section 2.01(e) of the Disclosure Schedules.

# EXHIBIT D

**EXECUTION COPY**

## TRANSITION SERVICES AGREEMENT

THIS TRANSITION SERVICES AGREEMENT, dated as of February 13, 2017 (this "Agreement"), is made by and among TEN: The Enthusiast Network, LLC, a Delaware limited liability company ("TEN"), TEN: The Enthusiast Network Magazines, LLC, a Delaware limited liability company ("TEN Magazines") and  Grind Media, LLC, a Delaware limited liability company ("Grind," and collectively with TEN and TEN Magazines, jointly and severally, ("Seller"), and Baseball America Enterprises, LLC a Delaware limited liability company (the "Receiver") and a wholly-owned subsidiary of Alliance Baseball BBA, LLC ("Alliance BBA" and, together with Receiver and Seller, the "Parties").

WHEREAS, Alliance BBA and Seller have entered into an Asset Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"), pursuant to which Alliance BBA has purchased from Seller certain assets (the "Acquired Assets") and assumed from Seller certain liabilities relating to the Publication (as defined in the Purchase Agreement);

WHEREAS, the Parties wish to enter into a transition services agreement for the provision of certain transitional services by Seller to the Receiver (the "Services"), which Services are described in this Agreement and the Schedules attached hereto, as amended from time to time (the "Schedules");

WHEREAS, this Agreement sets out the terms and conditions for such provision of the Services; and

WHEREAS, capitalized terms used herein but not defined shall have the meanings assigned to them in the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I

## TRANSITION SERVICES

1.1     Provision and Acceptance of Services.

(a)     For each Service, Seller agrees to provide or cause another Supplier Party (as defined below) to provide, and the Receiver agrees to accept, the Services in accordance with the description, specifications, intended purpose and within the timeframes as set forth in the Schedules, as the same may be amended, restated, modified or supplemented from time to time, in each case in writing upon the mutual agreement of the Parties.  The Seller shall provide the Services in consideration for the Purchase Price paid by to Seller and Seller shall not be entitled to receive any additional consideration for providing the Services; provided, however, that, notwithstanding the foregoing, Receiver shall be responsible for all out of pocket costs and expenses incurred by Seller in the course of providing the Services hereunder ("Costs"), for

which Receiver shall reimburse Seller within sixty (60) days of the receipt of an invoice from Seller detailing any Costs.

(b)     In addition to the Services provided for above, Seller shall provide Receiver with maintenance services to correct any Service in the event that a Service provided by Seller does not conform to its designated specifications or otherwise does not perform in accordance with the functionality reasonably expected for such Services.  Seller shall perform any such maintenance services promptly upon written request by Receiver, which written request shall set forth in sufficient detail the reason(s) for the required maintenance services and the nature and scope of the maintenance services required.  If the Seller fails to remedy any error as set forth above, then the Receiver shall be entitled to, upon no less than five (5) days prior written notice to the Receiver, at the Seller's commercially reasonable expense, immediately modify, or engage a third party to correct each error.

(c)     The Services to be provided hereunder may be provided by Seller or any of its Subsidiaries or its or their respective directors, officers, employees, contractors or agents (collectively, "Supplier Parties").  In respect of any Services that are provided by a contractor or agent of Seller or a Subsidiary thereof (such Person, a "Third Party Service Provider"), Seller shall, at the Receiver's election, use commercially reasonable efforts to assist the Receiver in procuring a written contractual relationship with such Third Party Service Provider to replace the relevant Schedule or portion thereof.  Notwithstanding anything to the contrary herein, (i) the performance of any Service by any Person other than Seller or the Supplier Parties shall not result in any change in such Service and/or the terms applicable to such Service; and (ii)  Seller shall remain responsible for the performance of any Service not performed directly by Seller, unless such Service is performed by a Third Party Service Provider that has entered into a written contractual relationship with the Receiver with respect to such Service in accordance with the preceding sentence.

(d)     Seller shall, and shall cause each other Supplier Party to, provide the Services (i) in accordance with applicable Law, (ii) in the manner and at a level substantially consistent with that provided by the Supplier Parties prior to the Closing, (iii) in a professional and workmanlike manner and (iv) using personnel with sufficient training and expertise in providing the Services.

(e)     If, during the term of this Agreement, the Receiver identifies a service that Seller provided with respect to the Publication prior to the Closing that the Receiver reasonably determines is necessary or desirable in order for the Publication to continue to operate in substantially the same manner in which the Publication operated prior to the Closing Date, and such service is not included in the Services (other than because the Parties explicitly agreed that such services shall not be included), then Seller shall use commercially reasonable efforts to provide, or cause to be provided, such requested services (such additional services, the "Additional Services").   The Receiver shall reasonably request the Additional Services in writing.  Subject to mutual agreement on the terms and conditions of providing such Additional Services, in the event Seller is able to provide such Additional Services using commercially reasonable efforts, and unless specifically agreed to in writing to the contrary, such Additional Services shall be deemed Services hereunder and accordingly, Seller shall provide such Additional Services, or cause such Additional Services to be provided, in accordance with the terms and conditions of this Agreement.  The Parties acknowledge and agree that any Additional

2

Services provided hereunder shall be provided for a fee equal to Seller's cost of providing such Additional Services.

(f)     The status of Seller and the Supplier Parties shall be that of independent contractors and nothing set forth herein shall be deemed to constitute any partnership, joint venture, fiduciary relationship, agency, or similar relationship between Seller and any Supplier Party, on the one hand, and the Receiver, on the other hand. Seller shall not represent, and shall cause each other Supplier Party not to represent, to any third party that any such partnership, joint venture, fiduciary relationship or agency exists in respect of this Agreement, or that Seller or any Supplier Party is acting on behalf of the Receiver pursuant to this Agreement in any capacity other than that of independent contractor.  Nothing in this Agreement confers authority upon Seller or any Supplier Party to enter into any commitment or agreement binding on the Receiver. To the extent that Seller or any Supplier Party utilizes any of its property in providing the Services, such property shall remain the property of such Person, and the Receiver shall not acquire any right, title or interest in or to such property, except to the extent provided under the Purchase Agreement or any other Transaction Document.

1.2     <u>Transitional Assets</u>.

(a)     The Receiver hereby grants to Seller and the Supplier Parties the right to use the Acquired Assets in their possession during the Term, if any (the "<u>Transitional Assets</u>"), solely for the purpose of providing the applicable Services pursuant to this Agreement.  The Receiver shall cause each Transitional Asset to be clearly labeled identifying it as the property of the Receiver.

(b)     Seller shall (i) maintain the Transitional Assets and keep the Transitional Assets in good operating condition and running order, normal wear and tear excepted, and (ii) keep the Transitional Assets insured against all risks of loss or damage from every cause whatsoever for not less than the fair market value of the Transitional Assets, in each case at the Receiver's sole cost and expense.

(c)     Seller shall not sublease, mortgage or otherwise encumber, remove or suffer to be removed from Seller's premises, or part with possession of, any Transitional Assets or any part thereof, or permit to attach or exist any lien on any Transitional Assets.

(d)     On a date mutually agreeable to the Parties, Seller shall cause the Transitional Assets to be delivered from Seller's facility to the location(s) specified by the Receiver, at the sole cost and expense of the Receiver.

1.3     <u>Project Managers</u>.  Each of Receiver and Seller shall designate a project manager (a "<u>Project Manager</u>") to report and discuss issues with respect to the provision of the Services, and shall give prior written notice to the other in the event it designates a replacement Project Manager.  Seller's initial Project Manager shall be Kevin Mullan and the Receiver's initial Project Manager shall be Jon Segal.  The Project Managers shall discuss the performance of the Services as often as reasonably necessary to ensure the orderly provision of the Services.

4847-6159-2123.7

**ARTICLE II**

**[INTENTIONALLY LEFT BLANK]**

**ARTICLE III**

**EMPLOYEES**

3.1     Seller Employees.  The employees of Seller who provide the Services are solely employees of Seller and shall remain subject only to the supervision of Seller.  Seller shall be solely responsible for the payment and provision of all wages, bonuses and commissions, employee benefits, including severance and worker's compensation, worker's compensation insurance and the withholding and payment of applicable taxes, of the Supplier Parties providing the Services.

**ARTICLE IV**

**INTELLECTUAL PROPERTY**

4.1     Title to Intellectual Property.  The Parties agree that all right, title and interest in and to any and all Intellectual Property that is developed, discovered, adapted, improved and/or conceived during the term of this Agreement by Seller or any Supplier Party in connection with the provision of the Services shall be solely owned by Seller or such Supplier Party, as applicable.

**ARTICLE V**

**INDEMNIFICATION**

5.1     Limitation on Liability.  Notwithstanding any other provision of this Agreement, the liability of the Seller with respect to this Agreement or in connection with the performance, delivery or provision of any Service shall be limited to actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable documented attorneys' fees ("Losses") of the Receiver arising from the Seller's breach of the terms of this Agreement or the Seller's willful misconduct or negligence. Notwithstanding anything set forth herein to the contrary, the aggregate amount of Losses for which the Seller may be liable in connection with any breach of this Agreement and the Purchase Agreement (in the aggregate) shall be subject to the limitation set forth in Section 7.04(d) of the Purchase Agreement, provided, however that the foregoing shall not preclude Receiver availing itself of the remedy provided in Section 9.14 of this Agreement.

5.2     Indemnification.  Subject to the limitation set forth in Section 5.1 hereof, Seller hereby agrees to indemnify the Receiver, its Affiliates and their respective officers, directors and employees from and against any and all Losses arising out of or resulting from (i) Seller's breach of the terms of this Agreement or (ii) any Supplier Party's willful misconduct or gross negligence in connection with the provision of Services.  The Persons entitled to indemnification

4

pursuant to the foregoing shall be express third party beneficiaries of the rights to indemnification described in this Section 5.2.

5.3     No Punitive Damages.  Notwithstanding anything to the contrary herein, no Party shall be liable or otherwise responsible to the other Party hereto or any Affiliate of the other Party hereto for consequential, special, exemplary or punitive damages, other than (i) consequential, special, exemplary or punitive damages (x) awarded to a third party pursuant to a claim resulting from the assertion of liability by such third party or (y) in connection with claims of fraud or willful or intentional misrepresentation or (ii) consequential or special damages that were reasonably foreseeable on the date hereof and are a direct consequence of or direct result of, or directly arise from, a breach of this Agreement.

## ARTICLE VI

## CONFIDENTIALITY

The Parties acknowledge and agree that any confidential and/or proprietary information of the Receiver or any of its Affiliates that has been obtained or received by any Supplier Party, prior to the Closing Date or in the course of performance of Seller's obligations pursuant to this Agreement, shall be "Confidential Information" under the Purchase Agreement and subject in all respects to the provisions of the Confidentiality Agreement.  For each Third Party Service Provider engaged by Seller after the date hereof that will have access to confidential and/or proprietary information of Seller or Receiver, Seller shall remain liable to the Receiver for any breach of the provisions of the Confidentiality Agreement by any such Third Party Service Provider.  Additionally, for each Third Party Service Provider engaged by Seller as of the date hereof that has access to confidential and/or proprietary information of Seller, Seller shall use commercially reasonable efforts to cause such Third Party Service Provider to be subject to a written confidentiality obligation with respect to such confidential and/or proprietary information that is no less favorable to the Receiver than the Confidentiality Agreement.

## ARTICLE VII

## TERM; TERMINATION

7.1     Term.  The term of this Agreement shall commence at the Closing and shall automatically terminate on the second (2nd) anniversary of the Closing (the "Term").

7.2     Termination.  Receiver may terminate this Agreement with immediate effect by providing written notice to the Seller of Seller having committed a material breach of the performance of its obligations under this Agreement, which breach has not been cured within five (5) days after the giving of such notice.

7.3     Effect of Termination.

(a)     Upon termination or expiration of this Agreement, each Party shall deliver all property belonging to the other Party provided pursuant to this Agreement as soon as is reasonably practicable.

(b)     Termination or expiration of this Agreement will not affect the rights and obligations of the Parties under this or any other agreement between the Parties including, without limitation, the Purchase Agreement.

(c)     The following Articles and Sections of this Agreement shall survive the termination of this Agreement:  Section 1.3 and Articles IV, V, VI, VII, VII and IX.

## ARTICLE VIII

## REPRESENTATION AND WARRANTIES

The Seller, jointly and severally, makes the following representations and warranties to Alliance BBA and the Receiver:

8.1     Each Seller has full power and authority to execute this Agreement and to perform all of its obligations under this Agreement.  The execution and delivery of this Agreement by each Seller and the performance of all of its obligations under this Agreement have been duly authorized by all necessary corporate or limited liability company action.  Each Seller has duly executed and delivered this Agreement and this Agreement constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms.

8.2     Any and all Intellectual Property that is developed, discovered, adapted, improved and/or conceived during the term of this Agreement by one or more Supplier Parties in connection with the provision of the Services ("Work Product") was and will be developed either (a) by employees of the Seller within the scope of their employment or (b) agents or independent contractors who have assigned all of rights to such Work Product to the Seller pursuant to a written agreement. The Work Product and any Services that do not constitute Work Product and the use thereof as contemplated by this Agreement, to the Seller's Knowledge, does not and will not infringe, violate, or in any manner contravene, breach, or constitute an unauthorized use or misappropriation of any patent, copyright, trademark, license, or other property or proprietary right of any third party or constitute the unauthorized use or misappropriation of a trade secret and there are no claims, demands, or proceedings that have been instituted, or are pending or, to Seller's Knowledge, threatened, by any person or entity against the Seller alleging any matter contrary to the foregoing.

8.3     To the Seller's Knowledge, the Services consisting of software and the use thereof as contemplated by this Agreement does not and will not infringe, violate, or in any manner contravene, breach, or constitute an unauthorized use or misappropriation of any patent, copyright, trademark, license, or other property or proprietary right of any third party or constitute the unauthorized use or misappropriation of a trade secret and, to the Seller's Knowledge, there are no claims, demands, or proceedings that have been instituted, or are pending or threatened, by any person or entity against the Seller or any customer of the Seller, alleging any matter contrary to the foregoing.

# ARTICLE IX

## MISCELLANEOUS

9.1     DISCLAIMER OF WARRANTIES. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO AND DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT, WITH RESPECT TO THE SERVICES, TO THE EXTENT PERMITTED BY APPLICABLE LAW.  SELLER MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE QUALITY, SUITABILITY OR ADEQUACY OF THE SERVICES FOR ANY PURPOSE OR USE

9.2     Entire Agreement.  This Agreement, together with the Purchase Agreement and the other Related Agreements, contain the entire agreement between the Parties relating to the subject matter of this Agreement and supersede any previous written or oral agreement between the Parties in relation to matters dealt with in this Agreement.  If there is any inconsistency or conflict between the terms of this Agreement and any Schedule or Exhibit hereto, the terms of this Agreement shall prevail, except if and to the extent any such Schedule or Exhibit expressly states that it shall prevail in the event of any such conflict.

9.3     Amendment and Modification; Waiver.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9.4     Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably conditioned, withheld or delayed; provided, that such prior written consent shall not be required in connection with the assignment of a party's rights or obligations hereunder to a purchaser of a majority of such party's issued and outstanding equity interests or business (whether directly or indirectly by merger, consolidation, reorganization, sale of all or substantially all assets, or otherwise) if such purchaser expressly agrees in writing to assume all of such selling party's obligations hereunder.

9.5     Third Party Beneficiaries.  Except as expressly set forth in Article V, nothing in this Agreement shall confer any rights upon any person that is not a Party or the successor or permitted assignee of a Party to this Agreement.

9.6     Severability.  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.

9.7    Notices.

(a)    All notices or other communications hereunder shall be given in accordance with the notice provision of the Purchase Agreement, provided that all notices and communications relating to any specific Service, including all requests from the Receiver for Services to be provided under this Agreement, shall be directed to the contact person(s) specified with respect to such Service (if any), with a copy to the Project Managers.

(b)    Any notice to Seller's Project Manager shall be sent to such Project Manager at the following mailing address, email address or facsimile number, or such other address or facsimile number as Seller may notify to the Receiver from time to time:

> 831 South Douglas Street
> El Segundo, CA 90245
> Attention: Bill Sutman
> E-mail: BSutman@enthusiastnetwork.com

(c)    Any notice to the Receiver's Project Manager shall be sent to such Project Manager at the following mailing address, email address or facsimile number, or such other address or facsimile number as the Receiver may notify to Seller from time to time:

> 50-E Concord Street
> Suite 500
> Wilmington, MA  01887
> Attention: David Geaslen
> david@threestep.com

Force Majeure.  Should any Supplier Party be affected by a Force Majeure, Seller shall inform the Receiver in writing specifying the Force Majeure as well as its expected duration and the obligations hereunder that such Supplier Party cannot fulfill as a result thereof.  Seller shall be excused by the Receiver from performance under this Agreement (or any Service Level Agreement) to the extent the Force Majeure prevents such performance and shall resume its performance hereunder as promptly as reasonably practicable following the removal of such Force Majeure.  For purposes of this Agreement, "Force Majeure" means an event that is beyond the reasonable control of the Party claiming the force majeure event, including any earthquake, flood, fire, riot, war, terrorism, sabotage, civil commotion or civil unrest, interference by civil or military authorities, strike, embargo, failure or interruption of networks or energy sources, or any other act of God or similar.

9.8    Dispute Resolution.

(a)    The Parties will attempt in good faith to resolve promptly any dispute arising out of or relating to this Agreement by negotiation.  If the matter is not resolved in the normal course of business the dispute will be referred to the Project Managers, who will meet as soon as reasonably possible, but in any case within one (1) week, to attempt to resolve the dispute.  If the Project Managers do not resolve the dispute within such timeframe (as may be extended by mutual agreement of the Parties), then the dispute shall be escalated to designated members of senior management of each Party.

(b)     If the dispute is not resolved in accordance with Section 9.8(a), then either Party may initiate litigation in accordance with Section 9.11.  In the event that a Party initiates litigation or otherwise is forced to incur costs to enforce the terms of this Agreement including, without limitation, using the provisions of Section 1.1(b) or Section 9.14 of this Agreement, the prevailing party shall be entitled to receive any and all costs incurred by such Party in connection therewith including reasonable attorneys' fees.

9.9     Certain References.  Any reference in this Agreement to a liability or obligation of a Party shall be deemed to incorporate an obligation on the part of that Party to ensure that the relevant liability is discharged or obligation is performed by the Party or any relevant Affiliate of that Party, subject to the terms set out in this Agreement.  Whenever used in this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation" and (b) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.

9.10     Headings and References.  The Article and Section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

9.11     Governing Law; Jurisdiction.   This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction).   ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF NEW YORK IN EACH CASE LOCATED IN THE CITY OF NEW YORK AND COUNTY OF NEW YORK, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

9.12     Waiver of Jury Trial.   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER

9

PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.12.

9.13   <u>Counterparts</u>.  This Agreement, including each Service Level Agreement, may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same instrument.  A signed copy of this Agreement or any such Service Level Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy thereof.

9.14   <u>Specific Performance</u>.  The Parties agree that irreparable damage could occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to seek specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

*[Remainder of page intentionally left blank; signature page follows]*

IN WITNESS WHEREOF, the Parties hereto have caused this Transition Services Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

TEN: THE ENTHUSIAST NETWORK, LLC

By:
    Name:   William A. Sutman
    Title:

    EVP, CFO & Treasurer

TEN: THE ENTHUSIAST NETWORK MAGAZINES, LLC

By:
    Name:   William A. Sutman
    Title:

    EVP, CFO & Treasurer

GRIND MEDIA, LLC

By:
    Name:
    Title:   William A. Sutman

    EVP, CFO & Treasurer

[Signature Page to Transition Services Agreement]

**ALLIANCE BBA:**

ALLIANCE BASEBALL BBA, LLC

By: _____

    Name:   Gary Green
    Title:    Chairman & CEO

**RECEIVER:**

BASEBALL AMERICA ENTERPRISES, LLC

By: _____

    Name:  DAVID GEASLEN
    Title:  PRESIDENT

Schedules

(see attached)

## Circulation/Consumer Marketing Services

**Subscriber Acquisition Marketing Efforts**

**Manage, create, implement, analyze and report on the following subscriber marketing channels (includes print production/management of marketing material):** $5,000.00

- Direct mail
- Insert cards in magazine
- Email subscription marketing (not enewsletters or other BBA emails)
- Online/social marketing
- Third party subscription agents/partners
- Gift campaigns both new and renewal gift efforts
- Subscriber invoicing and schedules for "bill me laters"
- Renewal subscriber marketing efforts including postal, email, telemarketing

**Digital Editions/Platforms** $2,000.00

- Manage relationships/marketing with the various digital edition platforms (not digital edition creation/production)
   - Apple, Kindle, Google Play, Readly, Nook, Zinio, Texture, Magzter and others
- Provide monthly reports detailing the following key metrics for CUSTOMER editions on digital edition newsstands and app stores:
   - Circulation (single copy sales and subscriptions)
   - App downloads/installs (native apps only)
   - Total revenue
- Provide customer support for CUSTOMER digital editions

**Subscription Fulfillment/Print Orders/Forecasting/Audits**

**Manage day to day operations of subscription fulfillment vendor (Palm Coast Data)** $1,000.00

- Includes schedules, magazine issue label pulls, order processing, customer service, reporting

**Circulation model forecasting** $1,000.00

- Upload subscription production, prices/terms (from fulfillment) into circ models
- Budget and forecast circulation levels from subscriptions and newsstand sales
- Budget and forecast subscription and newsstand revenue/expenses
- Track ongoing subscription volumes/production against model to meet goals
- Set and prepare print order quantities based on circulation model forecasting, provide per  issue volumes for printing for both sub and newsstand copies

**Audits/U.S Postal Statements** $500.00

- Compile, prepare and and file all necessary information for AAM (Alliance for Audited Media) circulation statements and audits
- Compile, prepare and file all necessary information for U.S Postal Statements requirements to maintain preferred postal rates.

**Newsstand** $2,000.00

Manage day to day communication and operations with National Distributor, Wholesalers and Retailers
Manage on-sale date schedules and changes  internally and with wholesalers/distributors
Manage newsstand draw issue to issue
 - Manage, set, implement wholesaler/retailer work assignments for copy allocation into new or existing retailers, decrease copies in under/non-performing retailers
 - Prepare newsstand print order volumes/allocations by issue to appropriate wholesalers
Work with retailers and wholesalers to secure and implement any special retail promotional opportunities as appropriate
Report sales by issue

**Digital Transitional Services**

| Service/Function | Monthly |
|---|---|
| Hosting/CDN/OVP/DNS | $    1,800 |
| Ad and Programmatic Operations | $    2,800 |
| Web Development | $    2,750 |
| Social Software license | $    2,000 |

**Hosting/CDN/OVP/DNS**
· Full hosting of existing website at Tier 1 data center with real-time software and human monitoring of uptime and availability.
· Continued management of domain names and DNS services.
· Continued access to TEN online video platform (OVP) and leveraging TEN existing Content Delivery network vendors (CDN).
 - Continued access and use of TEN's WordPress CMS and installed WordPress plug-ins and TEN's PageBuilder system for BBA's site
· Continued use of the GrindTV VPN allowing BBA to access BBA's MySQL databases
· Ongoing access to WhatCounts for BBA's newsletter and email marketing service

**Ad and Programmatic Operations**
· Campaign flighting and optimization.  Response to inventory requests and post campaign DFP reporting.
· Ongoing access to TEN programmatic vendors, team and platforms as well as vendor optimization.
· 100% of programmatic revenue will pass through to BBA or be netted out of vendor service agreements

**Social Software license**
· BBA currently has access to TEN enterprise licenses for both SpreadFast and TrueAnthem for social publishing, social intelligence & social amplification
· Ongoing access to these platform tools and services by the BBA team.

**IT TSA Services**

Remote Networking Support

Remote Desktop Support

## MFG TSA Services
### Digital Editions (Production)

Using final print edition files from CUSTOMER, TEN shall provide services for the production of digital "replica" edition files for digital newsstands, and distribute files to digital
Creation and maintenance of any required "Developer" or "Publisher" accounts (as needed).
Creation and submission of apps to app stores.
Maintenance (updates) of apps to maintain compatibility, introduce new features, etc.


**Distribution Mgmt**
Monitor 3rd party logistics vendor compliance/performance
Ensure USPS compliance

# EXHIBIT B

EXECUTION VERSION

# DISCLOSURE SCHEDULES

## PROVIDED PURSUANT TO THE

## ASSET PURCHASE AGREEMENT

## BY AND AMONG

## TEN: THE ENTHUSIAST NETWORK, LLC,

## TEN: THE ENTHUSIAST NETWORK MAGAZINES, LLC,

## GRIND MEDIA, LLC

## AND

## ALLIANCE BASEBALL BBA, LLC

These Disclosure Schedules (each individually a "**Disclosure Schedule**" and collectively, the "**Disclosure Schedules**") dated as of February 13, 2017, are the Disclosure Schedules referred to in that certain Asset Purchase Agreement (the "**Agreement**"), dated as of the date hereof, by and among TEN: The Enthusiast Network, LLC, a Delaware limited liability company ("**TEN**"), TEN: The Enthusiast Network Magazines, LLC, a Delaware limited liability company ("**TEN Magazines**"), and Grind Media, LLC, a Delaware limited liability company ("**Grind**," and collectively with TEN and TEN Magazines, jointly and severally, ("**Seller**") and Alliance Baseball BBA, LLC, a Delaware limited liability company ("**Buyer**"). Capitalized terms used in these Disclosure Schedules and not otherwise defined in these Disclosure Schedules shall have the meanings given such terms in the Agreement.

The section numbers in these Disclosure Schedules correspond to the section numbers in the Agreement; provided that disclosure of any fact or item in any section or subsection of these Disclosure Schedules shall be deemed to have been disclosed with respect to other sections or subsections of these Disclosure Schedules if it is reasonably apparent on its face that the disclosure in one section or subsection of these Disclosure Schedules is applicable to the subject matter of another section or subsection hereof or the representations and warranties corresponding thereto. These Disclosure Schedules are qualified in their entirety by reference to the specific provisions of the Agreement and are not intended to constitute, and will not be deemed to constitute, representations and warranties of Seller, except as and to the extent provided in the Agreement, and nothing in these Disclosure Schedules is intended to broaden the scope of any representation, warranty or covenant set forth in the Agreement, except to the extent contemplated by the Agreement. The inclusion of any matter, information or item in any Disclosure Schedules shall not be deemed to constitute an admission of any liability to any third party or otherwise imply, that any such matter, information or item is material or creates a measure for materiality for the purposes of the Agreement. Unless the Agreement specifically provides otherwise, the inclusion of any specific item in these Disclosure Schedules is not intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no party to the Agreement shall use the fact of the setting forth or the inclusion of any such item or matter in any dispute or controversy between the parties to the Agreement as to whether any obligation, item or

matter not described herein or included in any section hereof is or is not in the ordinary course of business for purposes of the Agreement. The disclosure in these Disclosure Schedules of any allegations with respect to any failure to perform, or breach or default of a contractual or other duty or obligation is not an admission that such has in fact occurred. Matters reflected in these Disclosure Schedules are not necessarily limited to matters required by the Agreement to be reflected in these Disclosure Schedules. To the extent any such additional matters are included, they are included for informational purposes and do not necessarily include other matters of a similar nature. The headings contained in these Disclosure Schedules are for convenience of reference only and do not form a part of these Disclosure Schedules.

2

**Section 1.01(a)**
**Data Room Index**

(see attached Exhibit  1.01(a))

4837-7657-3760.5

| TYPE | INDEX NUMBER | TITLE | UPLOADED | | SIZE | FILE TYPE |
|---|---|---|---|---|---|---|
| *FOLDER* | *1* | *Baseball America* | | | | |
| *FOLDER* | *1.1* | *Financials* | | | | |
| *FOLDER* | *1.1.1* | *P&L* | | | | |
| FILE | 1.1.1-1 | BBA - P&L(6.6.16).xlsx | 06/22/2016 12:55 PM | 344 KB | | Excel Worksheet |
| FILE | 1.1.1-2 | BBA - P&L.xlsx | 06/22/2016 12:56 PM | 344 KB | | Excel Worksheet |
| *FOLDER* | *1.1.1.1* | *Detailed P&L BBA* | | | | |
| FILE | 1.1.1.1-1 | BBA-Detailed P&L-2015.xlsx | 05/02/2016 1:23 PM | 14 KB | | Excel Worksheet |
| FILE | 1.1.1.1-2 | BBA-Detailed P&L-2016.xlsx | 05/02/2016 1:23 PM | 14 KB | | Excel Worksheet |
| FILE | 1.1.1.1-3 | BBA-Detailed P&L-2017.xlsx | 06/01/2016 9:00 AM | 32 KB | | Excel Worksheet |
| *FOLDER* | *1.1.1.2* | *Monthly P&L BBA* | | | | |
| FILE | 1.1.1.2-1 | BBA-MONTHLY P&L-2015.xlsx | 05/02/2016 1:40 PM | 27 KB | | Excel Worksheet |
| FILE | 1.1.1.2-2 | BBA-MONTHLY P&L-2016.xlsx | 05/02/2016 1:47 PM | 27 KB | | Excel Worksheet |
| FILE | 1.1.1.2-3 | BBA-MONTHLY P&L-2017.xlsx | 05/02/2016 4:47 PM | 17 KB | | Excel Worksheet |
| *FOLDER* | *1.1.1.3* | *Book Revenue* | | | | |
| FILE | 1.1.1.3-1 | BBA-FinSummary P&L-BOOK-2015.xlsx | 06/01/2016 8:59 AM | 22 KB | | Excel Worksheet |
| FILE | 1.1.1.3-2 | BBA-FinSummary P&L-BOOK-2016.xlsx | 06/01/2016 8:59 AM | 25 KB | | Excel Worksheet |
| FILE | 1.1.1.3-3 | BBA-FinSummary P&L-BOOK-2017.xlsx | 06/01/2016 8:59 AM | 31 KB | | Excel Worksheet |
| *FOLDER* | *1.1.2* | *Excluded Expenses* | | | | |
| FILE | 1.1.2-1 | BBA - Allocation Exclusion Reconciliation-2017.xlsx | 04/04/2016 6:14 PM | 339 KB | | Excel Worksheet |
| FILE | 1.1.2-2 | BBA - Allocation Exclusion Reconciliation-2016.xlsx | 04/25/2016 10:10 AM | 339 KB | | Excel Worksheet |
| FILE | 1.1.2-3 | BBA - Allocation Exclusion Reconciliation-2015.xlsx | 04/25/2016 10:10 AM | 338 KB | | Excel Worksheet |
| *FOLDER* | *1.1.3* | *Other* | | | | |
| FILE | 1.1.3-1 | BBA FY 17 Book and Apparel Sales 4 20 16.xlsx | 04/25/2016 10:08 AM | 11 KB | | Excel Worksheet |
| FILE | 1.1.3-2 | BBA-Base & SIP MONTHLY Revenue Trends-2017.xlsx | 06/01/2016 9:04 AM | 472 KB | | Excel Worksheet |
| *FOLDER* | *1.2* | *YTD Financials* | | | | |
| FILE | 1.2-1 | BBA-YTD Financial Results.xlsx | 07/14/2016 9:44 AM | 588 KB | | Excel Worksheet |
| FILE | 1.2-2 | BBA - Monthly Actuals & Budget (July YTD).xlsx | 09/18/2016 3:38 PM | 482 KB | | Excel Worksheet |
| *FOLDER* | *1.3* | *Audience* | | | | |
| *FOLDER* | *1.3.1* | *Demographics* | | | | |
| FILE | 1.3.1-1 | 1.2.1.1 Brand_Demo_Data-BBA.xlsx | 04/04/2016 6:48 PM | 14 KB | | Excel Worksheet |
| *FOLDER* | *1.3.2* | *Key Metrics* | | | | |
| FILE | 1.3.2-1 | BBA-audience-report_2 16.xlsx | 03/30/2016 2:31 PM | 33 KB | | Excel Worksheet |
| *FOLDER* | *1.4* | *Print* | | | | |
| *FOLDER* | *1.4.1* | *Circulation & Subscriptions* | | | | |
| FILE | 1.4.1-1 | Circulation levels history - BBA.xlsx | 03/30/2016 2:31 PM | 15 KB | | Excel Worksheet |
| FILE | 1.4.1-2 | Revenue Per Copy Subs Sold - BBA.xlsx | 03/30/2016 2:31 PM | 9 KB | | Excel Worksheet |
| FILE | 1.4.1-3 | BBA OnOFF Report.xlsx | 06/10/2016 10:12 AM | 91 KB | | Excel Worksheet |
| FILE | 1.4.1-4 | BBA Average Term.xls | 06/10/2016 10:12 AM | 166 KB | | Excel Worksheet |
| FILE | 1.4.1-5 | BBA Database Counts.xlsx | 06/10/2016 10:13 AM | 11 KB | | Excel Worksheet |
| *FOLDER* | *1.4.2* | *Renewal Rates* | | | | |
| FILE | 1.4.2-1 | Net Renewal Rates - BBA.xlsx | 03/30/2016 2:31 PM | 16 KB | | Excel Worksheet |
| *FOLDER* | *1.4.3* | *Advertising* | | | | |
| FILE | 1.4.3-1 | BBA - Print Metrics.xlsx | 03/30/2016 2:31 PM | 111 KB | | Excel Worksheet |
| FILE | 1.4.3-2 | Top 10 Advertisers - FY16 Print - BBA v2.xlsx | 04/05/2016 11:18 AM | 9 KB | | Excel Worksheet |
| *FOLDER* | *1.5* | *Digital & Other Media* | | | | |
| *FOLDER* | *1.5.1* | *Circulation & Pricing* | | | | |
| FILE | 1.5.1-1 | Digital Circ and Pricing - BBA.xlsx | 03/30/2016 2:31 PM | 337 KB | | Excel Worksheet |
| *FOLDER* | *1.5.2* | *Online Revenue & CPM* | | | | |
| FILE | 1.5.2-1 | Online Revenue & CPM - BBA.xlsx | 04/05/2016 11:29 AM | 18 KB | | Excel Worksheet |
| *FOLDER* | *1.5.3* | *Ad Phasing* | | | | |
| FILE | 1.5.3-1 | Ad Phasing Reports - BBA.xlsx | 03/30/2016 2:31 PM | 315 KB | | Excel Worksheet |
| *FOLDER* | *1.6* | *Miscellaneous* | | | | |
| *FOLDER* | *1.6.1* | *Media Kits* | | | | |
| FILE | 1.6.1-1 | 2016 Baseball America Media Kit.pdf | 03/30/2016 2:31 PM | 3 MB | | PDF |
| FILE | 1.6.1-2 | baseball-america.pdf | 03/30/2016 2:31 PM | 2 MB | | PDF |
| FILE | 1.6.1-3 | 2015 BA Media Kit.pdf | 03/30/2016 2:32 PM | 4 MB | | PDF |
| *FOLDER* | *1.6.2* | *Presentations* | | | | |
| FILE | 1.6.2-1 | BBA vFF.pdf | 05/04/2016 5:44 PM | 991 KB | | PDF |
| *FOLDER* | *1.6.3* | *Surveys* | | | | |
| FILE | 1.6.3-1 | BBA - 2014 Site Redesign Survey Results.xls | 06/01/2016 9:01 AM | 512 KB | | Excel Worksheet |
| FILE | 1.6.3-2 | BBA - January Survey Results.xls | 06/01/2016 9:01 AM | 46 KB | | Excel Worksheet |
| *FOLDER* | *1.7* | *Operations* | | | | |
| *FOLDER* | *1.7.1* | *Employees* | | | | |
| FILE | 1.7.1-1 | lifestyle - orgChart - bba v2.pdf | 06/01/2016 9:06 AM | 55 KB | | PDF |
| *FOLDER* | *1.8* | *Media Services Offering* | | | | |
| FILE | 1.8-1 | Media Service Offerings - BBA.xlsx | 08/31/2016 7:43 PM | 286 KB | | Excel Worksheet |

**Section 1.01(b)**
**Knowledge Group**

1. Tom Slater
2. Marc Bartell
3. Kevin Mullan
4. Diana Malhis
5. Shilpa Joshi
6. Norb Garrett
7. Will Lingo

4837-7657-3760.5

**Section 2.01(a)**
**Accounts Receivable**

| Nat | Sub | Working Capital Y/N | Estimated 1/31/17 balances |
|---|---|---|---|
| 12100 - Trade Receivables | 00000 - NA | Y | 87,070 |
| 12100 - Trade Receivables | 10010 - Advertising Revenue | Y | 50,735 |
| 12100 - Trade Receivables | 10020 - Subscriber Revenue | Y | 10,831 |
| 12100 - Trade Receivables | 10027 - Subscription Digital | Y | 4,163 |
| 12100 - Trade Receivables | 10040 - Direct Sales Revenue - Newsstand - Unit | Y | 103,281 |
| 12100 - Trade Receivables | 10050 - Online Revenue | Y | 70,130 |
| 12100 - Trade Receivables | 10084 - Conference Revenue-Sponsor | Y | 10,000 |
| 12600 - Reserve for Bad Debt | 10010 - Advertising Revenue | Y | (78,921) |
| 12600 - Reserve for Bad Debt | 10020 - Subscriber Revenue | Y | (607) |
| 12900 - Other Receivables | 23570 - Distribution-reship | Y | 140 |
| 12900 - Other Receivables | 23580 - Other | Y | 3,169 |

5

**Section 2.01(c)**
**Contracts**

1. Lease Agreement by and between Alston Avenue Partners, LLC and Baseball America, Inc., dated as of October 26, 2007 (the "Durham Lease Agreement").

2. Sales & Distribution Services Agreement, dated as of April 18, 2011, by and between Simon & Schuster, Inc. and Source Interlink Magazines, LLC with Amendment 1, dated as of November 9, 2012 (the "Simon & Schuster Agreement").

3. ASP Production and Hosting Services Agreement, dated as of August 10, 2009, by and between Olive Software, Inc. and Baseball America. with Annual Renewal Pricing Exhibit, dated as of March 18, 2016 (the "Olive Agreement").

4. License and Distribution Agreement, dated as of April 27, 2016, by and between National Baseball Hall of Fame and Museum, Inc. and Source Interlink Magazines, LLC (the "HOF Agreement").

5. Data Distribution Agreement, dated as of March 1, 2008, by and between MLB Advanced Media, L.P. and Baseball America, Inc. with Amendment, dated as of August 11, 2009, Amendment No. 2, dated as of March 2, 2013 and Amendment No. 3, dated as of March 1, 2014 ("MLBAM Agreement").

## Section 2.01(e)
## Tangible Personal Property

| Nat | Sub | Working Capital Y/N | Estimated 1/31/17 balances |
|---|---|---|---|
| 17130 - Equipment | 00000 - NA | N | 102,235 |
| 17140 - Furnture & Fixtures | 00000 - NA | N | 189 |
| 17160 - Leasehold Improvements | 00000 - NA | N | 8,161 |
| 17420 - Capitalized Labor - External | 00000 - NA | N | 9,371 |
| 17430 - Capitalized Labor - Internal | 00000 - NA | N | 23,285 |
| 17440 - Capitalized Software | 00000 - NA | N | 3,718 |
| 18130 - Accum Depr - Equipment | 00000 - NA | N | (98,025) |
| 18140 - Accum Depr - Furniture & Fixtures | 00000 - NA | N | (189) |
| 18160 - Accum Depr - Leasehold Improvements | 00000 - NA | N | (6,828) |
| 18420 - Accum Depr - Capitalized Labor - External | 00000 - NA | N | (9,371) |
| 18430 - Accum Depr - Capitalized Labor - Internal | 00000 - NA | N | (23,285) |
| 18450 - Accum Depr - Capitalized Software - Website | 00000 - NA | N | (3,718) |

7

**Section 2.01(f)**
**Prepaid Expenses**

| Nat | Sub | Working Capital Y/N | Estimated 1/31/17 balances |
|---|---|---|---|
| 14220 - Prepaid Consumer Marketing Expense | 44479 - Other | Y | 14 |
| 14900 - Other Prepaid Expenses | 00000 - NA | Y | 59,167 |
| 14900 - Other Prepaid Expenses | 13080 - Postage | Y | 3,296 |

8

**Section 2.03(i)**
**Subscriber Liabilities**

| Nat | Sub | Working Capital Y/N | Estimated 1/31/17 balances |
|---|---|---|---|
| 23700 - Deferred Revenue | 00000 - NA | N | (216,638) |
| 23700 - Deferred Revenue | 10020 - Subscriber Revenue | N | (813,692) |
| 23700 - Deferred Revenue | 10022 - Subscriber Revenue-Agency | N | (390) |
| 23700 - Deferred Revenue | 10024 - Subscriber Revenue-Clearing | N | (29,772) |
| 23700 - Deferred Revenue | 10027 - Subscription Digital | N | (21,683) |
| 23700 - Deferred Revenue | 10272 - 3rd Party Deposits | N | (16,576) |

9

**Section 2.03(vii)**
**Other Assumed Liabilities**

| Nat | Sub | Working Capital Y/N | Estimated 1/31/17 balances |
|---|---|---|---|
| 21113 - Accounts Payable Non-Trade | 00000 - N/A | Y | (72,529) |
| 21120 - Accrued Accounts Payable | 23570 - Distribution-Reship | Y | (6,369) |
| 21120 - Accrued Accounts Payable | 23571 - Accrued SC Freight | Y | (821) |
| 21120 - Accrued Accounts Payable | 23572 - Canadian/Foreign Postage | Y | (152) |
| 21120 - Accrued Accounts Payable | 23573 - Free Copy Postage and Freight | Y | (6,032) |
| 21120 - Accrued Accounts Payable | 23574 - Misc | Y | (361) |
| 21120 - Accrued Accounts Payable | 23575 - Subscription Postage | Y | (7,893) |
| 21120 - Accrued Accounts Payable | 23580 - Other | Y | (35,252) |
| 21121 - Accrued Circulation Expense - Ful | 00000 - Not Applicable | Y | (4,761) |
| 21124 - Accrued Circulation Expense - O | 41102 - Wholesaler Incentives | Y | (269) |
| 21125 - Retail Display Allowance | 00000 - Not Applicable | Y | (8,647) |
| 21127 - Accrued Inventory | 00000 - Not Applicable | Y | (37,087) |
| 26400 - Miscellaneous Long Term Liab | 32770 - Deferred Rent | Y | (6,424) |

4837-7657-3760.5

**Section 2.04(vi)**
**Other Excluded Liabilities**

None.

4837-7657-3760.5

**Section 4.03**
**No Conflicts**

1.   Durham Lease Agreement.

2.  Simon & Schuster Agreement.

3.  Olive Agreement.

4.   HOF Agreement.

5.  MLBAM Agreement.

12

**Section 4.05**
**Absence of Certain Changes**

(a)

HOF Agreement.

**Section 4.06**
**Material Contracts**

1.  Durham Lease Agreement.

2.  Simon & Schuster Agreement.

3.  Olive Agreement.

4.  HOF Agreement.

5.  MLBAM Agreement.

4837-7657-3760.5

**Section 4.07**
**Title to Tangible Personal Property**

None.

**Section 4.08**
**Intellectual Property**

(a)

1. HOF Agreement.

2. MLBAM Agreement.

3. Domain Names:
- BASEBALLAMERICA.BIZ
- BASEBALLAMERICA.CO
- BASEBALLAMERICA.COM
- BASEBALLAMERICA.NET
- BASEBALLAMERICA.TV
- BASEBALLAMERICADIGITAL.COM
- BASEBALLAMERICADIGITAL.NET
- Bba.am
- Bbamag.com
- Baseballamericamag.com
- Baseballamericaonline.com

See the Trademarks listed on Exhibit 4.08(a) attached hereto.

(b)

None.

16

Exhibit 4.08(a)

| | |
|---|---|
| **Word Mark** | **BASEBALL AMERICA** |
| **Goods and Services** | IC 016. US 037 038. G & S: PUBLICATIONS, NAMELY NEWSAPERS, BOOKS, AND CALENDARS RELATING TO BASEBALL, PRINCIPALLY ITEMS CONCERNING MINOR LEAGUE AND COLLEGE BASEBALL. FIRST USE: 19821215. FIRST USE IN COMMERCE: 19821215 |
| **Serial Number** | 73466988 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Registration Number** | 1346082 |
| **Owner** | BASEBALL AMERICA INC. CORPORATION NORTH CAROLINA 211 WEST MAIN STREET SUITE 201 DURHAM NORTH CAROLINA 27702 |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |

**Section 4.09**
**Legal Proceedings**

(a)

Seller and/or certain of its Affiliates may be named as a party in a patent infringement claim regarding the use of certain quick response (QR) codes in one of Seller's publications (which publication is not the Publication).

(b)

None.

(c)

None.

**Section 4.10**
**Compliance with Laws**

None.

## Section 4.11
## Employee Benefit Matters

(a)

See Exhibit 4.11(a).

**Life Insurance**: Basic Life Insurance of 1 x annual salary up to $750,000. ADD&D of 1 x annual salary up to $750,000.

**Short Term Disability (STD):** Paid by TEN, STD coverage provided a benefit equal to 60% of earnings up to a maximum of $1.500 per week for a period of 11 weeks.

**Retirement Savings Plan**: 401 (K) offered through Prudential, no employer contribution.

**PTO**:

    **Exempt**: All Exempt Employees have an unlimited PTO plan and do not accrue and hours, etc.

    **Non-Exempt**: Accrue as follows:

| Length of Employment | Bi-Weekly PTO Accrual | Annual PTO Maximum Accrual during the Fiscal |
|---|---|---|
| Hire Date/FT Effective Date to 23 months | 3.696 hours | 12 days |
| 24 to 47 | 4.616 hours | 15 days |
| 48 to 107 | 5.232 hours | 17 days |
| 108 to 179 months | 6.768 hours | 22 days |
| 180 to 999 months | 7.696 hours | 25 days |

PTO will stop accruing when an associate's balance has reached 1.5 times the annual maximum.

**Flexible Spending Account (FSA):** Healthcare FSA, Dependent Care FSA or Limited Purpose FSA are offered.

**Employee Assistance Program (EAP):** Available to all associates and dependents.

**Bonus**: Will Lingo eligible for up to $30,000 paid annually based on performance of business.

(d) None.

(e) None.

19

# Exhibit 4.11(a)

| Name | Position ID | Hire Date | Home Department | Medical | Coverage Level | Medical Per Pay Period EE | Dental | Coverage Level | Dental Per Pay Period for EE | Vision | Coverage Level | Vision Per Payroll Payroll Deduction | TEN Paid Basic Life & AD&D | TEN Paid Basic LTD | TEN Paid Basic STD | COBRA Cost Medical | COBRA Cost Dental | COBRA Cost Vision |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Badler, Benjamin | P1W051094 USA | 07/27/2017 | 893300 - Basebal | EPO - Out of Stat | Employee | $ 85.91 | Dental PPO | Employee | $ 6.61 | Waive Vision | N/A | $ - | 1X annual Sal | 40% of Earni | 60% of earni | $ 584.50 | $ 39.65 | $ - |
| Cahill, Edward | P1W056774 USA | 04/13/2015 | 893300 - Basebal | EPO - Out of Stat | Employee | $ 85.94 | Dental PPO | Employee | $ 6.61 | Vision | Employee | $ 2.86 | 1X annual Sal | 40% of Earni | 60% of earni | $ 584.50 | $ 39.65 | $ 6.32 |
| Carpenter, Haley | P1W051088 USA | 04/11/2011 | 893382 - Basebal | EPO - Out of Stat | Employee + 1 | $ 216.88 | Dental PPO | Employee + 1 | $ 14.14 | Vision | Employee + 1 | $ 4.13 | 1X annual Sal | 40% of Earni | 60% of earni | $ 1,753.41 | $ 84.82 | $ 9.12 |
| Cooper, Jackie | P1W051091 USA | 09/16/2002 | 893300 - Basebal | EPO - Out of Stat | Employee + Family | $ 216.88 | Dental PPO | Employee + Family | $ 20.08 | Vision | Employee + 1 | $ 4.13 | 1X annual Sal | 40% of Earni | 60% of earni | $ 1,753.41 | $ 121.19 | $ 9.12 |
| Eddy, Matthew | P1W051092 USA | 06/07/2000 | 893300 - Basebal | EPO - Out of Stat | Employee | $ 85.94 | Dental PPO | Employee | $ 6.51 | Vision | Employee | $ 2.86 | 1X annual Sal | 40% of Earni | 60% of earni | $ 584.50 | $ 39.65 | $ 6.32 |
| Glaser, Kyle | P1W056776 USA | 05/27/2016 | 893300 - Basebal | EPO - Out of Stat | Employee | $ 85.94 | Dental DHMO | Employee | $ 1.58 | Vision | Employee | $ 2.86 | 1X annual Sal | 40% of Earni | 60% of earni | $ 584.50 | $ 13.07 | $ 6.32 |
| Lavanna, Michael Josef | P1W056772 USA | 17/01/2014 | 893700 - Basebal | EPO - Out of Stat | Employee | $ 85.94 | Dental PPO | Employee | $ 6.61 | Vision | Employee | $ 2.86 | 1X annual Sal | 40% of Earni | 60% of earni | $ 584.50 | $ 39.65 | $ 6.32 |
| Langdon, Abagail Eliza | P1W054767 USA | 10/01/2013 | 393301 - Basebal | EPO - Waive Medical | N/A | | Dental PPO | Employee | $ 6.61 | Waive Vision | N/A | $ - | 1X annual Sal | 40% of Earni | 60% of earni | $ - | $ 39.65 | $ - |
| Lovitt, Brent | P1W051097 USA | 09/17/2007 | 893302 - Basebal | EPO - Out of Stat | Employee + 1 | $ 297.21 | Dental PPO | Employee + 1 | $ 14.14 | Vision | Employee + 1 | $ 4.13 | 1X annual Sal | 40% of Earni | 60% of earni | $ 1,673.60 | $ 84.82 | $ 9.12 |
| Luli, Kristopher | P1W051100 USA | 06/10/2010 | 893301 - Basebal | EPO - Out of Stat | Employee + Family | $ 216.88 | Dental PPO | Employee + Family | $ 20.08 | Vision | Employee + Family | $ 7.59 | 1X annual Sal | 40% of Earni | 60% of earni | $ 1,753.41 | $ 121.19 | $ 16.34 |
| Manuel, John | P1W051081 USA | 01/01/1996 | 893300 - Basebal | EPO - Out of Stat | N/A | | Waive Dental | N/A | $ - | Vision | Employee | $ 2.86 | 1X annual Sal | 40% of Earni | 60% of earni | $ 584.50 | | $ 6.32 |
| McCabe, Ronald | P1W051102 USA | 01/21/1987 | 893301 - Basebal | EPO - Out of Stat | Employee + 1 | $ 154.78 | Dental PPO | Employee + 1 | $ 14.14 | Vision | Employee + 1 | $ 4.13 | 1X annual Sal | 40% of Earni | 60% of earni | $ 1,230.64 | $ 84.82 | $ 9.12 |
| McDaniel, Sara | P1W051098 USA | 08/26/2013 | 893300 - Basebal | EPO - Out of Stat | Employee | $ 71.54 | Dental PPO | Employee | $ 6.61 | Vision | Employee | $ 2.86 | 1X annual Sal | 40% of Earni | 60% of earni | $ 449.62 | $ 39.65 | $ 6.32 |
| Norris, Josh | P1W054395 USA | 08/19/2013 | 893300 - Basebal | EPO - Out of Stat | Employee | $ 85.94 | Dental PPO | Employee | $ 6.61 | Vision | Employee | $ 2.86 | 1X annual Sal | 40% of Earni | 60% of earni | $ 584.50 | $ 39.65 | $ 6.32 |
| Richards, Edward | P1W054994 USA | 02/26/2010 | 893301 - Basebal | EPO - Out of Stat | Employee | $ 85.94 | Dental PPO | Employee | $ 6.61 | Vision | Employee | $ 2.86 | 1X annual Sal | 40% of Earni | 60% of earni | $ 584.50 | $ 39.65 | $ 6.32 |
| Sarzynak, Larry | P1W05864 USA | 11/09/2015 | 893301 - Basebal | EPO - Out of Stat | Employee | $ 85.94 | Dental PPO | Employee | $ 6.61 | Vision | Employee | $ 2.86 | 1X annual Sal | 40% of Earni | 60% of earni | $ 584.50 | $ 39.65 | $ 6.32 |
| Shelton, George | P1W051103 USA | 12/01/2013 | 893701 - Basebal | EPO - Out of Stat | Employee + Family | $ 216.83 | Dental PPO | Employee + Family | $ 20.08 | Waive Vision | N/A | $ - | 1X annual Sal | 40% of Earni | 60% of earni | $ 1,753.41 | $ 121.19 | $ - |
| Showord, James | P1W051086 USA | 03/17/2008 | 893300 - Basebal | EPO - Out of Stat | N/A | | Waive Dental | N/A | $ - | Vision | Employee | $ 2.86 | 1X annual Sal | 40% of Earni | 60% of earni | $ 584.50 | | $ 6.32 |
| Webb, Linwood | P1W051080 USA | 01/24/2011 | 893302 - Basebal | EPO - Out of Stat | Employee + Family | $ 216.88 | Dental PPO | Employee + 1 | $ 20.08 | Vision | Employee + 1 | $ 4.13 | 1X annual Sal | 40% of Earni | 60% of earni | $ 1,753.41 | $ 121.19 | $ 9.12 |

**Section 4.12**
**Employment Matters**

(a) See attached Exhibit 4.12(a)

(b) None.

20

**Exhibit 4.12(a)**

| BBA Staffing | | | | | | |
|---|---|---|---|---|---|---|
| ClockID | Name | Business Title | Most Recent DOH | Hourly Rate | Annual Rate | Location |
| 51084 | Badler,Benjamin | National Writer | 7/23/2007 | $22.8366 | $47,500.13 | TEN HOME MA |
| 56774 | Cahill,Edward | National Writer, Baseball America | 4/13/2015 | $16.8270 | $35,000.16 | Durham, NC |
| 51088 | Carpenter,Hailey | Accounting/Office Manager | 4/11/2011 | $17.3319 | $36,050.35 | Durham, NC |
| 51091 | Cooper,Jackie | Managing Editor | 9/16/2002 | $24.5193 | $51,000.14 | Durham, NC |
| 51092 | Eddy,Matthew | Assoc Editor | 6/7/2000 | $19.6155 | $40,800.24 | Durham, NC |
| 56956 | Glaser,Kyle | Assistant Editor, Baseball America | 5/23/2016 | $16.8270 | $35,000.16 | Durham, NC |
| 56722 | Lananna,Michael | Assistant Editor, Baseball America | 12/1/2014 | $13.4616 | $28,000.13 | Durham, NC |
| 54767 | Langdon,Abagail | Marketing Manager, Baseball America | 10/1/2013 | $17.3077 | $36,000.02 | Durham, NC |
| 51097 | Lewis,Brent | Technology Manager | 9/17/2007 | $20.6732 | $43,000.26 | Durham, NC |
| 51080 | Lingo,Wilbur | GM, Baseball America | 6/13/1994 | $50.4808 | $105,000.06 | Durham, NC |
| 51100 | Lull,Kristopher | Marketplace Manager | 6/7/2010 | $16.9472 | $35,250.18 | Durham, NC |
| 51081 | Manuel,John | Editor in Chief | 1/1/1996 | $43.6443 | $90,780.14 | Durham, NC |
| 51102 | Mccabe,Ronald | Customer Service Rep | 1/23/1987 | $20.6973 | $43,050.38 | Durham, NC |
| 51098 | McDaniel,Sara | Production Manager | 8/26/2013 | $35.4808 | $73,800.06 | Durham, NC |
| 54395 | Norris,Josh | News Editor, Baseball America | 8/19/2013 | $18.7500 | $39,000.00 | Durham, NC |
| 56994 | Richards,Edward | Account Executive, Baseball America | 8/22/2016 | $16.8270 | $35,000.16 | Durham, NC |
| 56864 | Sarzyniak,Larry | Digital Sales Manager, Baseball America | 11/30/2015 | $31.2500 | $65,000.00 | Durham, NC |
| 51103 | Shelton,George | Advertising Director | 12/2/2013 | $34.3270 | $71,400.16 | Durham, NC |
| 51086 | Shonerd,James | Assistant Editor | 3/17/2008 | $12.3799 | $25,750.19 | Durham, NC |
| 51089 | Webb,Linwood | Marketing Manager, Baseball America | 1/24/2011 | $19.6193 | $40,808.14 | Durham, NC |

| Vendor Name | Vendor# | Dept | Current Relationship | Description |
|---|---|---|---|---|
| BAGGARLY, ANDREW | 88767 | Edit | BBA | Freelancer - Ediorial |
| BALLEW, WILLIAM | 88782 | Edit | BBA | Freelancer - Ediorial |
| BATTLE, RICHARD W. | 99641 | Edit | BBA | Freelancer - Ediorial |
| BELINSKY, HUDSON | 95980 | Edit | BBA | Freelancer - Ediorial |
| DAVIDI, SHI | 93571 | Edit | BBA | Freelancer - Ediorial |
| DEROSA, TOMASSO | 88903 | Edit | BBA | Freelancer - Ediorial |
| DIGIOVANNA, MICHAEL | 91384 | Edit | BBA | Freelancer - Ediorial |
| DIVISH, RYAN E | 93187 | Edit | BBA | Freelancer - Ediorial |
| ESKEW, ALAN | 88904 | Edit | BBA | Freelancer - Ediorial |
| ETKIN, JACK | 88766 | Edit | BBA | Freelancer - Ediorial |
| FARLOW, TONY | 88765 | Edit | BBA | Freelancer - Ediorial |
| GAMMONS, PETER W | 88997 | Edit | BBA | Freelancer - Ediorial |
| GIERHART, PAUL | 90437 | Edit | BBA | Freelancer - Ediorial |
| GOOLD, DERRICK | 89034 | Edit | BBA | Freelancer - Ediorial |
| GOREN, LARRY | 88775 | Edit | BBA | Freelancer - Ediorial |
| GREGOR, SCOT A | 93170 | Edit | BBA | Freelancer - Ediorial |
| GURGANUS, ROBERT | 88821 | Edit | BBA | Freelancer - Ediorial |
| HAUDRICOURT, TOM | 88781 | Edit | BBA | Freelancer - Ediorial |
| INGRAHAM, JAMES R | 95417 | Edit | BBA | Freelancer - Ediorial |
| IOTT, CHRISTOPHER J | 94461 | Edit | BBA | Freelancer - Ediorial |
| KAPLAN, JAKE | 98898 | Edit | BBA | Freelancer - Ediorial |
| KENNEY, KIRK D | 90316 | Edit | BBA | Freelancer - Ediorial |
| KING, GEORGE ANTHONY | 89818 | Edit | BBA | Freelancer - Ediorial |
| KLINE, CARL | 88887 | Edit | BBA | Freelancer - Ediorial |
| KRASOVIC, TOM | 89584 | Edit | BBA | Freelancer - Ediorial |
| KUBATKO, ROCH ERIC | 89332 | Edit | BBA | Freelancer - Ediorial |
| LUSK, LACY JR | 88907 | Edit | BBA | Freelancer - Ediorial |
| MIKE JANES PHOTOGRAPHY LLC | 88817 | Edit | BBA | Freelancer - Ediorial |
| MILLER, PHILLIP W | 88908 | Edit | BBA | Freelancer - Ediorial |
| MITCHELL, WILLIAM | 88776 | Edit | BBA | Freelancer - Ediorial |
| NICHOLS, WILLIAM | 88772 | Edit | BBA | Freelancer - Ediorial |
| PARKER, DANIEL LEE | 89694 | Edit | BBA | Freelancer - Ediorial |
| PERROTTO, JOHN | 89283 | Edit | BBA | Freelancer - Ediorial |
| PIECORO, NICK | 96192 | Edit | BBA | Freelancer - Ediorial |
| PRIDDY, TOM | 88771 | Edit | BBA | Freelancer - Ediorial |
| RINGOLSBY, TRACY | 88837 | Edit | BBA | Freelancer - Ediorial |
| ROSECRANS, CHARLES TRENT | 91795 | Edit | BBA | Freelancer - Ediorial |
| RUBIN, ADAM | 94365 | Edit | BBA | Freelancer - Ediorial |
| SALISBURY, JAMES T | 89208 | Edit | BBA | Freelancer - Ediorial |
| SPEIER, ALEXANDER | 90043 | Edit | BBA | Freelancer - Ediorial |
| STARK, JAYSON | 88841 | Edit | BBA | Freelancer - Ediorial |
| TEFERTILLER, CASEY | 63201 | Edit | BBA | Freelancer - Ediorial |
| TOPKIN, MARC | 88836 | Edit | BBA | Freelancer - Ediorial |
| TRAP, PAUL | 88818 | Edit | BBA | Freelancer/Edit |
| VILLA, WALTER | 89243 | Edit | BBA | Freelancer - Ediorial |
| WELCH, CLIFF | 88770 | Edit | BBA | Freelancer - Ediorial |
| WESTERHOLT, BRIAN | 88805 | Edit | BBA | Freelancer - Ediorial |
| WILLIAMSON, JOHN | 88769 | Edit | BBA | Freelancer - Ediorial |
| WILSON, JEFF | 89050 | Edit | BBA | Freelancer - Ediorial |
| WITTENMYER, GORDON W | 94827 | Edit | BBA | Freelancer - Ediorial |
| WOLFSTEIN, EDWARD | 88768 | Edit | BBA | Freelancer - Ediorial |
| WOOD, RODGER | 88779 | Edit | BBA | Freelancer - Ediorial |
| WOOLLEY, ANDREW | 88953 | Edit | BBA | Freelancer - Ediorial |

**Section 4.13**
**Taxes**

None.

4837-7657-3760.5

**Section 4.14(b)**
**Leases**

1.  Durham Lease Agreement.

**Section 4.15**
**Brokers**

1.  Moelis & Company.

**Section 4.17**
**Financial Statements**

(see attached Exhibit 4.17)

4837-7657-3760.5

**Exhibit 4.17**

| Sum of Estimated 1/31/17 balances | | |
|---|---|---|
| **Working Capital Y/N** | **Nat** | **Total** |
| Y | 12100 - Trade Receivables | 293,570 |
| | 12600 - Reserve for Bad Debt | (33,129) |
| | 12900 - Other Receivables | 55,413 |
| | 14220 - Prepaid Consumer Marketing Expense | 14 |
| | 14900 - Other Prepaid Expenses | 4,167 |
| | 19110 - Deposits - Non-current | 5,045 |
| | 21113 - Accounts Payable Non-Trade | (203,692) |
| | 21120 - Accrued Accounts Payable | (75,237) |
| | 21125 - Retail Display Allowance | (6,641) |
| | 22100 - Salary Payable | (33,802) |
| | 26400 - Miscellaneous Long Term Liab | (6,424) |
| **Y Total** | | **(716)** |
| N | 17130 - Equipment | 102,235 |
| | 17140 - Furnture & Fixtures | 189 |
| | 17160 - Leasehold Improvements | 8,161 |
| | 17420 - Capitalized Labor - External | 9,371 |
| | 17430 - Capitalized Labor - Internal | 23,285 |
| | 17440 - Capitalized Software | 3,718 |
| | 17482 - Inserts-Asset-17/9 (monthly/weekly) months | 6,164 |
| | 17483 - Renewals-Assets-19/10 (monthly/weekly) months | 32,129 |
| | 17484 - Gifts-Assets-12 months | 7,944 |
| | 18130 - Accum Depr - Equipment | (98,025) |
| | 18140 - Accum Depr - Furniture & Fixtures | (189) |
| | 18160 - Accum Depr - Leasehold Improvements | (6,828) |
| | 18420 - Accum Depr - Capitalized Labor - External | (9,371) |
| | 18430 - Accum Depr - Capitalized Labor - Internal | (23,285) |
| | 18450 - Accum Depr - Capitalized Software - Website | (3,718) |
| | 18482 - Inserts-Accum Amort-17 months | (3,033) |
| | 18483 - Renewals-Accum Amort-19 months | (15,244) |
| | 18484 - Gifts-Accum Amort-12 months | (3,199) |
| | 19820 - Goodwill | (320,102) |
| | 19870 - Content Repurpose | 513,863 |
| | 19871 - Content Repurpose Labor | 248,019 |
| | 20020 - Accum Amort - Goodwill | 125,373 |
| | 20070 - Accum Amort - Content Repurpose | (393,996) |
| | 20071 - Accum Amort - Content Repurpose Labor | (178,362) |
| | 21500 - Taxes Payable - Current | (76) |
| | 23700 - Deferred Revenue | (1,030,812) |
| **N Total** | | **(1,005,788)** |
| **Grand Total** | | **(1,006,504)** |

CONFIDENTIAL

**Baseball America Summary**

*$k*

**FY 2017**

TEN — THE ENTHUSIAST NETWORK — POWERED BY PASSIONS

| | Act+Frcst 2017 |
|---|---|
| **REVENUE** | |
| Print Advertising | $ 493.0 |
| Subscriber - Print | 1,788.5 |
| Newsstand | 443.3 |
| Digital Media | 482.2 |
| Video Programming | 6.4 |
| Production | 1.3 |
| Experiential Media | 62.1 |
| Barter, Licensing & Other | 44.2 |
| **Total Revenue** | **$ 3,320.9** |
| | |
| **EXPENSES** | |
| Cost of Goods - Print | 719.3 |
| Cost of Goods - Digital | 64.5 |
| Cost of Goods - Video Programming | 0.1 |
| Cost of Goods - Production | - |
| Cost of Goods - Experiential | 50.5 |
| Cost of Goods - Other | 11.5 |
| Consumer Marketing - Print | 138.6 |
| Content & Art | 877.1 |
| Sales & Marketing | 868.8 |
| Direct Overhead - Digital | 116.3 |
| Direct Overhead - Other | 405.6 |
| **Total Expenses** | **$ 3,252.5** |
| Add back: One Time Items | 0.0 |
| | |
| **Adjusted EBITDA** | **$68.4** |
| *% Margin* | *2.1%* |
| Capitalized Content | (199.0) |
| **EBITDA Less Capex** | **($130.5)** |
| *% Margin* | *(3.9%)* |

**Section 4.19**
**Insurance**

(see attached Exhibit 4.19)

25

Exhibit 4.19

| TEN Summary - As of 10/20/16 | | Next Renewal Date | Carrier | Policy Number |
|---|---|---|---|---|
| **MANAGEMENT / PROFESSIONAL LIABILITY** | | | | |
| Media, Privacy, Network, Misc E&O Liability | ($10 million) | 05/01/17 | Beazley Insurance Co., Inc. / Lloyds | W15KFJ160801 |
| Directors & Officers Liability - $5M Primary | ($5 million) | 06/19/17 | Starr Indemnity & Liability Company | 1000055964161 |
| Directors & Officers Liability - $5M xs $5M | ($10 million) | 06/19/17 | AIG: National Union Fire Ins. of Pittsburg, PA | 15283871 |
| Directors & Officers Liability - $ 5M xs $10M | ($15 million) | 06/19/17 | Chubb: Executive Risk Indemnity | 8237-1036 |
| Directors & Officers Liability - $ 5M xs $15M | ($20 million) | 06/19/17 | Endurance Risk Solutions Assurance Company | DOX10009378200 |
| Directors & Officers Liability - $ 5M xs $20M | ($25 million) | 06/19/17 | Liberty Insurance Underwriters, Inc. | DOATAA51YX002 |
| Employment Practices Liability | ($5 million) | 06/19/17 | AIG: National Union Fire Ins. of Pittsburg, PA | 15012730 |
| Fiduciary Liability | ($ 5 million) | 06/19/17 | AIG: National Union Fire Ins. of Pittsburg, PA | 15012730 |
| Corporate Counsel Liability | ($ 2 million) | 06/19/17 | AIG: Illinois National Insurance Company | 15012730 |
| Crime (1st Party) | ($ 2 million) | 06/19/17 | AIG: National Union Fire Ins. of Pittsburg, PA | 15012730 |
| **PROPERTY COVERAGES** | | | | |
| Inland Marine Equipment Floater  (Leased Cameras/Misc) | | 04/15/17 | Hartford Fire Insurance Company | 21MSAN7432 |
| Property (with $2.5M California EQ) | ($35 million loss limit) | 05/01/17 | Affiliated FM Insurance Company | GM674 |
| Excess California Earthquake | ($10M xs $2.5M) | 05/01/17 | Westchester Surplus Lines Insurance Company | I08899885003 |
| Excess California Earthquake | ($5M xs $12.5M) | 05/01/17 | Essex Insurance Company | MKLX14XP006508 |
| **CASUALTY COVERAGES** | | | | |
| General Liability | | 07/01/17 | Milestone Captive - Old Republic Insurance Compa | MWZY 307807 |
| Automobile Liability & Physical Damage | | 07/01/17 | Milestone Captive - Old Republic Insurance Compa | MWTB 307809 |
| Workers Compensation | | 07/01/17 | Milestone Captive - Old Republic Insurance Compa | MWC 307807 |
| - Captive Operating Costs | | 07/01/17 | Milestone Captive - Old Republic Insurance Company | |
| - Captive Estimated Surcharges / Assessments | | 07/01/17 | Milestone Captive - Old Republic Insurance Company | |
| - Captive Terrorism | | 07/01/17 | Milestone Captive - Old Republic Insurance Company | |
| - Captive Collateral | | 07/01/17 | Milestone Captive - Old Republic Insurance Company | |
| Foreign Package Policy | | 07/01/17 | AIG: Insurance Co. of State of Pittsburg, PA | WS11006294 |
| Umbrella Liability - $25M Lead | | 07/01/17 | XL Specialty Insurance Company | US00072833LI16A |
| Excess Liability   - $25M x $25M Excess | | 07/01/17 | Chubb: Federal Insurance Company | 79891332 |
| Excess Liability   - $25M x $50M Excess | ($75 million total) | 07/01/17 | Liberty: Ohio Casulty Insurance Company | ECO(17)55769422 |
| **SPECIALTY COVERAGES** | | | | |
| Aviation - Unmanned Aircraft (Drones) | ($ 5 million) | 05/01/17 | Global Aerospace, Inc. | 9000256 |
| Racing Events  - Sponsors Liability | ($ 1 million) | 02/28/17 | ACE Insurance Company | OGLG27299465 |
| Racing Events  - Promoted Events Liability | ($ 1 million) | 02/28/17 | ACE Insurance Company | OGLG27299477 |
| Racing Events  - Excess Liability | ($ 10 million) | 02/28/17 | ACE Property & Casualty Insurance Company | M00811518 |
| Racing Events  - Participant Accident | | 02/28/17 | ACE American Insurance Company | N0025583A-TEN |
| Event Cancellation:  Auto Shows | Per Event - Seasonal Policy | 08/01/17 | Lloyds of London | L009735 |
| Collector Vehicles - Physical Damage | | 10/10/17 | AIG: AIG Property Casualty Company | PCG0040006472 |
| Environmental Liability (El Segundo gasoline storage) | | 07/25/17 | Zurich: Steadfast Insurance Company | ZRE593222701 |
| Wells Fargo Insurance Services: Brokerage, Marketing / Placement, Loss Control Site / Event Visits and Reports, Claims and Certificates of Insurance | | 12/07/16 | 3-Year Client Service Agreement:  $90,000 for 12/07/14 - 12/07/15; $80,000 for 12/07/15 - 12/07/16;  $65,000 for 12/07/16 - 12/07/17. | |

**Section 5.03**
**No Conflicts**

None.

**Section 5.04**
**Brokers**

1. Inner Circle Sports

**Section 5.07**
**Legal Proceedings**

None.

**Section 6.01(a)**
**Transferred Employees**

Ben Badler                           Jim Shonerd

Teddy Cahill                         Linwood Webb

Hailey Carpenter

J.J. Cooper

Matt Eddy

Kyle Glaser

Nicholas Johnson

Michael Lananna

AbagailLangdon

Vincent Lara-Cinisomo

Brent Lewis

Will Lingo

Kristopher Lull

John Manuel

Ronnie McCabe

Sara McDaniel

Josh Norris

Edward Richards

Larry Sarzyniak

George Shelton

29

# EXHIBIT C


*www.rimonlaw.com*

March 8, 2018

**<u>VIA EMAIL</u>**

TEN:  The Enthusiast Network, LLC
TEN:  The Enthusiast Network Magazines, LLC
Grind Media, LLC
831 South Douglas Street
El Segundo, CA  90245
Attention:  Chief Financial Officer

Re:  Direct Claim Notice

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement dated February 17, 2017 (the "Agreement") among TEN:  The Enthusiast Network, LLC, TEN:  The Enthusiast Network Magazines, LLC and Grind Media, LLC (collectively, the "Sellers") and Alliance Baseball BBA, LLC (the "Buyer").  Capitalized terms used herein and not defined herein shall have the meaning ascribed thereto in the Agreement.

On behalf of our client Buyer and pursuant to Section 7.05(c) of the Agreement, Buyer hereby notifies Sellers that it is hereby making a Direct Claim for misrepresentations by Sellers contained in Section 4.06 and Section 4.17 of the Agreement.

Buyer hereby claims that (i) the Financial Statements provided by Sellers misrepresented the financial condition of the Publication and (ii) Sellers failed to disclose Material Contracts.   Specific details of the Direct Claim are as follows:

- With roughly the same number of books and magazine subscriptions sold by Baseball America Enterprises, LLC ("BAE") in FY2018 as sold by Sellers during FY2017, total subscriber and newsstand revenue was misrepresented by Sellers by roughly $489,700 ($2,232,000 as represented by Sellers in the Agreement and $1,742,000 as actual by BAE).

- Although BAE printed less books and about the same number of magazines as Sellers for the same period, total cost of print goods sold reported by Sellers was $719,000 and cost of print goods sold by BAE for the same period was $1,091,300 resulting in an understatement by Sellers of cost of print good sold of $372,300.

- As a result, you can see that with an overstatement of revenue by Sellers of $489,700 and an understatement of costs of print goods sold by Sellers equal to $372,300, Sellers misrepresented the financial performance of the Publication and damaged Buyer in the amount of $862,000.

- In addition, Sellers failed to disclose the existence several Material Contracts that Buyer and BAE are obligated under.  These Material Contracts include contracts with Palm Coast Data



($36,000 per year), Wolfe ISP ($48,000 per year), Major League Baseball Winter Meetings sponsorship agreement ($30,000 plus activation costs), Allen Simpson book contract and various digital platform contracts with Barnes and Noble, Magster and Google.   We believe that the failure to disclose these Material Contracts obligated Buyer and BAE to additional costs of over $125,000 that it had not anticipated and budgeted for in purchasing the Publication and related assets from Sellers.

In addition, Buyer has reason to believe that the misrepresentations made by Sellers outlined in this notification resulted directly from the fraudulent actions of Sellers and its agents and accordingly is making this claim under Section 7.02(a) of the Agreement.   Accordingly, Buyer hereby requests that Sellers pay to Buyer damages in a total amount of $987,000 plus legal fees and expenses.

Very truly yours,

Matthew D. Pace


cc:   Zuckerman Gore Brandeis & Crossman, LLP
      Eleven Times Square
      Fifteenth Floor
      New York, NY  10036
      Attention:  Clifford A. Brandeis, Esq.

# EXHIBIT D

**TEN: The Enthusiast Network, LLC**
**TEN: The Enthusiast Network Magazines, LLC**
**Grind Media, LLC**
831 South Douglas Street
El Segundo, CA  90245

April 4, 2018

<u>**Via Electronic Mail**</u>

Zukerman Gore Brandeis & Crossman, LLP
Eleven Times Square
New York, NY 10036
Attn: Clifford A. Brandeis, Esq.

Re:      <u>Indemnification Notice</u>

Ladies and Gentlemen:

Reference is hereby made to that certain escrow agreement entered into by and among TEN: The Enthusiast Network, LLC, TEN: The Enthusiast Network Magazines, LLC, Grind Media, LLC, Alliance Baseball BBA, LLC and Zukerman Gore Brandeis & Crossman, LLP, dated as of February 13, 2017 (the "Escrow Agreement").  Except as otherwise expressly set forth herein to the contrary, all capitalized terms set forth in this correspondence shall have the meanings ascribed to them in the Escrow Agreement.

The Sellers are in receipt of the Indemnification Notice dated March 8, 2018 delivered by Buyer's counsel.  Please be advised that in accordance with the provisions of Section 3(b) of the Escrow Agreement, Sellers object to all Indemnification Claims set forth or referenced in the Indemnification Notice, and this correspondence shall constitute Sellers' Dispute Notice. Accordingly, the Escrow Agent shall not distribute any Escrow Funds to the Buyer until there has been a resolution of the matters that are the subject to the Indemnification Notice in accordance with the provisions of Section 3(b) of the Escrow Agreement.

Please be advised that the Sellers object to all the Indemnification Claims, including those described in the Direct Claim Notice that was transmitted by Buyer with the Indemnification Notice.  The Direct Claim is without merit for the reasons previously communicated by the Sellers to Buyer orally and by electronic mail.  Specifically, Sellers did not misrepresent the financial condition of the Publication in the Financial Statements nor fail to disclose Material Contracts.  The alleged "details" of the Direct Claims set forth in the Direct Claim Notice do not cite any misrepresentation or errors in the Financed Statements, but simply complain about Buyer's own financial results following Buyer's acquisition of the Publication. In addition, the contracts that Buyer asserts were not disclosed were either disclosed by Seller or were not material in accordance with Section 4.06 of the Asset Purchase Agreement.

4821-0237-6032, v. 3

Very truly yours,

TEN: The Enthusiast Network, LLC


By: _____
     Name: Kevin Mullen
     Title:   Authorized Signatory


TEN: The Enthusiast Network Magazines, LLC


By: _____
     Name: Kevin Mullen
     Title:   Authorized Signatory


Grind Media, LLC


By: _____
     Name: Kevin Mullen
     Title:   Authorized Signatory


cc:   <u>Via Electronic Mail</u>

     Alliance Baseball BBA, LLC
     318 West 39th Street, 8th Floor
     New York, NY 10018
     Attn: Gary Green
     (<u>ggreen@alliance.us</u>)


     Rimon P.C.
     245 Park Avenue, 39th Floor
     New York, NY 10168
     Attn: Matthew Pace, Esq.
     (<u>matthew.pace@rimonlaw.com</u>)